Nos. 23-1535, 23-1645

---

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

L.M., a minor by and through his father and stepmother and natural guardians, Christopher and Susan Morrison,

*Plaintiff-Appellant,*

v.

TOWN OF MIDDLEBOROUGH, MASSACHUSETTS; MIDDLEBOROUGH SCHOOL COMMITTEE; CAROLYN J. LYONS, Superintendent, Middleborough Public Schools, in her official capacity; HEATHER TUCKER, Acting Principal, Nichols Middle School, in her official capacity,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Massachusetts, Eastern Division
Case No. 1:23-cv-11111-IT

---

## APPELLANT'S OPENING BRIEF

---

TYSON C. LANGHOFER
P. LOGAN SPENA
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@ADFlegal.org
lspena@ADFlegal.org

ANDREW D. BECKWITH
SAMUEL J. WHITING
MASSACHUSETTS FAMILY INSTITUTE
401 Edgewater Pl., Ste. 580
Wakefield, MA 01880
(781) 569-0400
andrew@mafamily.org
sam@mafamily.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

RORY T. GRAY
DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org
dcortman@ADFlegal.org

*Attorneys for Appellant*

## DISCLOSURE STATEMENT

L.M., his father, and stepmother are natural persons with no parent corporations or stockholders.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ................x

STATEMENT OF JURISDICTION .........................................................1

STATEMENT OF ISSUES .......................................................................3

INTRODUCTION .....................................................................................4

STATEMENT OF THE CASE ..................................................................6

    A.    L.M. and Middleborough Public Schools ................................6

    B.    L.M. wears a "There are only two genders" t-shirt to school and the principal forces him to return home..............7

    C.    Middleborough's superintendent ratifies the ban on L.M.'s "There are only two genders" t-shirt ..........................9

    D.    L.M. asks the Middleborough School Committee to uphold his free-speech rights. ................................................11

    E.    The Massachusetts Family Institute reaches out to Middleborough on L.M.'s father's behalf, but the district refuses to respect L.M.'s free-speech rights.............13

    F.    L.M. wears a "There are censored genders" t-shirt to school and the principal forces him to remove it..................14

    G.    The ongoing chilling of L.M.'s free-speech rights................15

    H.    District court proceedings....................................................16

        1.    Procedural history......................................................16

        2.    The district court's ruling on L.M.'s preliminary-injunction request ......................................................16

        3.    L.M.'s appeals are consolidated ..................................19

SUMMARY OF THE ARGUMENT ......................................................... 20

ARGUMENT ...................................................................... 21

I.  Standard of Review ................................................... 21

II. L.M. is entitled to judgment as a matter of law on his free-speech claim because his t-shirts' messages did not invade other students' rights. .................................................... 21

   A.  *Tinker*'s "rights of others" language applies to students, not teachers. ........................................................... 22

   B.  Five principles from the *Tinker* decision clarify what it means to impinge on other students' rights. ........................ 23

   C.  These five *Tinker* principles show that L.M.'s messages didn't impinge on other students' rights. ........................... 26

   D.  Other Supreme Court decisions illuminate what collides with the rights of others: L.M.'s t-shirts messages don't qualify, not even close. ................................. 30

   E.  This Court's precedent confirms that L.M.'s t-shirt messages didn't infringe other students' rights. ................. 33

   F.  Ruling that L.M.'s speech intruded on other students' rights would conflict with decisions by six circuits. ............. 37

   G.  The district court's cited authority is off base. ..................... 40

III. L.M. is entitled to judgment as a matter of law on his free-speech claim because Middleborough couldn't reasonably forecast that his t-shirt messages would result in material and substantial interference at school ........................................... 40

   A.  Supreme Court precedent shows that Middleborough couldn't reasonably forecast substantial disruption as a result of L.M.'s t-shirt messages. ......................................... 41

B. Decisions by other circuits show that Middleborough's prediction of substantial disruption was unjustified and unreasonable. ................................................. 46

IV. Certain provisions of the school dress code are unconstitutional both facially and as-applied to L.M.'s speech. ................................................................. 51

A. The First and Fourteenth Amendment's requirements for speech policies. ............................................... 51

B. Middleborough's ban on messages that officials deem "hate speech" is unconstitutional. ........................... 52

C. The district's prohibition on messages "target[ing] groups" is unconstitutional. ................................. 54

D. Middleborough's ban on "unacceptable" messages that defy "community standards" is unconstitutional ................ 54

CONCLUSION ................................................................. 55

CERTIFICATE OF COMPLIANCE .......................................... 57

CERTIFICATE OF SERVICE ................................................ 58

ADDENDUM TABLE OF CONTENTS ..................................... A-1

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
    143 S. Ct. 2298 (2023) ............................................................ 28, 49

*Alexander v. United States,*
    509 U.S. 544 (1993) ...................................................................... 51

*B.H. ex rel. Hawk v. Easton Area School District,*
    725 F.3d 293 (3d Cir. 2013) ................................................... 43, 46

*Bair v. Shippensburg University,*
    280 F. Supp. 2d 357 (M.D. Pa. 2003) ........................................... 53

*Bethel School District No. 403 v. Fraser,*
    478 U.S. 675 (1986) ...................................................................... 31

*Blackwell v. Issaquena County Board of Education,*
    363 F.2d 749 (5th Cir. 1966) .................................................. 23–24

*Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.,*
    482 U.S. 569 (1987) ...................................................................... 42

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ...................................................................... 21

*Burnside v. Byars,*
    363 F.2d 744 (5th Cir. 1966) ........................................... 24, 26, 47

*Bystrom ex rel. Bystrom v. Fridley High School, Independent School District No. 14,*
    822 F.2d 747 (8th Cir. 1987) .................................................. 39, 49

*C.R. v. Eugene School District 4J,*
    835 F.3d 1142 (9th Cir. 2016) ...................................................... 39

*C1.G ex rel. C.G. v. Siegfried,*
    38 F.4th 1270 (10th Cir. 2022) ..................................................... 53

*Chandler v. McMinnville School District,*
    978 F.2d 524 (9th Cir. 1992) ............................................ 40, 47, 50

*Chen ex rel. Chen v. Albany Unified School District,*
    56 F.4th 708 (9th Cir. 2022) .......................................... 39

*City of Lakewood v. Plain Dealer Publishing Co.,*
    486 U.S. 750 (1988) ...................................................... 51

*Connecticut State Federation of Teachers v. Board of Education
    Members,*
    538 F.2d 471 (2d Cir. 1976) ........................................... 48

*Dambrot v. Central Michigan University,*
    839 F. Supp. 477 (E.D. Mich. 1993) ............................... 52

*DeJohn v. Temple University,*
    537 F.3d 301 (3d Cir. 2008) ...................................... 48–49

*Dodge v. Evergreen School District #114,*
    56 F.4th 767 (9th Cir. 2022) .......................................... 49

*Doe v. Hopkinton Public Schools,*
    19 F.4th 493 (1st Cir. 2021) ....................................... 35–37

*Doe v. University of Michigan,*
    721 F. Supp. 852 (E.D. Mich. 1989) .............................. 54

*Doe v. Valencia College,*
    903 F.3d 1220 (11th Cir. 2018) ..................................... 39

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ...................................................... 52

*Garcia-Rubiera v. Calderon,*
    570 F.3d 443 (1st Cir. 2009) ......................................... 21

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ...................................................... 42

*Guiles ex rel. Guiles v. Marineau,*
    461 F.3d 320 (2d Cir. 2006) ........................................... 46

*Hardy v. Jefferson Community College,*
260 F.3d 671 (6th Cir. 2001) ........................................................ 44

*Holloman ex rel. Holloman v. Harland,*
370 F.3d 1252 (11th Cir. 2004) .......................................... 47–48, 50

*Iancu v. Brunetti,*
139 S. Ct. 2294 (2019) ....................................................... 44, 53, 54

*J.S. ex rel. Snyder v. Blue Mountain School District,*
650 F.3d 915 (3d Cir. 2011) ....................................................... 23, 37

*James v. Board of Education of Central District No. 1,*
461 F.2d 566 (2d Cir. 1972) ............................................................ 46

*Kennedy v. Bremerton School District,*
142 S. Ct. 2407 (2022) ......................................................... 32–33, 45

*Lowry ex rel. Crow v. Watson Chapel School District,*
540 F.3d 752 (8th Cir. 2008) .......................................................... 50

*Mahanoy Area School District v. B.L. ex rel. Levy,*
141 S. Ct. 2038 (2021) ......................................................... 32, 41, 45

*Matal v. Tam,*
582 U.S. 218 (2017) ....................................................................... 43

*McNeil v. Sherwood School District 88J,*
918 F.3d 700 (9th Cir. 2019) .......................................................... 39

*Minnesota Voters Alliance v. Mansky,*
138 S. Ct. 1876 (2018) ................................................................... 42

*Morgan v. Swanson,*
659 F.3d 359 (5th Cir. 2011) .......................................................... 43

*Morse v. Frederick,*
551 U.S. 393 (2007) ................................................................... 43–44

*Newsom ex rel. Newsom v. Albemarle County School Board,*
354 F.3d 249 (4th Cir. 2003) .......................................................... 47

*Norris ex rel. A.M. v. Cape Elizabeth School District,*
  969 F.3d 12 (1st Cir. 2020)................................................. 22, 33–35

*Pyle ex rel. Pyle v. South Hadley School Committee,*
  861 F. Supp. 157 (D. Mass. 1994) ....................................... 5, 51, 53

*Rowan v. U.S. Post Office Department,*
  397 U.S. 728 (1970) ........................................................................ 31

*Saxe v. State College Area School District,*
  240 F.3d 200 (3d Cir. 2001).................................................... passim

*Scott v. School Board of Alchua County,*
  324 F.3d 1246 (11th Cir. 2003) ..................................................... 40

*Shanley v. Northeast Independent School District,*
  462 F.2d 960 (5th Cir. 1972) ....................................... 38, 46, 48, 50

*Sypniewski v. Warren Hills Regional Board of Education,*
  307 F.3d 243 (3d Cir. 2002)...................................................... 48, 54

*Taylor v. Roswell Independent School District,*
  713 F.3d 25 (10th Cir. 2013) ......................................................... 47

*Terminiello v. City of Chicago,*
  337 U.S. 1 (1949) ............................................................................ 44

*Texas v. Johnson,*
  491 U.S. 397 (1989) ........................................................................ 32

*Tinker v. Des Moines Independent Community School District,*
  393 U.S. 503 (1969) ............................................................... passim

*Together Employees v. Mass General Brigham Inc.,*
  32 F.4th 82 (1st Cir. 2022) ............................................................ 21

*United States v. Kokinda,*
  497 U.S. 720 (1990) ........................................................................ 42

*United States v. Stevens,*
  559 U.S. 460 (2010) ........................................................................ 52

*West v. Derby Unified School District No. 260*,
    206 F.3d 1358 (10th Cir. 2000) ..................................................... 40

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943) ............................................................. passim

*Zamecnik v. Indian Prairie School District No. 204*,
    636 F.3d 874 (7th Cir. 2011) .................................................. 38, 50

## **Other Authorities**

*There Are Only Two Genders*, YouTube (May 3, 2023) ........ 11–12, 16, 28

U.S. Dep't of Veterans Affairs, Vietnam Veterans .................................. 29

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Appellant L.M. respectfully requests oral argument. Middleborough Public Schools promotes an identity-based view of gender and encourages students to do the same. L.M., a seventh-grade student, answered by wearing a t-shirt to school that said, "There are only two genders." No disruption occurred. But officials forced L.M. to change his shirt or go home, then did so again when L.M. wore the same shirt with the words, "There are [censored] genders" on it. This case presents important questions relating to students' free-speech rights, including (1) what constitutes interference with the rights of others under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969); (2) what justifies a forecast of material disruption under *Tinker*; and (3) what constitutional constraints apply to dress code provisions. Because this matter involves complex and unsettled areas of the law, oral argument will substantially assist the Court in finding right answers.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the federal constitutional questions presented in this appeal under 28 U.S.C. §§ 1331 & 1343. Those questions arise under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

L.M. and his natural guardians are individuals and citizens of Massachusetts. The Town of Middleborough is a local government entity situated in Massachusetts.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The U.S. District Court for the District of Massachusetts, the Honorable Indira Talwani presiding, denied L.M.'s motion for a preliminary injunction on June 16, 2023. L.M. filed his notice of appeal with the district court on June 23, 2023, within the 30-day period set by 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A). That appeal is pending before this Court as case number 23-1535.

On July 19, 2023, the district court granted the parties' joint motion to convert its preliminary-injunction ruling into a final judgment, without prejudice to L.M.'s right to appeal. That same day the district court granted final judgment in Middleborough's favor. L.M. filed his notice of appeal on August 4, 2023, within the 30-day period set by 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A). That appeal is pending before this Court as case number 23-1645.

On August 18, 2023, this Court consolidated case numbers 23-1535 and 23-1645 for briefing and argument.

There are no remaining proceedings in the district court, no motions that would toll the time for appeal, and no prior or related appellate proceedings.

## STATEMENT OF ISSUES

L.M. is a student at Nichols Middle School in Middleborough, Massachusetts. The middle school regularly expresses the notion that a person's identity, not biology, determines their sex. And it encourages students to join in by—for example—wearing Pride gear to celebrate LGBTQ+ Pride Month. L.M. disagrees with this view of sex and decided to contribute to the conversation his school initiated by wearing a t-shirt to class that said, "There are only two genders."

There was no school disruption. Yet officials removed L.M. from class and ordered him to change the shirt or go home, citing a few complaints, and subsequently the school's dress code. L.M. went home but later wore a protest shirt to class that said, "There are [censored] genders." Even though no disruption occurred, officials removed L.M. from class and barred him from wearing that message, too.

The issues presented on appeal:

1. Whether the district court erred in denying L.M.'s motion for a preliminary injunction.

2. Whether the district court erred in granting final judgment to the school district on L.M.'s First and Fourteenth Amendment claims.

## INTRODUCTION

Public schools are a microcosm of American life. They teach students how to interact with each other and with their government. Answers to questions such as who belongs, what duties we owe each other, and how to navigate ideas that differ from our own are the blocks on which society is built. Our Constitution provides the basic answers to these questions. Yet many schools aren't teaching them, with disastrous consequences not just for students but society. This case is one example of schools teaching—and students learning—the wrong lesson. But it's a lesson this Court can fix.

L.M. is an honors student at a middle school in Massachusetts where the motto is "peace only under liberty." L.M.'s school believes that gender is indeterminate and identity-based, and it bombards students with that message. After listening respectfully, L.M. responded by communicating his own biology-based view of gender through a t-shirt that said, "There are only two genders." No disruption occurred. Yet school officials demanded that L.M. either remove his shirt or go home, citing a few complaints. And they have continued to deny L.M.'s right to express his views since.

The First Amendment prohibits schools from replacing the marketplace of ideas with an echo chamber. Free speech is not reserved for those who share the government's views. And while schools may

advocate their own gender-identity views, they may not censor students'
different views.

What Judge Ponsor said nearly 30 years ago remains true today:
schools may "bar a T-shirt that causes a material disruption" but they
"cannot prohibit one that merely advocates a particular point of view
and arouses the hostility of a person with an opposite opinion." *Pyle ex
rel. Pyle v. S. Hadley Sch. Comm.*, 861 F. Supp. 157, 171 (D. Mass.
1994). This Court should follow the vast weight of Supreme Court and
federal circuit authority, and reverse the district court.

## STATEMENT OF THE CASE[1]

### A.    L.M. and Middleborough Public Schools

L.M. is a student who resides in Plymouth County and attends Nichols Middle School in Middleborough, Massachusetts. App.20. L.M.'s entire school career has taken place in Middleborough. App.24. He academically excelled, making the Honor Roll. App.24.

Middleborough Public School's speech, curriculum, and events embrace the view that sex depends on personal identity and has no biological foundation. App.24. The district sees gender as limitless. App.24. And it invites students to voice their agreement by, for example, participating in "Pride Spirit Week," an event designed to "promot[e] . . . self-affirmation" and foster an "outlook that bolsters . . . LGBT rights." App.53. Teachers and students participate in various ways, including by donning rainbow colors by grade or coming to school in "Pride gear to Celebrate Pride Month." App.53.

What's more, Middleborough's schools feature GLSEN-sponsored signs. One of them states: "Rise Up to Protect Trans and GNC [or gender non-conforming] Students." App.26–27. Rainbow flags and signs declaring "Proud friend/ally of LGBTQ+" are also commonplace. App.27. The district's stance on gender-identity issues is clear and students are encouraged to—and do—express their agreement. App.25. Indeed,

---

[1] All district court record cites indicate the docket number and ECF page number.

L.M.'s peers often wear clothing and other apparel with messages the district approves. App.26.

Some students, including L.M., believe there are only two sexes: male and female. App.25. L.M. wants to share that viewpoint at school for three reasons. First, L.M. wants to respond to the district's take on gender identity and begin a real conversation, which hasn't occurred because all existing speech is one-sided. App.25–28. Second, L.M. thinks the district's philosophy is false and harmful and wants to make students aware of that. App.25. Last, L.M. wants to show that caring and compassionate people can believe that sex is binary without being hateful or bigoted towards those with different views. App.25.

Other students agree with L.M.'s view of sex and gender. App.25. The pressure exerted by school authorities, other students, and the greater community makes them afraid to speak out. App.25. Yet L.M. summoned up the courage to make his views known. App.26, 95.

### B.    L.M. wears a "There are only two genders" t-shirt to school, and the principal forces him to return home.

As a seventh-grade student, L.M. shared his views at school by wearing a black t-shirt that stated in black and white letters: "There are only two genders." App.18, 24, 26. This statement summarized L.M.'s beliefs at a high level of generality without criticizing opposing views or those who share them. L.M. did not protest, chant, or

distribute campaign-style buttons in class. He merely went to his first period—P.E.—and participated as usual. App.26, 28.

No student appeared visibly upset by L.M.'s message, and his t-shirt caused no disruption of P.E., a subject generally more focused on athletics than fashion. App.28, 96. Yet L.M.'s teacher reported his shirt to the administration and Acting Principal, Heather Tucker, removed L.M. from class, saying he could not wear the shirt because other students complained. App.28, 85–86. (Notably, the school district presented no evidence that student complaints actually occurred. The superintendent, principal, and assistant principal heard no complaints themselves. And they were the only individuals who offered evidence on the district's behalf. E.g., App.66, 85–86, 210.) Tucker gave L.M. two options: either remove the t-shirt now or discuss it further somewhere else. App.28, 86.

L.M. opted for discussion and followed Tucker to another room where the school counselor joined them. App.28. When L.M. asked why he could not wear the "There are only two genders" shirt, Tucker said that some students complained. App.28. She gave L.M. two options: remove the shirt or return home. App.28. Because L.M. couldn't remove the shirt in good conscience, he politely opted to go home. App.28.

Tucker then called L.M.'s father, explaining that "staff and students . . . found his shirt upsetting" and claiming the shirt was "a disruption to the learning environment." App.56. She reiterated that

L.M. could not return to class unless he removed the t-shirt. App.56. L.M.'s father supported L.M.'s refusal to remove the shirt and his parents picked L.M. up from school. App.28, 56.

Rather than using L.M.'s t-shirt as a means to teach students to "think critically," "appreciate diversity," or "problem solv[e]," App.113, the school shutdown L.M.'s counterspeech before the end of his first class. This censorship had a cost. Because L.M. refused to surrender his free-speech rights, he lost nearly a full day of learning—"educational opportunities" the district promises to "every child" that L.M. will never be able to get back. App.113. Later, the district did allow L.M. to wear t-shirts with messages like "Don't Tread on Me" and "First Amendment Rights." App.86.

### C. Middleborough's superintendent ratifies the ban on L.M.'s "There are only two genders" t-shirt

L.M.'s father emailed the Middleborough Superintendent, Carolyn Lyons, about the episode a short while later. He explained that L.M. "is a good kid" who "is quiet, polite, and an honor roll student," and expressed confusion because L.M.'s family had "reviewed the student handbook and [couldn't] find anything that indicates a school policy or rule that [L.M.] broke." App.56.

L.M.'s father asked Lyons to "help [him] understand why [L.M.] was removed from class and ultimately missed out on a day of class instruction." App.56. The school's actions were mystifying, he said,

because the t-shirt's message wasn't "directed to any particular person" and merely "stated [L.M.]'s view on a subject that has become a political hot topic[ ] . . . that is being discussed in social media, schools, and churches all across [the] country." App.56.

Appealing to basic fairness, L.M.'s father also explained that L.M. couldn't understand why he was "not allowed to express his own political statement when he sees others doing the same every day in their choice of clothes, pins, posters, and speech." App.56. Removing L.M. from class was surprising, he said, because L.M. "only received positive feedback from other students [about his t-shirt] on that day and since." App.56. L.M.'s father objected that while his son "witnesses other students[']" disruptive behavior in class that goes unchecked," the passive expression of L.M.'s views "cause[d] . . . him to be pulled from class." App.56.

Superintendent Lyons responded a few days later. Lyons agreed that L.M. "was articulate in his position and respectful in his statements to [Tucker] about [his] opinions." App.55. But she "support[ed]" the way in which "Tucker enforced the dress code." App.55. Middleborough's policy, Lyons said, is "governed by health, safety, and appropriateness," and whether an article of clothing is "appropriate[ ]" is up to "the discretion of the building administration." App.55. Regarding L.M., Lyons claimed that his message "targeted students of a protected class; namely in the area of gender identity" and that "students and staff . . .

complained about [his] shirt." App.55. She provided L.M.'s father with the full text of the dress code and approved L.M.'s removal from class as "implement[ing]" that policy "as written." App.55.

The superintendent's claim that L.M.'s message targeted students based on gender identity is curious given sex-binary language in the school's handbook, which states that all aspects of education "must be fully open and available to members of *both sexes*," App.120 (emphasis added), and that sexual harassment refers to "written materials or pictures derogatory to *either gender*," App.163 (emphasis added).

### D. L.M. asks the Middleborough School Committee to uphold his free-speech rights.

After Tucker and Lyons barred L.M. from wearing his t-shirt at school, L.M. turned to a higher authority—the Middleborough School Committee. L.M. spoke at a committee meeting during the public-comment period. App.29–30. He described how school officials pulled him out of class and forced him to remove a t-shirt with "[f]ive simple words: 'There are only two genders,'" a statement of what L.M. "believe[s] to be . . . fact" that is neither "harmful" nor "threatening." App.29; *There Are Only Two Genders*, YouTube (May 3, 2023), https://perma.cc/V74R-EBAR.

Regarding disruption, L.M. recounted that "[n]ot one person, staff or student, told [him] that they were bothered by what [he] was wearing," "stormed out of class," or had an emotional outburst. *There Are*

*Only Two Genders*, YouTube (May 3, 2023), https://perma.cc/V74R-EBAR. "[J]ust the opposite," [s]everal kids told [L.M.] that they supported [his] actions." *Id.* As to other students' rights, L.M. denied that his speech targeted any "protected class" and questioned why others' hurt "feelings [were] more important than" his free-speech rights. *Id.* Tolerance, he explained, is a two-way street.[2] L.M. doesn't "complain when [he] sees 'pride flags' and 'diversity posters' hung throughout the school" that conflict with his beliefs. *Id.* So neither should others be heard to complain that L.M.'s "opposing view" made them feel "unsafe." *Id.*

L.M. explained that he "didn't go to school that day to hurt feelings or cause trouble." *Id.* "Even at 12 years old" L.M. has his "own political opinions" and he claimed a First Amendment "right to express those opinions, even at school." *Id.* In practical terms, L.M. contrasted his non-disruptive t-shirt with students who "act[ ] out in class" and cause real "disruptions to . . . learning every day," "yet nothing is done." *Id.* And L.M. expressed "hope" the committee would see the injustice and "speak up for the rest of us so" that students could "express [themselves] without being pulled out of class." *Id.*

---

[2] Likewise, Middleborough purports to "believe" that "mutual respect and civility are essential to a quality educational environment." App.114.

The school committee did nothing, endorsing officials' censorship by default.

### E. The Massachusetts Family Institute reaches out to Middleborough on L.M.'s father's behalf, but the district refuses to respect L.M.'s free-speech rights.

Dissatisfied with Middleborough's response, L.M.'s father reached out to the Massachusetts Family Institute for help. An attorney sent Superintendent Lyons a letter explaining that the district violated L.M.'s free-speech rights under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 504 (1969), because the district had "not pointed to *any* evidence of substantial disruption" and "apprehension that some students may be offended" is not enough. App.60.

"Nor [was] there any evidence that other students' rights were infringed," as L.M.'s "expression was passive and could easily be ignored or avoided." App.60. A few students' and teachers' offense couldn't bar L.M.'s speech, the attorney said, because "no one [can] simply shut down speech that makes them upset." App.60. And the school had no legitimate basis for censoring L.M.'s speech because key provisions of its dress code were facially unconstitutional. App.60–61.

Informing the district that L.M. planned to wear his t-shirt to school again, the attorney expressed hope that Middleborough would "not interfere." App.61. But he asked for "confirm[ation] in writing" that

the district would allow L.M. "to wear the shirt." App.61. Otherwise, a lawsuit "may be necessary." App.61.

Middleborough's attorney responded a week later. She broadly asserted that *Tinker* did not apply, implying that L.M.'s t-shirt somehow "intrude[d] upon the work of the schools or the rights of other students." App.63 (quotation omitted). What mattered, according to the district's attorney, was that Massachusetts bars discrimination, harassment, and bullying in schools based on gender identity. App.63; *accord* App.77–84. So the district would "prohibit the wearing of a t-shirt" by L.M. "or anyone else" that is "likely to be considered discriminatory, harassing and/or bullying to others, including those who are gender nonconforming by suggesting that their . . . gender identity or expression does not exist or is invalid." App.63–64. School officials apparently claimed to fear that L.M.'s expression might be disruptive or cause LGBTQ+ students to feel "unsafe." App.210.

### F.    L.M. wears a "There are [censored] genders" t-shirt to school and the principal forces him to remove it.

Due to the response by Middleborough's counsel, L.M. did not wear his "There are only two genders" shirt to school. App.31. Instead, he wore a protest t-shirt that said in black and white letters "There are [censored] genders." App.31. When L.M. arrived at his first class, the teacher sent him to the principal's office even though there was no disruption, objection, or visible reaction by anyone. App.31–32, 97.

Concerned that missing another day of school would jeopardize his academic performance, L.M. removed the protest shirt on his way to the office. App.31. Once there, Principal Tucker forced L.M. to promise that he would not put the shirt back on before she allowed L.M. to rejoin his class. App.31, 87–88.

### G.    The ongoing chilling of L.M.'s free-speech rights

L.M. still desires to wear his "There are only two genders" t-shirt—and shirts with similar messages—at school to share his beliefs with classmates. App.32. Yet Middleborough's dress code chills L.M.'s and other students' freedom of expression, especially as repeat violations are punishable by suspension.[3] App.32–33, 47.

Superintendent Lyons admitted that L.M.'s speech was banned due, in part, to "concerns that other students would also attempt to wear clothing with the same or similar messages." App.67. That is especially troubling because L.M.'s purpose in speaking out was to *counter* the district's viewpoint on sex—which it declares loudly and often. App.32. Middleborough expects students to "express [agreement] or just stay quiet." App.95. That communicated to L.M. that it's not "ok for [him] to have an opposing view" and that ideological diversity is

---

[3] Two other students wore t-shirts to school with the "There are only two genders" message. Principal Tucker also "required" these students to "change their shirts" or go home, App.88, even though their speech caused no disruption, App.97.

15

"unsafe" and intolerable. *There Are Only Two Genders*, YouTube (May 3, 2023), https://perma.cc/V74R-EBAR.

### H.    District court proceedings

L.M. filed suit through his natural guardians in the U.S. District Court for the District of Massachusetts. App.16. The complaint requested preliminary and permanent injunctive relief; a declaratory judgment; actual and nominal damages; and attorney fees and costs. App.37–38.

#### 1.    Procedural history

One day after filing his complaint, L.M. filed a motion requesting a temporary restraining order or preliminary injunction. Doc. 5; *accord* Doc. 12. The district court set an expedited briefing schedule and held a hearing on the TRO request on May 31, 2023. Docs. 39–40. The district court denied L.M.'s request for a TRO for three reasons: (1) L.M. didn't file suit immediately, as his attorneys tried to reach an out-of-court resolution with the school district; (2) L.M.'s speech outside of school wasn't proscribed, and (3) the court had scheduled a prompt hearing on L.M.'s request for a preliminary injunction. Doc. 38.

#### 2.    The district court's ruling on L.M.'s preliminary-injunction request

The parties filed supplemental briefs, and the district court held a hearing on L.M.'s preliminary-injunction request on June 13, 2023. Docs. 48–49. Three days later, the court denied L.M.'s motion.

From the start, the district court's order stacked the deck in the school's favor, asserting public schools can bar any student expression that conflicts with their "basic educational mission," Add.9, and granting broad deference to officials' regulation of student speech, Add.10.

Regarding L.M.'s "There are only two genders" t-shirt, the court held that L.M. could not prevail on his free-speech claim because this message violated transgender and gender non-conforming students' right "to a safe and secure educational environment." Add.11. Other students would "not feel safe," the court said, because L.M.'s message "may communicate that only two gender identities—male and female—are valid and any others are invalid or nonexistent." Add.11–12. Essentially, the court said that LGBT students have a right not to see "messages attacking their identities." Add.11. And it grounded this notion on *Tinker*'s holding that schools may lawfully bar expression that "colli[des] with the rights of others to be secure and be let alone." Add.11.

The district court deemed irrelevant that L.M.'s message was purely ideological, targeted no one, and did not overtly address—let alone criticize—competing views. Add.11. The court adopted a "broad[ ] view" of "students' safety" and virtually unlimited deference to school officials' estimation of what creates "an unhealthy and potentially unsafe learning environment." Add.12 (quotation omitted).

Concerning L.M.'s "There are [censored] genders" t-shirt, the district court said that it too "intrude[d] on the rights of others." Add.13. "[A] message protesting censorship would not" do so. Add.13. But the court said that "administrators could reasonably conclude" that L.M.'s shirt "did not merely protest censorship but conveyed the 'censored' message and thus invaded the rights of the other students." Add.13–14.

The court did "not determine" whether Middleborough could also censor L.M.'s t-shirts based on a forecast of "material disruption of classwork or substantial disorder." Add.13 n.4. But it summarily rejected L.M.'s vagueness and overbreadth challenges to the dress code based on school officials' evaluation that L.M.'s t-shirts "would interfere with the rights of other students," as well as a purported lack of "discipline" for violations of the dress code. Add.14.

The district court's analysis of the preliminary-injunction factors hinged on its prior ruling that L.M.'s speech wasn't protected because it invaded other students' rights. Add.14–17. In this portion, the court equated L.M.'s message with "harassment" and emphasized Massachusetts' bar on "discrimination, bullying, or harassment in schools based on gender identity or expression." Add.15–16. Accordingly, the court denied L.M.'s motion for a preliminary injunction. Add.17.

After L.M. filed a notice of appeal, the parties jointly sought a stay of the trial-court litigation. Docs. 53, 57. But the district court appeared ready to order an expedited trial. Doc. 58. So the parties requested an

opportunity to file a joint motion to turn the preliminary-injunction ruling into a final judgment based on the preliminary-injunction record, without prejudice to L.M.'s right to appeal. Doc. 60. The district court granted that request, and the parties jointly filed that motion, Doc. 61, which the court granted a few days later, Doc. 62.

Thereafter, the district court issued a final judgment in Middleborough's favor, Add.18, and L.M. filed another notice of appeal, App.215.

### 3. L.M.'s appeals are consolidated

On July 27, 2023, the parties jointly moved to consolidate the preliminary-injunction and final-judgment appeals. This Court granted the joint motion and consolidated L.M.'s appeals for purposes of briefing and argument on August 15, 2023.

## SUMMARY OF THE ARGUMENT

L.M. has a First Amendment right to speak at school unless the school district proves that his expression caused—or would cause—a material disruption or collided with the rights of others. No such showing is possible. *Tinker*'s rights-of-others prong bars expressive activity with a coercive element, such as harassment, assault, or battery. It doesn't apply to L.M.'s silent, passive expression of opinion or allow schools to prohibit expression based on other students' offense.

The school district also couldn't reasonably forecast that L.M.'s t-shirt messages would cause substantial disruption. No current or prior events suggested a disturbance was likely. A few students may have privately claimed offense. But there was no sign of impending trouble. What's more, schools cannot suppress speech for viewpoint-based reasons or implement heckler's vetoes. And it makes no difference that the school district cloaks censorship in anti-discrimination terms.

In addition, the dress code provisions barring messages that officials deem "hate speech," "targeting groups" or "unacceptable to community standards" are unconstitutional on prior restraint, overbreadth, and vagueness grounds.

# ARGUMENT

## I.    Standard of Review

This Court reviews the district court's preliminary and permanent injunction rulings under the same standard. Factual findings are generally reviewed for clear error, legal conclusions de novo, and the denial of an injunction for an abuse of discretion. *E.g.*, *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (preliminary-injunction rulings); *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 455–56 (1st Cir. 2009) (permanent injunction rulings).

But in First Amendment cases, like this one, the Court "independently review[s] the factual record to ensure" the trial "court's judgment does not unlawfully intrude on free expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648–49 (2000); *accord Tinker*, 393 U.S. at 509 (noting the court's "independent examination of the record").

## II.    L.M. is entitled to judgment as a matter of law on his free-speech claim because his t-shirts' messages did not invade other students' rights.

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. They "are 'persons' under our Constitution" with "fundamental rights which the State must respect." *Id.* at 511. But given "the special characteristics of the school environment" the Supreme Court has adjusted the standard free-speech rules. *Id.* at 506.

21

All agree that *Tinker* supplies the standard here. L.M. "may express his opinions, even on controversial subjects," so long as "he does so without materially and substantially interfering with the . . . operation of the school and without colliding with the rights of others." *Id.* at 513 (cleaned up). Importantly, this Court assumes L.M. has the right to speak unless the district proves otherwise. *Id.* at 509; *accord Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020).

Because the district court ruled on "rights of others" grounds, it makes sense to address *Tinker*'s second prong first. So the question is whether L.M.'s t-shirt messages "intrude[d] upon . . . the rights of other students." *Tinker*, 393 U.S. at 508. And the answer is no, whether one looks to Supreme Court, First Circuit, or other circuits' decisions.

L.M.'s purely ideological messages did not invade other students' rights. Public schools are the archetypal "marketplace of ideas." *Id.* at 512 (quotation omitted). They *should* expose students to different viewpoints. No student has the right to avoid seeing or hearing messages they dislike. And the conclusion does not change simply because L.M.'s first t-shirt expressed a view on sex and gender, a subject that elicits strong beliefs.

### A. *Tinker*'s "rights of others" language applies to students, not teachers.

*Tinker* speaks in terms of "the rights of other students" or, more specifically, "the rights of other students to be secure and to be let

alone." *Id.* at 508–09. Yet it also makes a few shorthand references to "the rights of others." *Id.* at 513. And that has led to some confusion. Because Middleborough originally cited complaints from teachers as grounds for censoring L.M.'s t-shirt, clarity is needed.

*Tinker*'s every mention of "the rights of others" clearly refers back to "the rights of other students." *E.g.*, *id.* at 513. Teachers are public servants who are paid to teach and interact with students. At school, they have no right "to be let alone." So applying *Tinker*'s "rights of others" language to them makes little sense and could work mischief. *Accord J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 931 n.9 (3d Cir. 2011) (en banc) (noting the "danger [of] accepting" that *Tinker*'s "rights of others" language applies beyond students).

In short, teachers dismayed by L.M.'s expression may be able to seek an employment accommodation. But their complaints are irrelevant to L.M.'s free-speech rights.

### B. Five principles from the *Tinker* decision clarify what it means to impinge on other students' rights.

The Supreme Court has not offered a comprehensive explanation of what it means to "intrude[ ] upon . . . the rights of other students." *Tinker*, 393 U.S. at 508. But five aspects of *Tinker* clarify that language. First, the Court clearly had *Blackwell v. Issaquena County Board of Education*, 363 F.2d 749 (5th Cir. 1966), in mind. *Tinker* explicitly affirms *Blackwell*'s conclusion that the First Amendment doesn't

protect students "wearing freedom buttons" who "harassed [other] students who did not wear them." 393 U.S. at 505 n.1.

The problem in *Blackwell* was that students "accosted other students by pinning the buttons on them even though they did not ask for one," which caused at least one "younger child" to "cry[ ]." *Blackwell*, 363 F.2d at 751. Button-wearing students were eventually sent home but returned and tried pinning buttons "on anyone walking in the hall." *Id.* at 752. It was assaults and/or batteries of this nature which "colli[ded] with the rights of others" and showed a "complete disregard for the rights of . . . fellow students."[4] *Id.* at 753–54.

When *Tinker* borrowed this language from *Blackwell*, it referenced expressive activity that involves (1) severe harassment, (2) assault, or (3) battery. Those are the prototypical infringements on other students' rights. In contrast, *Tinker* approved the holding in *Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966), that button-wearing students who engaged in no "improper conduct" were constitutionally protected. *Accord Tinker*, 393 U.S. at 505 & n.1.

Second, *Tinker*'s rights-of-other analysis focused on the speaker's own behavior. There, students wore black armbands in a passive expression of sentiment against the Vietnam War. *Id.* at 508, 514.

---

[4] *Accord Blackwell*, 363 F.2d at 753 (button-wearers "disturbed other students who did not wish to participate in the wearing of the buttons").

Doing so made "their views known[ ]" and potentially "influence[d] others to adopt them." *Id.* at 514. But the Tinker children did not try and force anyone else to join them. As a result, the Court barely mentioned other' rights. It simply noted that armband-wearing students never "sought to intrude in . . . the lives of others." *Id.*

Third, the Supreme Court expected students to encounter a "marketplace of ideas," not an echo chamber. *Id.* at 512 (quotation omitted). Learning to listen, consider, and respond to divergent views prepares students for life in our "relatively permissive, often disputatious, society." *Id.* at 509. So *Tinker* placed a premium on students' "exposure to [the] robust exchange of ideas." *Id.* at 512. (quotation omitted).

Fourth, *Tinker* saw "personal intercommunication among the students" as "an important part of the educational process." *Id.* at 512. Learning is not confined to "supervised and ordained discussion" in the "classroom." *Id.* at 512. It happens when students talk face-to-face. Absent "carefully restricted circumstances," *Tinker* presumed such discussions, "even on controversial subjects," are protected. *Id.* at 113.

Last, *Tinker* establishes that students have no right to avoid disagreeable views. "Any variation from the majority's opinion may inspire fear." *Id.* at 508. But this "discomfort" doesn't justify censoring "unpopular viewpoint[s]." *Id.* at 509. Under the *Tinker* standard, students will necessarily see or hear "views" that "deviate[ ] from" their

own. *Id.* at 508. They could hardly do otherwise, as the First Amend-ment bars schools from "foster[ing] a homogeneous people" by excluding minority opinions. *Id.* at 511 (quotation omitted).

### C. These five *Tinker* principles show that L.M.'s messages didn't impinge on other students' rights.

These *Tinker*-derived principles show that L.M.'s t-shirts didn't impinge on other students' rights. First, the facts of this case are on all fours with *Tinker* (and *Burnside*) and bear no similarity to *Blackwell*. L.M.'s shirts, like the Tinker children's armbands, constitute "a silent, passive expression of opinion." *Tinker*, 393 U.S. at 508. L.M. simply wore a message and "went about [his] ordained rounds in school." *Id.* at 514. He didn't harass those with contrary views or force other students to support his message. App.28.

Because L.M. engaged in no "improper conduct," *Burnside*, 363 F.2d at 748; *accord Tinker*, 393 U.S. at 505 n.1, his "silent, passive" response to the district's messages about sex and gender didn't violate other students' rights, *id.* at 514.

Second, the First Amendment protects every citizen's right to convince their neighbors "by persuasion and example." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 640 (1943). That is all L.M. did here. Like the Tinker children's black armbands, L.M.'s t-shirts were designed to make his "views known[ ]" and convince "others to adopt

them." *Tinker*, 393 U.S. at 514. Persuasion of this sort is not "intru[sion] in . . . the lives of others." *Id.*

Third, L.M.'s "There are only two genders" t-shirt responded to Middleborough's messages about sex and gender. App.25. L.M. wore it to end "officially disciplined uniformity" on matters of gender ideology, *Barnette*, 319 U.S. at 637, and create a true "marketplace of ideas" where none existed. *Tinker*, 393 U.S. at 512 (quotation omitted). This counterpoint to the district's one-sided commentary on a matter of public concern didn't violate other students' rights. It exposed other students to the "robust exchange of ideas" that *Tinker* regarded as critical to their future success. *Id.* (quotation omitted).

Fourth, *Tinker's* baseline is that "personal intercommunication among . . . students" is valuable and constitutionally protected. *Id.* Middleborough cannot limit students' discussion of social and political issues to "officially approved" activities, *id.* at 511, in the "school classroom," *id.* at 513. That means students will encounter their classmates' "express[ion] [of] opinions, even on controversial subjects" like sex and gender. *Id.* Absent unusual and "carefully restricted circumstances," *id.*, seeing or hearing these expressions of opinion doesn't implicate—let alone "intrude[ ] upon"—other students' rights, *id.* at 508.

Last, the school banned L.M.'s t-shirts based on a few subjective complaints that students felt upset, unsafe, or targeted. App.55–56;

*There Are Only Two Genders*, YouTube (May 3, 2023),

https://perma.cc/V74R-EBAR. But *Tinker* bars schools from censuring

expression based on the "discomfort" or "fear" that results from

exposure to "unpopular viewpoint[s]," *Tinker*, 393 U.S. at 508–09; the

armbands in *Tinker* likely caused discomfort and fear for students

whose parents were serving or killed in Vietnam. Students have no

right to avoid (or cancel) "views" that "deviate[ ] from" their own. *Id.* at

508. "If liberty means anything at all, it means the right to tell people

what they do not want to hear." *303 Creative LLC v. Elenis*, 143 S. Ct.

2298, 2321 (2023) (cleaned up). Otherwise, students couldn't learn from

each other and "personal intercommunication" amongst students would

be pointless. *Tinker*, 393 U.S. at 512.

What's more, L.M.'s t-shirts didn't target anyone. "There are only

two genders" is a general statement of L.M.'s beliefs about the nature of

human existence. App.26, 95. It reflects L.M.'s view that sex and gender

are inseparable. Not only is this view grounded in biological fact, it

applies equally to everyone—including L.M himself. App.25, 95. Schools

cannot ban ideological statements on hotly-debated public issues simply

because they make students upset. If they could, the school district in

*Tinker* would have won.

It's impossible to understand *Tinker* apart from its backdrop;

namely, the Vietnam War. Roughly 58,000 American service members

lost their lives in that conflict and another 153,000 were wounded. U.S.

Dep't of Veterans Affairs, Vietnam Veterans, https://bit.ly/3LslumG.
This reality wasn't lost on students in Des Moines in the 1960s. "[S]ome
of the wounded and the dead [were] their friends and neighbors."
*Tinker*, 393 U.S. at 524 (Black, J., dissenting). The *Tinker* majority gave
one poignant example: a "former student . . . killed in Viet Nam" whose
"friends [were] still in school." *Id.* at 509 n.3 (quotation omitted).

Yet the Supreme Court upheld the Tinker children's right to make
an ideological statement "protest[ing]" the war by wearing black
armbands—a traditional symbol of "mourning." *Id.* at 516 (Black, J.
dissenting). Older students likely felt targeted by their expression,
which raised uncomfortable questions, such as "Did my friend die for
nothing?," "Will I get drafted too?," "Will I survive?" Yet *Tinker* said
other students' rights weren't even implicated by the armband-wearers
because the protestors didn't "intrude in . . . the[ir] lives." *Id.* at 514.

There's only one explanation for this ruling; under *Tinker*, subjec-
tive psychological intrusions don't count. In other words, the right "to be
secure and . . . let alone" extends to "aggressive[ ] . . . action" but not
"passive expression[s] of opinion." *Id.* at 508. Students cannot avoid the
pure expression of ideas, even if the implications of those ideas could be
upsetting. Otherwise, schools could repackage peers' subjective "discom-
fort" as targeting and ensure that no "variation from the majority's
opinion" was ever heard. *Id.* at 508–09.

That's what Middleborough did here. L.M. wore a t-shirt with a purely ideological message about sex and gender to school. A few students complained in private because they disagreed with L.M.'s views and were offended. Administrators responded by first suppressing L.M.'s expression and then, after reviewing their policies, claiming it "targeted" LGBT students. But psychological discomfort plays no role in *Tinker*'s rights-of-others analysis. And officials can't justify excluding L.M.'s views on that basis.

What's more, L.M.'s "There are [censored] genders" shirt protested Middleborough's—well, censorship. App.31, 96. It stated no view of sex and gender. Indeed, that was L.M.'s point: Middleborough wouldn't allow L.M. to share his views on the subject, which is currently debated in legislatures, courtrooms, editorial pages, and newsrooms. App.56. Protesting censorship doesn't interfere with other students' rights. So the ban on L.M.'s protest shirt is also unconstitutional for this independent reason.

### D.    Other Supreme Court decisions illuminate what collides with the rights of others: L.M.'s t-shirts messages don't qualify, not even close.

A line of Supreme Court decisions stretching back nearly 80 years clarify what *Tinker* meant by "colli[ding] with the rights of other students." 393 U.S. at 508. They confirm that L.M.'s messages don't qualify for suppression. And the matter is not close.

Consider *Barnette*, where the collision-with-the-rights-of-others language originated. There, students who refused to participate in the Pledge of Allegiance didn't "colli[de] with rights asserted by any other individual" because they didn't "interfere with or deny [the] rights of others to" say the pledge. *Barnette*, 319 U.S. at 630. The same is true here. L.M. never sought to prevent other students from expressing their views on gender and sex. He simply wanted to join the conversation.

Also helpful is *Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970), an opinion that issued roughly a year after *Tinker*. In upholding householders' right to block provocative ads, the Court discussed "the right . . . 'to be let alone.'" *Id.* at 736. And this time the Court explained what it meant: "no one has a right to press even 'good' ideas on an unwilling recipient." *Id.* at 738. That proscription doesn't apply to L.M., who never pressed his ideas on anyone.

The Court's decision in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), also provides clarity. *Bethel* allows schools to bar students' use of "certain modes of expression," namely "vulgar and offensive terms." *Id.* at 683. So officials may protect other students from "offensively lewd and indecent speech." *Id.* at 685. But they may not shield peers from "unpopular and controversial views," which students have "[t]he undoubted freedom to advocate." *Id.* at 681. Here, no one claims that L.M.'s speech was vulgar or lewd. Other students simply didn't like his "unpopular" ideas. *Id.*

Another key ruling is *Mahanoy Area School District v. B.L. ex rel. Levy*, 141 S. Ct. 2038 (2021), which gives examples of invading other students' rights, including "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at . . . other students." *Id.* at 2045. L.M. never engaged in harassment or bullying, let alone targeted particular students. Nor did he threaten anyone.

What's more, *Mahanoy* rejects any notion that censoring student expression is easy. The Court characterized the *Tinker* standard as "demanding," *id.* at 2048, emphasized public schools' "interest in protecting . . . unpopular expression," and lauded their role as "the nurseries of democracy" where students encounter "the 'marketplace of ideas'" and learn to value free speech, *id.* at 2046. In this case, Middleborough took the opposite tack, crediting meritless complaints, barring L.M.'s messages without cause, and teaching students to cancel speech they dislike instead of responding with their own ideas.[5]

The Supreme Court made similar points in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), which, while not a student case, is revealing. There, the Court faulted a school that opted for censorship rather than teaching students "how to tolerate diverse expressive activities," which are part of life in our "pluralistic society." *Id.* at 2431

---

[5] *But see Texas v. Johnson*, 491 U.S. 397, 419 (1989) (objections to speech should be met with "more speech, not enforced silence" (quotation omitted)).

(quotation omitted). *Kennedy* denies that schools have any interest in shielding students from "offens[ive]" expression, which they'll inevitably encounter "in a society where [speech] enjoy[s] such robust constitutional protection." *Id.* at 2430.

"Offense does not equate to coercion," *Kennedy* said. *Id.* at 2430 (cleaned up). But a coercive element is what unites everything that *does* violate other students' rights. *E.g.*, *supra* Part II.B–D (severe harassment, assault, barring others' expression, pressing ideas on unwilling recipients, threats). So mere offense doesn't qualify.

### E.   This Court's precedent confirms that L.M.'s t-shirt messages didn't infringe other students' rights.

Two of this Court decisions address *Tinker*'s second prong. And both confirm that it doesn't apply to L.M.'s expression. First, *Norris* involved a female student who placed an anonymous sticky note in the girls' bathroom that said: "THERE'S A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS." 969 F.3d at 14. School officials said the note referred to "a particular male student" and resulted in his ostracization, which amounted to "bullying." *Id.* at 15–16. So they suspended the female student for three days. *Id.* at 17. After the female student sued, the district court preliminarily enjoined the suspension on free-speech grounds, and this Court affirmed. *Id.* at 18–19, 33.

At the start, *Norris* established that schools "may not rely on post hoc rationalizations for . . . speech restrictions." *Id.* at 25. Courts will

consider "only . . . the reasons originally provided to" the student. *Id.* at 26. If a justification was "articulated only after litigation commenced," it doesn't count. *Id.*; *accord id.* at 26–28. Relatedly, *Norris* held that evidence doesn't factor into the *Tinker* equation unless it was " known to the school administrators at the time they disciplined the student or decided to restrict the speech." *Id.* at 30.

*Norris* then discussed *Tinker*'s rights-of-others prong and gave one broad example: "bullying is the type of conduct that implicates the governmental interest in protecting against the invasion of the rights of others." *Id.* at 29. Yet schools cannot attach the "bullying" label to any speech they dislike. Officials must show "a reasonable basis for . . . determin[ing]  both that the student speech" (1) "targeted a specific student and that it" (2) "invaded that student's rights." *Id.* at 29. So *Tinker* requires an *actual* invasion of a *specific* student, not a *potential* invasion of *no identified* student.

In making these inquiries, courts do not blindly follow the school district's lead. "[T]he ultimate question [of] whether a school has exceeded constitutional constraints," *Norris* said, "rests with the courts and courts owe no deference to schools when they consider that question." *Id.* at 30 (cleaned up).

The male student in *Norris* encountered real problems after the female student posted her anonymous note. *Id.* at 15–16. Even so, this Court held that suspending the female student violated the First

Amendment because *Tinker*'s rights-of-others prong wasn't met. *Id.* at
30–33. School officials failed to show that "the [female student's] note
caused the bullying harm." *Id.* at 31. And without "show[ing] it was the
note and not some other factors [that] caused any bullying," *id.* at 31,
officials couldn't prove the female student "caused any invasion of [the
male student's] rights" sufficient to justify punishing "her protected
speech," *id.* at 33.

This case is simpler. Middleborough produced no evidence that
another student was bullied—or faced similar burdens—for *any* reason.
There's no targeting of a "a specific student," let alone an actual viola-
tion of that individual's rights. *Id.* at 29. Under *Norris*, that bars any
conclusion that *Tinker*'s second prong is met.

This case's only similarities with *Norris* confirm that Middlebor-
ough violated L.M.'s rights. Just like the female student in *Norris*,
L.M.'s message was a response to the "school administration," phrased
in universal terms, and didn't "name or otherwise describe a particular
individual." *Id.* at 32; *accord* App.18, 24–26, 31. What's more, *Norris*
held that schools can't "punish a student merely because [his] speech
causes argument on a controversial topic." 969 F.3d at 32. There's no
evidence of even a low-grade argument here.

Second, this Court addressed *Tinker*'s rights-of-others prong again
in *Doe v. Hopkinton Public Schools*, 19 F.4th 493, 501 (1st Cir. 2021),
where members of the hockey team "were aware of, joined, participated

in, and encouraged the [severe] bullying" of a teammate. The school conducted an investigation, removed the offenders from the hockey team, and meted out suspensions of three to five days. *Id.* at 501–02. Two of the hockey players sued on First Amendment grounds. *Id.* at 502. Concluding the hockey players participated in the bullying by approving and encouraging it and that their actions infringed upon their teammates rights, the district court upheld the hockey players' punishment. *Id.* at 503. And this Court affirmed. *Id.* at 512.

Citing *Mahonoy* and *Norris*, the *Hopkinton* Court reiterated that "serious or severe bullying or harassment . . . invades the rights of others." *Id.* at 506 (quotation omitted). The hockey players' "speech and conduct" met this description, the Court said, because they—among other things—joined in a SnapChat group where eight students posted "numerous derogatory comments and nonconsensual photos and videos" of their teammate. *Id.* at 508.

Though the plaintiffs didn't post any photos or videos themselves, they "actively and extensively encouraged" their teammates to engage in "direct or face-to-face bullying conduct." *Id.* at 508. And this, the Court held, "invad[es] the rights of others and "is not protected under the First Amendment." *Id.* 508–09. In contrast, the hockey players couldn't be—and were not—"punished because [the victim] was offended by the content of their messages." *Id.* at 508.

*Hopkinton* too shows that *Tinker*'s rights-of-others prong doesn't apply to L.M.'s speech. L.M. simply wore t-shirts with ideological and protest messages at school. He didn't harangue anyone with his views, bully a classmate, or encourage others to do so. In fact, Middleborough presented no evidence that *any* student was harassed or bullied, let alone "direct or face-to-face." *Id.*

Because there was no real-world problem or actual invasion of another student's rights, Middleborough had no legitimate basis to censure L.M.'s speech on a matter of public concern. Officials merely responded to complaints that other students were "offended by the content of [L.M.'s] messages." *Id.* And *Hopkinton* prohibits schools from regulating student expression on that basis. *Id.*

### F. Ruling that L.M.'s speech intruded on other students' rights would conflict with decisions by six circuits.

Another reason to hold that L.M.'s speech didn't intrude on other students' rights is avoiding a conflict with six other circuits. Rulings by the Third, Fifth, Seventh, Eighth, Ninth, and Eleventh Circuits are incompatible with that conclusion.

For example, the Third Circuit has explicitly warned against construing *Tinker*'s rights-of-others language "broadly" because that would allow the "assertion of virtually any 'rights' [to] transcend and eviscerate the protections of the First Amendment." *J.S.*, 650 F.3d at 931 n.9. "[S]peech [that] is merely offensive to some listener" does not

violate the rights of others, as then-Judge, now-Justice Alito said. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.) Middleborough has showed no more than that here.

The Fifth Circuit clarified early on that *Tinker*'s rights-of-others language focuses on the "method of expression" that students adopt. *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 971 n.8 (5th Cir. 1972). Whereas "tr[ying] to force papers" on other students and "attempt[ing] to block [their] ingress or egress to a building" may be "offensive to the rights of others," the Fifth Circuit said, "merely hand[ing] newspapers to those who wish[ ] to read them" is not. *Id.* L.M.'s speech was even less invasive than handing out newspapers: he merely wore t-shirts silently communicating his views—exactly the sort of "polite, orderly" expression the Fifth Circuit said *Tinker* protects. *Id.*

Particularly relevant here, the Seventh Circuit rejected the argument that LGBT students "have a legal right to prevent criticism of their beliefs or even their way of life." *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011). No "generalized 'hurt feelings' defense to a . . . school's violation of the First Amendment" exists. *Id.* at 877. So the Seventh Circuit upheld a student's right to wear a t-shirt that said "Be Happy, Not Gay" in response to others' "advocacy of [LGBT] rights." *Id.* at 876. If that statement doesn't violate other students' rights, then it's impossible for L.M.'s to do so.

38

The Eighth Circuit constrains *Tinker*'s second prong even further, confining it to "speech which could result in tort liability." *Bystrom ex rel. Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 752 (8th Cir. 1987). No one suggests that L.M.'s speech could potentially result in tort liability here.

For its part, the Ninth Circuit holds that interference with other students' rights includes "severe targeted harassment of fellow students," *Chen ex rel. Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 718 (9th Cir. 2022) (quotation omitted); naming students "for a potential school shooting," *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 711 (9th Cir. 2019) (per curiam) (cleaned up); and "[s]exually harassing speech," *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1152 (9th Cir. 2016). L.M.'s messages aren't remotely comparable to egregious expression of this sort. What *Tinker* doesn't cover, the Ninth Circuit said, is "speech that is merely offensive to some listener." *Id.* (cleaned up). And that's Middleborough's only basis for claiming a rights-violation here.

The Eleventh Circuit similarly ruled that bombarding a classmate with "unwanted messages" and "lewd references," despite being told to stop, "interfer[ed] with [the classmate's] rights 'to be secure and to be let alone,' free from persistent unwanted advances and related insults." *Doe v. Valencia Coll.*, 903 F.3d 1220, 1230 (11th Cir. 2018) (citation omitted). L.M.'s t-shirt messages weren't lewd, forced on anyone, or directed to a specific classmate. They infringed no one's rights.

### G.    The district court's cited authority is off base.

The district court ruled against L.M. based on "[a] broad[ ] view" of other students' right to "safety." Add.12. But none of the cases it cited are on point. L.M.'s messages about gender and censorship aren't remotely comparable to the Confederate flag, which flew over a breakaway polity dedicated to the slavery of African Americans. *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366–67 (10th Cir. 2000); *Scott v. Sch. Bd. of Alchua Cnty.*, 324 F.3d 1246, 1247–49 (11th Cir. 2003) (per curiam) (not even citing the rights of others).

What's more, the court in *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 530–31 (9th Cir. 1992), said nothing about other students' rights and *upheld* students' right to speak on lack-of-disruption grounds. So the district court's ruling lacks support.

## III.    L.M. is entitled to judgment as a matter of law on his free-speech claim because Middleborough couldn't reasonably forecast that his t-shirt messages would result in material and substantial interference at school.

*Tinker* also empowers schools to regulate student speech that "material[ly] and substantial[ly] interfere[s] with schoolwork or discipline." 393 U.S. at 511. L.M.'s speech resulted in no actual "disturbances or disorders." *Id.* at 514; *accord* App.18, 28, 31–32, 96–97. So the district can prevail only by "demonstrat[ing] . . . facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at

514. Middleborough produced no such facts, as the Supreme Court's and other circuits' decisions make clear.

### A. Supreme Court precedent shows that Middleborough couldn't reasonably forecast substantial disruption as a result of L.M.'s t-shirt messages.

The district's ability to mute L.M.'s speech turns on "a specific showing of constitutionally valid reasons" to predict a substantial disruption. *Tinker*, 393 U.S. at 511. No such showing is possible here. Six principles derived from Supreme Court precedent explain why.

First, *Tinker*'s standard is "demanding" because most interruptions caused by student speech aren't "'substantial.'" *Mahanoy*, 141 S. Ct. at 2047–48 (quoting *Tinker*, 393 U.S. at 514). It's not enough for a school to show "discussion[s]" in class for "a couple of days," peer "upset," or that students "ask[ed]" related questions. *Id.* Even an exchange of "warnings" by students opposing and defending the speech and a "practically 'wrecked'" math class falls below that threshold. *Tinker*, 393 U.S. at 517 (Black, J., dissenting). At best, Middleborough could predict standard-grade interruptions resulting from L.M.'s speech, nothing more.

Consider *Tinker*, where children's armband wearing occurred in the midst of "vehement" debate, "[a] wave of draft card burning[s]," and "vocal" expression by those "supporting" and "opposing" the Vietnam War. *Id.* at 510 n.4. Yet the Supreme Court held there was "no evidence

whatever of [the protestors'] interference, actual or nascent, with the schools' work." *Id.* at 508. Middleborough's atmosphere isn't half so volatile. And there are no widespread debates about sex and gender because the district eliminates competing viewpoints. There's no basis to predict a substantial disruption would occur.

Second, certain modes of expression are more potentially disruptive than others, *United States v. Kokinda*, 497 U.S. 720, 734 (1990), and t-shirt wearing falls near the bottom of the list, *Bd. of Airport Comm'rs of the City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987). The Supreme Court has "noted the nondisruptive nature of expressive apparel" like L.M.'s t-shirts. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1887 (2018) (quotation omitted). And *Tinker* itself protected students' "silent, passive expression[s] of opinion" through apparel. 393 U.S. at 508. So reasonably forecasting a substantial disruption based on a t-shirt would require exceptional facts. But Middleborough provided none, relying on "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," which is insufficient. *Id.* at 509.

Third, schools may only suppress speech that substantially "disrupts or is about to disrupt normal school activities" based on an "individualized" assessment of "the particular fact situation." *Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972) (applying *Tinker*). Here, officials ordered L.M. to remove his t-shirts or leave school before the

end of his first class. App.28, 31, 96–97. No meaningful facts were developed. No tailored inquiry occurred. Officials rushed to judgment and censured L.M.'s speech based merely on "an urgent wish to avoid the controversy which might result." *Tinker*, 393 U.S. at 510. And that *Tinker* forbids.

Fourth, *Barnette* and *Tinker* underlie the Supreme Court's prohibition on viewpoint discrimination. The former bars officials from "prescrib[ing]" which ideas are "orthodox" (and allowed), and which are unorthodox (and forbidden). *Barnette*, 319 U.S. at 642. And the latter deems listeners' "offens[e]" at "ideas . . . themselves" a forbidden "viewpoint"-based reason for censoring speech. *Matal v. Tam*, 582 U.S. 218, 243–44 (2017) (plurality opinion) (quotation omitted) (citing *Tinker*, 393 U.S. at 509–14); *accord id.* at 250 (Kennedy, J., concurring) (citing "*ante*, at 1763–1764," the plurality's reliance on *Tinker*).

Justice Alito's controlling concurrence in *Morse v. Frederick*, 551 U.S. 393, 423 (2007),[6] makes the ban on viewpoint discrimination clear. Both he and Justice Kennedy refused to allow schools to cite their "educational mission" as a justification for "suppress[ing] speech on political and social issues based on disagreement with the viewpoint

---

[6] Several other circuits have deemed Justice Alito's *Morse* concurrence controlling. *E.g.*, *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 309–13 (3d Cir. 2013) (en banc); *Morgan v. Swanson*, 659 F.3d 359, 403 (5th Cir. 2011) (en banc).

expressed." *Id.* (Alito, J., concurring). Similarly, the *Morse* plurality forbade schools from censuring "any speech that could fit under some definition of 'offensive,'" *id.* at 409, a distinction the Court has ruled viewpoint based, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299–2301 (2019).

Middleborough violated this viewpoint-discrimination ban at every turn by (a) establishing an orthodox opinion that gender is identity-based, promoting and encouraging students to adopt that view, and barring L.M.'s contrary view that gender is sex-based; (b) suppressing L.M.'s speech on a matter of political and social concern based on disagreement with his viewpoint, and (c) censuring L.M.'s t-shirt messages as the direct result of others' subjective complaints of offense at his ideas. App.17–18, 24–33, 55–56, 58, 63–64, 94–97.

Fifth, public schools are barred from implementing heckler's vetoes. *Tinker* relied on *Terminiello v. City of Chicago*, 337 U.S. 1 (1949)—a classic heckler's veto case—for the proposition that schools cannot censure expression based on "fear" experienced by other students or the prospect those students might "start an argument or cause a disturbance."[7] 393 U.S. at 508. "[E]ven if [otherwise protected] speech is deeply offensive to members of the school community and may cause a disruption, the school cannot punish the student who spoke out;

---

[7] *Accord Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 681–82 (6th Cir. 2001) (*Tinker* "echoed *Terminiello*'s rationale").

that would be a heckler's veto." *Mahanoy*, 141 S. Ct. at 2056 (Alito, J., concurring) (quotation omitted); *accord Kennedy*, 142 S. Ct. at 2427 (rejecting a "modified heckler's veto" in schools in the Establishment Clause context (quotation omitted)).

Here, Middleborough's only plausible basis for predicting a substantial disruption is other students' extreme reaction. But that forecast isn't reasonable. What's more, "[i]f listeners riot because they find speech offensive, schools should punish the rioters, not the speaker. In other words, the heckler's don't get the veto." *Mahanoy*, 141 S. Ct. at 2056 (Alito, J., concurring) (cleaned up).

Last, L.M.'s protest shirt was a direct response to the district's censorship of his viewpoint. *Mahonoy* recognizes the importance of protecting students' right to "critici[ze] . . . the rules of a community of which [they] form[ ] a part." 141 S. Ct. at 2046. And that's all L.M.'s t-shirt did: protest L.M.'s inability to express his beliefs at school. App.31, 96. No "facts" known at the time could "reasonably have led school authorities to forecast substantial disruption" as a result of his advocacy for free speech. *Tinker*, 393 U.S. at 514. Administrators censured L.M.'s protest shirt out of a mere "undifferentiated fear or apprehension of disturbance," which is "not enough." *Id.* at 508.

**B.    Decisions by other circuits show that Middleborough's prediction of substantial disruption was unjustified and unreasonable.**

This Court's precedent doesn't address *Tinker*'s substantial-disruption prong. But other circuits' decisions do. And those rulings show the untenable nature of Middleborough's prediction that L.M.'s speech would cause material and substantial interference at school.

Critically, "schools must tolerate a great deal of student speech that is not lewd or vulgar." *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 326 (2d Cir. 2006). Courts do not give "sweeping and total deference to school officials." *B.H.*, 725 F.3d at 316. Officials "cannot rely on *ipse dixit* to demonstrate the 'material and substantial' interference" loomed. *Shanley*, 462 F.2d at 970. "[D]emonstrable factors," *id.* at 974, must bear out "a specific and significant fear of disruption," *Saxe*, 240 F.3d at 211. So officials must prove they acted on "reasonable inferences flowing from concrete facts and not abstractions." *James v. Bd. of Educ. of Cent. Dist. No. 1*, 461 F.2d 566, 571 (2d Cir. 1972).

Middleborough cannot do so here. There was no sign of disruption when L.M. wore his t-shirts to school. App.28, 31–32, 96–97.  Publicly, other students supported L.M.'s expression. App.30, 56. Privately, a few students may have complained. App.28, 55–56, 96. But class proceeded as normal. App.28, 31–32, 96–97. No contemporary events suggested that a material and substantial interference with school activities was around the corner.

46

Schools may also forecast material disruption "based on past incidents arising out of similar speech." *Saxe*, 240 F.3d at 212. But that doesn't help the district. As far as we know, Middleborough never allowed students to express contrary views of sex and gender at school. App.17–19, 22, 25–26, 28–29, 97. So the result of launching a true marketplace of ideas is unknown. Certainly, there were no historical data capable of showing "a realistic threat of substantial disruption" at school. *Saxe*, 240 F.3d at 217.

What's more, on this record, every reasonable inference favors L.M.—not the district. Multiple circuits have recognized that speaking passively through a t-shirt or button is unlikely to cause a material disruption[8] *E.g.*, *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 259 (4th Cir. 2003) (t-shirt); *Chandler*, 978 F.2d at 530–31 (button); *Burnside*, 363 F.2d at 748 (button). T-shirts were L.M.'s only mode of expression. App.26, 29–31. So the district could at most expect "some slight, easily overlooked disruption" of class. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1271 (11th Cir. 2004). And that sort of "insubstantial impact" on school activities doesn't justify barring speech. *Id.*

---

[8] *Accord Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 37–38 (10th Cir. 2013) (t-shirts have little potential for disruption).

Crucially, officials cannot ban expression based on "intuition," *Shanley*, 462 F.2d at 974, or the "apprehension or speculation that disturbances or interferences" will occur, *Conn. State Fed'n of Teachers v. Bd. of Educ. Members*, 538 F.2d 471, 478 (2d Cir. 1976). But that's what happened here. Administrators silenced L.M. based on a few complaints from students and teachers. Later, they raised potential disruption too. App.63. But any forecast of disruption must be reasonable. *DeJohn v. Temple Univ.*, 537 F.3d 301, 319 (3d Cir. 2008); *Shanley*, 462 F.2d at 974; *Holloman*, 370 F.3d at 1273. And the district's isn't because no student protested in class, walked out of the room, or even said a harsh word. App.28, 31–32, 96–97.

All that remains is a few student complaints, which are not only insufficient but irrelevant. Schools cannot "prohibit[ ]" student expression simply because "students, teachers, [or] administrators[ ] . . . may disagree with its content." *Shanley*, 462 F.2d at 970. L.M.'s right to free speech doesn't turn on elections, *Barnette*, 319 U.S. at 638, or other students' permission, *Saxe*, 240 F.3d at 212. "The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264–65 (3d Cir. 2002) (quotation omitted). Simply put, Middleborough cannot ban L.M.'s messages "in the name of preventing disruption, when the only disruption was the effect controversial speech has on those who disagree with it *because they*

*disagree with it.*" *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 786 (9th Cir. 2022) (emphasis in original).

It makes no difference that Middleborough cloaks censorship in anti-harassment or anti-discrimination terms. "There is no categorical 'harassment exception' to the First Amendment's free speech clause," *Saxe*, 240 F.3d at 204; *accord DeJohn*, 537 F.3d at 319–20, and "no public accommodations law is immune from the demands of the Constitution," *303 Creative*, 143 S. Ct. at 2315. Nor can Middleborough bar any speech that touches on transgender students' identity or "'values.'" *Saxe*, 240 F.3d at 210. Because those topics lay "at the heart of moral and political discourse," any speech concerning them implicates "the core concern of the First Amendment." *Id.*

Excluding L.M.'s messages to "creat[e] a safe place" and ensure "inclusivity and tolerance" for LGBT students fails too. *Dodge*, 56 F.4th at 786 (quotation omitted). Those are just bywords for "avoid[ing] the 'discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Id.* (quoting *Tinker*, 393 U.S. at 509). Schools can't "suppress or punish speech . . . because it takes a political or social viewpoint different from theirs, or different from that subscribed to by the majority." *Bystrom*, 822 F.2d at 755. That's this case.

One last basis for a material disruption remains: a heckler's veto. Yet L.M. "reasonably exercise[d] [his] freedom of expression" and the district could not "restrain[ ] or punish[ ]" him "because a small,

perhaps vocal or violent, group of students with differing views might . . . create a disturbance." *Shanley*, 462 F.2d at 974. Nothing of that sort appeared likely. But even if LGBT "students and their sympathizers [actually] harassed [L.M.] because of their disapproval of [his] message," the district would have no "permissible ground for banning it." *Zamecnik*, 636 F.3d at 879; *accord Holloman*, 370 F.3d at 1275–76.

Regarding L.M.'s protest shirt, the substantial-disruption analysis is straightforward. L.M.'s "There are [censored] genders" shirt opposed the district's speech censorship. App.31, 96. So L.M. was engaged in the "protest of a government policy" that had been applied directly to him. *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 760 (8th Cir. 2008). A primary function of the Free Speech Clause is to protect the right of "those governed and regulated" to "comment[ ] upon the actions of their . . . governors and regulators." *Shanley*, 462 F.2d at 972 n.10. And that's what L.M. did until officials forced him to choose between free speech and his education that day. App.31, 96–97.

Nothing supports Middleborough's suppression of L.M.'s protest shirt based on a "There are only two genders" message no one could see. Additionally, "where arguably political speech is directed against the very individuals who seek to suppress that speech," as is the case here, "school officials do not have limitless discretion." *Chandler*, 978 F.2d at 531. This Court has "a First Amendment responsibility to insure that robust rhetoric is not suppressed." *Id.* (cleaned up). And it should fulfill

that responsibility by holding that Middleborough's censorship of L.M.'s protest shirt violated his free-speech rights.

## IV.  Certain provisions of the school dress code are unconstitutional both facially and as-applied to L.M.'s speech.

Middleborough's dress code provisions barring messages that officials deem "hate speech," "target[ing] groups," or "unacceptable to community standards" are unconstitutional, both facially and as applied to L.M.'s t-shirts. App.50. Schools may teach students tolerance and respect. But "[t]he constitutional line is crossed when, instead of merely teaching, the educators demand that students express agreement with the educator's values" or remain silent. *Pyle*, 861 F. Supp. at 173 (quotation omitted).

### A.  The First and Fourteenth Amendment's requirements for speech policies.

Middleborough's dress code must survive a gauntlet of three constitutional doctrines. First, because the dress code forbids certain messages before they occur, it's a prior restraint on speech. *Alexander v. United States*, 509 U.S. 544, 550 (1993). Prior restraints cannot leave the decision "of who may speak and who may not" to an official's "unbridled discretion" or allow officials to discriminate based on content or viewpoint. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988).

Second, a regulation may be clear and precise, and still unconstitutionally overbroad. In the free-speech context, that means "a substantial number of its applications are unconstitutional, judged in relation to the [regulation's] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation omitted).

Third, the void-for-vagueness doctrine requires a regulation to give "a person of ordinary intelligence fair notice of what is prohibited" and contain sufficient standards so as not to "authorize[ ] or encourage[ ] seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quotation omitted).

### B. Middleborough's ban on messages that officials deem "hate speech" is unconstitutional.

Middleborough's dress code bans messages that "state, imply, or depict hate speech . . . based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation, or any other classification." App.50. None of these terms are defined. So the unbridled discretion and vagueness problems are stark.

"Hate speech" has no standard definition and is largely in the eye of the beholder. The policy's prohibition on "state[d]," "impl[ied]," or "depict[ed]" hate speech magnifies the problem exponentially, sweeping in speech that only a diversity, equity, and inclusion expert would find "hateful," and even depictions of famous art. *Cf. Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477, 482 (E.D. Mich. 1993) (barring "'negative

connotations'" is unconstitutional). Just as concerning, the code's "any other classification" language, which is completely vacuous, leaves a wide variety of student expression open to suppression.

The policy also invites officials to discriminate based on viewpoint and encourages discriminatory enforcement. Negative or "hateful" messages touching directly, indirectly, or pictorially on "any" classification are banned. Yet positive or "loving" messages are welcomed. That's viewpoint discriminatory on its face. *Iancu*, 139 S. Ct. at 2299–2301. So too is equating "hateful" messages with "offensive" speech, which the code readily allows. *Id.* at 2301; *cf. Pyle*, 861 F. Supp. at 170. And this was essentially the district's reason for continuing to ban L.M.'s first shirt here. App.63 (barring "offensive" messages).

What's more, the First Amendment doesn't categorically exempt "hate speech" from protection. *C1.G ex rel. C.G. v. Siegfried*, 38 F.4th 1270, 1279 (10th Cir. 2022). School speech policies must comply with *Tinker. E.g.*, *Saxe*, 240 F.3d at 215–17; *Pyle*, 861 F. Supp. at 170–73. Yet Middleborough's policy makes no mention of substantial disruption or interference with other students' rights. App.49–50. "Simply utilizing buzzwords" like hate speech "does not cure this deficiency." *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 372 (M.D. Pa. 2003). As most of the "hate speech" policy's applications are to protected, not unprotected, speech, it is significantly overbroad and unconstitutional.

### C.    The district's prohibition on messages "target[ing] groups" is unconstitutional.

Non-discrimination rules usually list several protected classes. Middleborough's policy bans messages that "target groups" based on "any . . . classification" officials can imagine. App.50. With language this vague and broad, it's impossible for reasonable students to know what violates the policy in advance. Administrators have perfect freedom to interpret "target[ing]" and "any . . . classification" as they wish. And that encourages severely discriminatory enforcement.

L.M.'s experience bears this out. After L.M. wore his "There are only two genders" shirt to school, officials censored L.M.'s message based on his alleged "target[ing]" of transgender students. App.55. But the real problem was that a few students complained they were "upset" by L.M.'s beliefs. App.56. Officials simply made the policy's wide-open "target[ing]" language turn "on the reaction of listeners" and students' expression of "hurt feelings" or "offense." *Sypniewski*, 307 F.3d at 264–65. And that is both viewpoint discriminatory, *Iancu*, 139 S. Ct. at 2301, and "unconstitutionally overbroad," *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 864 (E.D. Mich. 1989).

### D.    Middleborough's ban on "unacceptable" messages that defy "community standards" is unconstitutional

The policy's ban on messages "the administration determines to be unacceptable to our community standards" doesn't just invite unbridled

discretion, viewpoint discrimination, and discriminatory enforcement, it demands it. App.50. Middleborough essentially drafted a policy that is a hollow shell. It has no guardrails and provides officials a blank check to tailor "community standards" to their desired outcomes and prohibit any views that offend or which they personally dislike.

Superintendent Lyons confirmed this blank check by stating that dress code violations are completely "*at the discretion* of the building administration" who decides what is "appropriate[ ]." App.74 (emphasis added). It was on this patently unconstitutional basis that she approved Acting Principal Tucker's suppression of L.M.'s speech. *Id.*

But school principals are not petty monarchs with royal prerogative and students are not their subjects. L.M. is a person "under our Constitution" with "fundamental rights which the State must respect." *Tinker*, 393 U.S. at 511. Neither Middleborough's policy nor its application to L.M. may stand. This Court should invalidate both.

## CONCLUSION

L.M. respectfully asks this Court to reverse and remand for the district court to enter final judgment in L.M.'s favor on his First and Fourteenth Amendment claims; issue a permanent injunction allowing L.M. to wear his "There are only two genders" t-shirt and similar messages to school; issue a declaratory judgment that the "hate speech," "target[ing] groups," and "unacceptable to our community standards"

provisions of the dress code are unconstitutional, facially and as-applied; and award L.M. actual and nominal damages.

Dated: September 25, 2023

Respectfully submitted,

TYSON C. LANGHOFER
P. LOGAN SPENA
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@ADFlegal.org
lspena@ADFlegal.org

ANDREW D. BECKWITH
SAMUEL J. WHITING
MASSACHUSETTS FAMILY
INSTITUTE
401 Edgewater Pl., Ste. 580
Wakefield, MA 01880
(781) 569-0400
andrew@mafamily.org
sam@mafamily.org

s/Rory T. Gray
RORY T. GRAY
DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org
dcortman@ADFlegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

*Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,063 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: September 25, 2023

*s/Rory T. Gray*
Rory T. Gray

*Attorney for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Rory T. Gray*
Rory T. Gray

*Attorney for Appellant*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Order Denying Motion for Preliminary Injunction .......................... Add.1

Final Judgment ................................................................. Add.18

Constitutional Provisions.............................................. Add.19

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

L.M.,                                              *
                                                   *
        Plaintiff,                                 *
                                                   *
        v.                                         *      Civil Action No. 1:23-cv-11111-IT
                                                   *
TOWN OF MIDDLEBOROUGH;                             *
MIDDLEBOROUGH SCHOOL                               *
COMMITTEE; Carolyn LYONS,                          *
Superintendent of the Middleborough Public         *
Schools, in her official capacity; and             *
HEATHER TUCKER, acting Principal of                *
Nichols Middle School, in her official             *
capacity,                                          *
                                                   *
        Defendants.                                *

MEMORANDUM & ORDER

June 16, 2023

TALWANI, D.J.

    Plaintiff L.M., a minor, by and through his father and stepmother, alleges violations of

his First and Fourteenth Amendment rights by Defendants Town of Middleborough, the

Middleborough School Committee (the "School Committee"), and two school administrators.

Verified Compl. [Doc. No. 11]. Pending before the court is L.M.s Motion for a Preliminary

Injunction [Doc. No. 12], which Defendants oppose.

## I.    Background

    Nichols Middle School ("Nichols") is a public middle school in Middleborough,

Massachusetts. Verified Compl. ¶ 43 [Doc. No. 11]. Defendant Carolyn Lyons is the

Superintendent of Middleborough Public Schools, and Defendant Heather Tucker is the acting

Principal of Nichols. Id. ¶¶ at 26, 36.

Student survey data collected in June 2022 at Nichols "show over 20 individual student[] comments about perceived bullying at school, feeling unwelcome at school, and expressing specific concerns about how the LGBTQ+ population is treated at school." Affidavit of Carolyn Lyons ("Lyons Aff.") ¶ 23 [Doc. No. 45]. Lyons is aware of several Nichols students, including "members of the LGBTQ+ community," having attempted to commit suicide or having had suicidal ideations, and that "[t]hese situations have frequently cited LGBTQ+ status and treatment as a major factor." Id. at ¶ 25. In July 2022, one Middleborough High School student committed suicide. Id.; see also Second Affidavit of Heather Tucker ("Tucker Aff.") ¶ 32 [Doc. No. 46] (Tucker was informed of the student suicide). Before assuming her position at Nichols, Tucker had met with parents of students and students themselves who have been bullied "because of the lack of acceptance of their gender identify." Tucker Aff. ¶ 2 [Doc. No. 46]. Tucker has also worked closely with students who have been hospitalized for attempted suicide or suicidal ideation or who have self-harmed "because of their gender identity." Id. Tucker is aware of several students at Nichols who identify as "transgender or gender nonconforming." Id. at ¶ 31.

In January 2022, May 2022, and January 2023, teachers and staff at Nichols received training "to further the goal of providing support to students who are part of the LGBTQ+ community." Lyons Aff. ¶ 24 [Doc. No. 45].

Nichols promotes messages commonly associated with "LGBTQ Pride." Affidavit of L.M. ("L.M. Aff.") ¶ 5 [Doc. No. 43]. Nichols also observes events like "Pride Month," and "Pride Day" in support of the "LGBTQ+ community." Tucker Aff. ¶ 27 [Doc. No. 46]. Nichols has had a Gay Straight Alliance Club since at least 2018, "[t]o further the goal of providing support to students who are part of the LGBTQ+ community." Lyons Aff. ¶ 22 [Doc. No. 45].

2

Add.002

The club is a student-run organization, id., that is intended as a space for students who "fit under the LGBTQ+ umbrella or are their allies." Tucker Aff. ¶ 31 [Doc. No. 46]. Generally, approximately ten to twenty students attend the club meetings. Id.

Each year, students and their families are provided with the Nichols Jr. Middle School Student & Family Handbook (the "Handbook"). Tucker Aff. ¶ 3 [Doc. No. 46]. The Handbook includes a Code of Conduct with a dress code (the "Dress Code"). Verified Compl. Ex. C 44-45 [Doc. No. 11-3]. The Dress Code provides, in relevant part, that Nichols:

> expect[s] all students to conform to the following:
>
> ....
>
> - Clothing must not state, imply, or depict hate speech or imagery that target groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation, or any other classification.
>
> - Any other apparel that the administration determines to be unacceptable to our community standards will not be allowed.

Id. The Dress Code states further that "[i]f students wear something inappropriate to school, they will be asked to call their parent/guardian to request that more appropriate attire be brought to school. Repeated violations of the [D]ress [C]ode will result in disciplinary action." Id.

L.M. is a twelve-year old student at Nichols. L.M. Aff. ¶ 2 [Doc. No. 43]. L.M. and his father both signed an acknowledgment form at the beginning of the 2022-2023 school year reflecting that each "understand[s] the regulations and policies of [Nichols] contained in the Student/Parent Handbook for 2022-20223" and that L.M., as a student, "is responsible for following the regulations and policies of [Nichols]." Lyons Aff., Ex. B, Nichols Handbook 80 [Doc. No.45-2].

3

On March 21, 2023, L.M. attended school at Nichols in a t-shirt with the message "THERE ARE ONLY TWO GENDERS" (the "Shirt"). L.M. Aff. ¶ 14 [Doc. No. 43].[1] While L.M. was participating in gym class, Principal Tucker asked L.M. to come speak with her. Id. at ¶ 15; Tucker Aff. ¶ 6 [Doc. No. 46]. Tucker informed L.M. that he could not wear the Shirt because of complaints, and that he could either remove the Shirt or discuss it further in another room. L.M. Aff. ¶ 15 [Doc. No. 43]; Tucker Aff. ¶ 6 [Doc. No. 46]. L.M. indicated he would like to discuss it further and Tucker escorted him to another room, where the school counselor joined the conversation. L.M. Aff. ¶ 16 [Doc. No. 43]; Tucker Aff. ¶ 7 [Doc. No. 46]. Tucker reiterated that some students and staff complained that the Shirt made them upset, and that L.M needed to remove the Shirt to return to class. L.M. Aff. ¶ 18 [Doc. No. 43]. L.M. declined and Tucker called L.M.'s father. L.M. Aff. ¶ 18 [Doc. No. 43]; Tucker Aff. ¶ 8 [Doc. No. 46]. Tucker explained to L.M.'s father that L.M. could not return to class if he did not remove the Shirt. L.M. Aff. ¶ 18 [Doc. No. 43]; Tucker Aff. ¶ 8 [Doc. No. 46]. L.M's father picked L.M. up from school and L.M. did not return to class for the rest of the day. Id. at ¶ 8. L.M. did not observe any disruption to school classes or activities by his wearing of the Shirt. L.M. Aff. ¶ 17 [Doc. No. 43]. Nor did L.M. observe any students complaining or appearing to be upset. Id. at ¶ 16.

L.M. returned to school the following day and has attended every school day since then. Tucker Aff. ¶ 10 [Doc. No. 46]. L.M. was permitted to wear other t-shirts to Nichols, including ones with the messages: "Don't Tread on Me"; "First Amendment Rights"; "Freedom Over Fear"; and "Let's Go Brandon." Tucker Aff. ¶¶ 11, 28 [Doc. No. 46]. L.M. was not asked to remove any of these shirts. Id.

---

[1] L.M. attests that he equates "gender" with "sex" and that he believes that there are only two sexes, male and female. Id. at ¶ 6.

On April 1, 2023, L.M.'s father emailed Superintendent Lyons regarding the March 21, 2023 incident. Verified Compl. ¶ 95 [Doc. No. 11]; Lyons Aff. ¶ 4 [Doc. No. 45]. L.M.'s father asked about the substance and number of complaints lodged regarding the Shirt and why L.M. was removed from class given the Shirt "simply stated [L.M.]'s view on a subject that has become a political hot topic." Compl, Ex. E Emails [Doc. No. 11-7]. On April 4, 2023, Lyons responded that L.M. was not, nor would be the subject of discipline for wearing the Shirt. Id. Lyons explained that Tucker sought L.M.'s compliance with the Dress Code, which Lyons supported, where the "content of [the S]hirt targeted students of a protected class; namely in the area of gender identity." Id.

L.M. has not been restricted from posting on social media when not in school. Tucker Aff. ¶ 12 [Doc. No. 46]. On April 13, 2023, L.M. attended the School Committee meeting and spoke during the public comment period regarding the Shirt. Verified Compl. ¶ 97 [Doc. No. 11]. At the School Committee Meeting, L.M. stated:

> What did my shirt say? Five simple words: "There are only two genders." Nothing harmful. Nothing threatening. Just a statement I believe to be a fact. I have been told that my shirt was targeting a protected class. Who is this protected class? Are their feelings more important than my rights? I don't complain when I see "pride flags" and "diversity posters" hung throughout the school. Do you know why? Because others have a right to their beliefs just as I do. Not one person, staff, or student told me that they were bothered by what I was wearing. Actually, just the opposite. Several kids told me that they supported my actions and that they wanted one too.

Id. L.M.'s statements have been broadcast on YouTube. Id. (citing *There Are Only Two Genders*, YouTube, (May 3, 2023) bit.ly/3pD6TN8 (last accessed May 16, 2023) at 9:40-12:20).

On April 27, 2023, counsel for L.M. sent a letter to Lyons, asserting that Defendants had censored L.M. in violation of his First Amendment rights by restricting L.M. from wearing the Shirt in school. Id. at ¶¶ 98, 99; Verified Compl. Ex. F, April 27, 2023 Letter [Doc. No. 11-8]. The letter stated that L.M. intended to wear the Shirt again on May 5, 2023. Counsel requested

Lyons' confirmation that L.M. would be permitted to wear the Shirt. Verified Compl. ¶¶ 98-99 [Doc. No. 11]; Verified Compl. Ex. F, April 27, 2023 Letter [Doc. No. 11-8].

On or about April 29, 2023, the incident involving the Shirt became the subject of news coverage, which included interviews of L.M. and discussion on social media amongst parents, students, and others about the incident. Tucker Aff. ¶ 16 [Doc. No. 46].

On May 4, 2023, counsel for the Middleborough Public Schools responded to L.M.'s counsel's letter, stating that under <u>Tinker v. Des Moines Independent Community School District</u>, 393 U.S. 503, 508 (1969), and Massachusetts law prohibiting discrimination, harassment, and bullying on the basis of sexual orientation and gender identity, Middleborough Public Schools "has, and will continue to, prohibit [the Shirt worn by L.M.] or anyone else [wearing messages] likely to be considered discriminatory, harassing and/or bullying to others including those who are gender nonconforming by suggesting that their sexual orientation, gender identity or expression does not exist or is invalid." Verified Compl. Ex. G, May 4, 2023 Letter [Doc. No. 11-9]. Assistant Principal Jason Carroll learned of this letter from Principal Tucker and was aware of concern that the Shirt "would be disruptive and would cause students in the LGBTQ+ community to feel unsafe." Affidavit of Jason Carroll ("Carroll Aff.") ¶ 3 [Doc. No. 47].

On May 5, 2023, L.M. wore the Shirt to Nichols, but with the phrase "ONLY TWO" covered by a piece of tape with the word "CENSORED" (the "Taped Shirt"). L.M. Aff. ¶¶ 19, 20 [Doc. No. 43]. When L.M. arrived at his first class, he was instructed to go to Tucker's office. <u>Id.</u> at ¶ 20; Carroll Aff. ¶ 4 [Doc. No. 47] (Carroll looked for L.M. that morning and brought him to Carroll's office to meet with Tucker and Carroll). Before meeting with Tucker, L.M. removed the Taped Shirt. L.M. Aff. ¶ 20 [Doc. No. 43] (L.M. removed the Taped Shirt on the way to the

6

office); Carroll Aff. ¶ 4 [Doc. No. 47] (when Carroll and Tucker entered Carroll's office, L.M. had already removed the Taped Shirt); Tucker Aff. ¶ 22 [Doc. No. 46] (when Tucker returned to Carroll's office after speaking with the Superintendent and School counsel, L.M. had removed the Taped Shirt). Tucker instructed L.M. that he could keep the Taped Shirt in his backpack or leave it in the Assistant Principal's Office for the day. Tucker Aff. ¶ 22 [Doc. No. 46]. L.M. put the Taped Shirt away and returned to class. L.M. Aff. ¶ 21 [Doc. No. 43]; Carroll Aff. ¶ 5 [Doc. No. 47]. He did not wear the Taped Shirt for the remainder of the school day. L.M. Aff. ¶ 21 [Doc. No. 43]. L.M. did not witness any disruption to school classes or activities resulting from his wearing the Taped Shirt on May 5, 2023. L.M. Aff. ¶ 22 [Doc. No. 43].

On May 9, 2023, two other students wore shirts with the words "There Are Only Two Genders" to Nichols. Tucker Aff. ¶ 24 [Doc. No. 46]. Tucker met with the students and told them they were required to change their shirts. Id. One student followed this directive and returned to class. Id. The other student did not, the student's parents were called, and Tucker met with the student's mother at the school. Id. Following this meeting, the student went home as the school day was over. Id. Neither these two students nor L.M. was disciplined after wearing a shirt with the words "There are only two genders." Id. at ¶¶ 9, 24.

On May 11, 2023, Plaintiff filed the instant action bringing claims under 42 U.S.C. 1983 for violation of the First and Fourteenth Amendments. L.M. contends that the Defendants' application of the Dress Code to restrict the Shirt and the Taped Shirt, but not other messages by Nichols students pertaining to sexual orientation, gender identity, and expression, amounted to impermissible viewpoint discrimination. Plaintiff also asserts that the Dress Code is vague and overbroad on its face.

Add.007

On May 19, 2023, Plaintiff filed his <u>Emergency Motion for a Temporary Restraining Order and Preliminary Injunction</u> [Doc. No. 12]. Following a hearing, the court denied emergency relief. June 1, 2023 Elec. Order [Doc. No. 38]. The court held oral argument as to the preliminary injunction on June 13, 2023. Clerk's Notes [Doc. No. 48].

## II.    Preliminary Injunction Standard

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

<u>Esso Standard Oil Co. v. Monroig–Zayas</u>, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting <u>Bl(a)ck Tea Soc'y v. City of Boston</u>, 378 F.3d 8, 11 (1st Cir. 2004)).

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." <u>New Comm Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." <u>Sindicato Puertoriqueno de Trabajadores v. Fortuno</u>, 699 F.3d 1, 10 (1st Cir. 2012). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." <u>Id.</u> at 9 (quoting <u>Respect Maine PAC v. McKee</u>, 622 F.3d 13, 15 (1st Cir. 2010)).

Add.008

### III.   Discussion

A.   *Likelihood of Success on the Merits*

1.   Legal Framework

A student's rights to freedom of expression while attending public school in Massachusetts is defined by Supreme Court and First Circuit case law. "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." Tinker, 393 U.S. at 506. "[F]or the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Id. at 509.

But "the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (internal citation and quotation marks omitted). "A school need not tolerate student speech that is inconsistent with its basic educational mission, [ ] even though the government could not censor similar speech outside the school." Id. (citation and internal quotation marks omitted).

So while students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," schools may impose limitations on speech. Tinker, 393 U.S. at 506. "[C]onduct by the student, in class or out of it, which for any reason–whether it stems from time, place, or type of behavior–materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Id. at 513. This interest in regulating speech is at its strongest

9

when the speech occurs under the school's supervision, where the school stands <u>in loco parentis</u> towards all students, and of lesser interest where the speech or expression occurs outside of school. <u>Mahonoy Area Sch. Dist. v. B.L.</u>, 141 S.Ct. 2038, 2046 (2021).[2]

While a school bears the burden of justifying restrictions on student speech, <u>Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.</u>, 969 F.3d 12, 25 (1st Cir. 2020), courts should generally defer to school administrators' decisions regarding student speech so long as the administrators' judgment is reasonable, <u>id.</u> at 30.

2.       Challenge to March 21, 2023 Dress Code Enforcement

Plaintiff contends that he is likely to prevail on his claim that the Shirt was constitutionally protected expression and that Defendants' enforcement of the Dress Code on March 21, 2023, impermissibly restricted L.M.'s First Amendment free speech right, constituted viewpoint discrimination, and lacked justification. Plaintiff asserts that Defendants have not met their burden of demonstrating (i) that the shirt caused a material and substantial disruption, where Defendants assert only a few unidentified complaints were made, or (ii) that the Shirt invaded the rights of others, where the Shirt did not target a specific individual. Mem. in Supp. of Pl. Emergency Mot. for Temp. Restraining Order and Prelim. Injunction ("PI Mem.") 9-10 [Doc. No. 13]; Pl. Suppl. Mem. in Supp. of Mot. for Prelim. Injunction ("Suppl. PI Mem.") 7 [Doc. No. 42]. Defendants do not dispute that the Shirt may be constitutionally protected speech,

---

[2] The Court in <u>Mahonoy</u> pointed to three features of off-campus speech that diminish the strength of the unique educational characteristics that call for special First Amendment leeway in school: (1) the school is rarely standing <u>in loco parentis</u> off campus; (2) regulation of off-campus speech coupled with regulations on-campus speech would stop students from engaging in speech at all; and (3) "the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus" because of schools' role in preparing citizens to carry on "[o]ur representative democracy." 141 S.Ct. at 2046.

however, they assert that their restriction of the Shirt was justified where (i) the administration received complaints from students and staff, and (ii) the Shirt invaded on the rights of trans and gender non-conforming students, who are a protected class under Massachusetts law. Defs. Opp. 5, 10 [Doc. No. 44].

Plaintiff has not established a likelihood of success on the merits where he is unable to counter Defendants' showing that enforcement of the Dress Code was undertaken to protect the invasion of the rights of other students to a safe and secure educational environment. School administrators were well within their discretion to conclude that the statement "THERE ARE ONLY TWO GENDERS" may communicate that only two gender identities–male and female– are valid, and any others are invalid or nonexistent,[3] and to conclude that students who identify differently, whether they do so openly or not, have a right to attend school without being confronted by messages attacking their identities. As Tinker explained, schools can prohibit speech that is in "collision with the rights of others to be secure and be let alone."  393 U.S. at 508.

Plaintiff contends that, under Norris, Defendants could not restrict the Shirt as an "invasion of the rights of others" unless it determined that the speech "targeted a *specific* student." Suppl. PI Mem. 7, 8 [Doc. No. 42] (quoting Norris, 969 F.3d at 29, emphasis added by Plaintiff). Norris, however, did not attempt to set a rule for all speech that is an "invasion[] of the rights of others" or even "the precise boundaries of what speech constitutes 'bullying' such that it falls within the 'invasion of the rights of others' framework of Tinker." Norris, 969 F.3d at 29

---

[3] L.M. attests that he does not believe his views about sex and gender to be inherently hateful and does not intend to deny any individual's existence. L.M. Aff. ¶¶ 8-9 [43]. His intent is not relevant to the question of whether the school permissibly concluded that the Shirt invades the rights of others.

Add.011

n.18. Instead, <u>Norris</u> concluded that where the school had justified the limitation on the student's statement that "THERE IS A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS" on the ground that the student had engaged in "bullying" under the school's policy, the school was required to demonstrate that it had a reasonable basis to determine that the speech targeted a specific student and invaded that student's rights. <u>Id.</u> at 25, 29.

Here, the School's rational for prohibiting the Shirt is not that LM is bullying a specific student, but that a group of potentially vulnerable students will not feel safe. A broader view directed at students' safety has been acknowledged by other courts. <u>See</u>, <u>e.g.</u>, <u>West v. Derby Unified Sch. Dist. No. 260</u>, 206 F.3d 1358, 1366 (10th Cir. 2000) (holding the display of the confederate flag may interfere with the rights of others to be secure); <u>Chandler v. McMinnville Sch. Dist.</u>, 978 F.2d 524, 529 (9th Cir. 1992) (recognizing that school officials may suppress speech that is vulgar, lewd, obscene, or plainly offensive as "such language, by definition, may well 'impinge upon the rights of other[s].'"); <u>Scott v. School Bd. of Alchua Cty.</u>, 324 F.3d 1246. 1247 (11th Cir. 2003) (recognizing that a students' rights cannot interfere "with a school administrator's professional observation that certain expressions have led to, and therefore could lead to, an unhealthy and potentially unsafe learning environment for the children they serve."); <u>see</u> <u>also</u> <u>Doe v. Hopkinton Pub. Schs.</u>, 19 F.4th 493, 505 (1st Cir. 2021) ("<u>Tinker</u> holds that schools have a special interest in regulating speech that involves the 'invasion of the rights of others.'").

Accordingly, Plaintiff has not shown a substantial likelihood of success on his claim that Defendants violated his constitutional rights in requiring him to remove the Shirt at school.[4]

    3.       Challenge to May 5, 2023 Dress Code Enforcement

Plaintiff contends that he is likely to prevail on his claim that Defendants also unconstitutionally restricted his speech when Plaintiff wore the Taped Shirt to school on May 5, 2023, because (i) the underlying message was constitutionally protected speech, and (ii) the Taped Shirt was a form of constitutionally protected protest of Defendants' censorship of Plaintiff. Suppl. PI Mem. 3-4 [Doc. No. 42]. Defendants respond that the underlying message was not constitutionally protected speech, and that Plaintiff's use of tape on the Shirt merely covered part of the offending message while still conveying the same meaning and raising the same concerns for which Defendants had restricted the Shirt in the first place.[5] Defs. Opp. 7-8 [Doc. No. 44].

Plaintiff again is unable to demonstrate a reasonable likelihood of success on the merits where Defendants have shown that they restricted the speech based on their expectation that it too would intrude on the rights of others. First, as discussed supra, the original message of the Shirt was not protected speech and could be restricted by Defendants. Second, while a message protesting censorship would not invade the rights of others, the school administrators could

---

[4] The court need not determine at this juncture whether Defendants were also justified in prohibiting the Shirt under Tinker based on a material disruption of classwork or substantial disorder.

[5] Defendants also assert that the Taped Shirt could be restricted because Defendants had reasonably forecast substantial and material disruption stemming from the taped version of the Shirt. Defendants rely, in part, on threats received by school staff and administrators about the Shirt and its restriction, as well as the need for an increased police presence at Nichols. Lyons Aff. ¶¶ 10-11 [Doc. No. 45]. These threats should be discouraged by all parties. The court has not considered those threats in applying the "invasion of the rights of others" prong of Tinker.

13

reasonably conclude that the Taped Shirt did not merely protest censorship but conveyed the "censored" message and thus invaded the rights of the other students.

    4.    Challenge to the Dress Code

Plaintiff contends that he is also likely to show the Dress Code is facially vague and overly discretionary where it targets some speech and not others. PI Mem. 14 [Doc. No. 13]. Plaintiff points to the Dress Code's application to L.M.'s "protest" on May 5, 2023, as an illustration of how "vague" and "overbroad" the Dress Code is on its face. Suppl. PI Mem. 14 [Doc. No. 42]. But this example does not support his claim where Defendants could reasonably find that the Taped Shirt would interfere with the rights of other students.

Nor is Plaintiff's overbreadth challenge likely to succeed where the Dress Code does not threaten discipline for a violation of the Dress Code that has not been specifically identified by the school as improper. To the contrary, the Dress Code provides that "[i]f students wear something inappropriate to school, they will be asked to call their parent/guardian to request that more appropriate attire be brought to school." Verified Compl., Ex. C 44-45 [Doc. No. 11-5]. Only "[r]epeated violations of the [D]ress [C]ode will result in disciplinary action." Id. at 45.

Accordingly, L.M. has failed to demonstrate a likelihood of success on the merits of his claim that the Dress Code facially violates his First Amendment rights.

    B.    *Potential for Irreparable Harm*

L.M. has likewise not established a potential for irreparable harm absent a preliminary injunction. L.M. contends that any deprivation of his First Amendment freedoms constitutes irreparable injury, and that, where he has made a strong showing of a likelihood of success on the merits, "the irreparable injury component of the preliminary injunction analysis is satisfied as well." PI Mem. 14-15 [Doc. No. 13]. However, where the court has concluded that Plaintiff has

Add.014

not demonstrated a likelihood of success on the merits, and Plaintiff offers no other arguments as to the potential for irreparable harm, Plaintiff has failed to establish this prong of the preliminary injunction analysis.

      C.    *Balance of Equities*

The third prong of the preliminary injunction analysis, the balance of equities between the parties, cuts in Defendants' favor. As to the harm to L.M. absent an injunction, there is no doubt Defendants have restricted L.M.'s speech during school hours. However, this is not a circumstance where the restrictions are such that L.M. "cannot engage in that kind of speech at all." Mahonoy Area Sch. Dist., 141 S.Ct. at 2046. Although L.M.'s speech as to the specific message displayed on the Shirt has been restricted while at school, L.M. has been and remains free to convey his message elsewhere, and in fact, his message has been amplified through social media, news outlets, and this litigation. Further, L.M. has not been restricted from other speech while attending school. He has worn a variety of messages, see Tucker Aff. ¶ 11 [Doc. No. 46], and can voice his views elsewhere, id. at ¶ 12; Verified Compl. ¶ 97 [Doc. No. 11]. L.M. has only been prohibited from wearing the Shirt and the Taped Shirt, and only while attending school, based on Defendants' reasonable determination that the Shirt invaded the rights of other students.

Defendants, by contrast, contend that, were an injunction to issue, the hardship to Defendants and students at Nichols would not be insignificant. First, Defendants contend that the Shirt would cause harm to students who identify as transgender or gender nonconforming because it would prevent them from attending school without harassment. See Defs. Opp. 17-19 [Doc. No. 44]. Second, Defendants contend that, were Plaintiff permitted to wear the Shirt, Defendants would fail to comply with their mandate from the Massachusetts Legislature

15

prohibiting discrimination, bullying, or harassment in schools based on gender identity or expression and directives from the Massachusetts Department of Elementary and Secondary Education ("DESE") requiring that schools provide a safe environment to progress academically and developmentally regardless of gender identity. Id.; see also M.G.L. c. 76 § 5; M.G.L. c. 71 § 37O; 603 C.M.R. § 26.05; DESE, Guidance for Mass. Pub. Sch. Creating a Safe and Supportive School Environment, available at https://www.doe.mass.edu/sfs/lgbtq/genderidentity.html.

The balance of relative hardships cuts against the requested relief. While Plaintiff may experience some limited restriction in his ability to convey a specific message during the school day absent injunctive relief, were an injunction to issue, the court credits Defendants' contention that other students' rights to be "secure and to be let alone" during the school day would be infringed upon, as would Defendants' ability to enforce policies required under state law and regulations. Accordingly, this prong weighs against Plaintiff's requested relief.

D.    *Public Interest*

Finally, the court must consider the preliminary injunction's effect on the public interest. Plaintiff asserts that enjoining unconstitutional acts is always in the public interest. PI Mem. 15 [Doc. No. 13] (quoting Dorce v. Wolf, 506 F. Supp. 3d 142, 145 (D. Mass. 2020)). However, as discussed supra, Plaintiff has not established a likelihood of success on his claim that an unconstitutional act occurred or is threatened, and therefore, has not established an injunction is in the public interest. By contrast, Defendants point to statutes passed by the Massachusetts Legislature prohibiting discrimination, bullying, or harassment in schools based on gender identity or expression, as well as directives from the Massachusetts Department of Elementary and Secondary Education requiring that schools provide a safe environment to progress academically and developmentally regardless of gender identity. Defs. Opp. 7-8 [Doc. No. 44].

16

Accordingly, this prong weighs against injunctive relief as well.

**IV.     Conclusion**

For the foregoing reasons, all four preliminary injunction factors weigh against the relief

requested, and accordingly, Plaintiff's <u>Motion for Preliminary Injunction</u> [Doc. No. 12] is

DENIED.

IT IS SO ORDERED

June 16, 2023                                          /s/  Indira Talwani
                                                      United States District Judge

17

Add.017

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| L.M., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *     Civil Action No. 1:23-cv-11111-IT |
| | * |
| TOWN OF MIDDLEBOROUGH; | * |
| MIDDLEBOROUGH SCHOOL | * |
| COMMITTEE; Carolyn LYONS, | * |
| Superintendent of the Middleborough Public | * |
| Schools, in her official capacity; and | * |
| HEATHER TUCKER, acting Principal of | * |
| Nichols Middle School, in her official | * |
| capacity, | * |
| | * |
| Defendants. | * |

**FINAL JUDGMENT**

TALWANI, D.J.

Plaintiff L.M.'s Complaint [Doc. No. 11] sought injunctive relief against Defendants

Town of Middleborough, Middleborough School Committee, Middleborough Superintendent of

Schools Carolyn Lyons, and Nichols Middle School Acting Principal Heather Tucker. For the

reasons set forth in the court's Memorandum and Order [Doc. No. 51] denying a preliminary

injunction, and where the parties have agreed that judgment as a matter of law is appropriate

based on the factual record established through the preliminary injunction proceedings (without

prejudice to Plaintiff's appeal of legal issues), Joint Motion for Entry of Final Judgment [Doc.

No. 61], the court DENIES Plaintiff's request for permanent injunctive relief and enters

judgment for the Defendants.

IT IS SO ORDERED

July 19, 2023                              /s/ Indira Talwani
                                                 United States District Judge

**<u>U.S. Const. amend I</u>**

The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech."

**<u>U.S. Const. amend XIV</u>**

The Fourteenth Amendment to the United States Constitution provides, in relevant part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

Add.019