No. 23-1535

# 𝕴𝖓 𝖙𝖍𝖊 United States Court of Appeals
## for the First Circuit

---

L. M., a minor by and through his father and stepmother and natural guardians,
Christopher and Susan Morrison,
*Plaintiff-Appellant,*

v.

TOWN OF MIDDLEBOROUGH, MASSACHUSETTS; MIDDLEBOROUGH
SCHOOL COMMITTEE; CAROLYN J. LYONS, Superintendent, Middleborough
Public Schools, in her official capacity; HEATHER TUCKER, Acting Principal,
Nichols Middle School, in her official capacity,
*Defendants-Appellees.*

**On Appeal from the United States District Court
for the District of Massachusetts, Boston
No. 1:23-cv-11111-IT**

---

**BRIEF OF *AMICUS CURIAE*
INSTITUTE FOR FAITH AND FAMILY
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

---

Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554
lawyerdeborah@outlook.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The *Amicus Curiae*, Institute for Faith and Family, is a nonprofit corporation that has no parent corporation, is not a publicly held corporation, and does not issue stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES ............................................................................ iv

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........................................... 1

INTRODUCTION AND SUMMARY .................................................................. 1

ARGUMENT ................................................................................................. 2

I.     THE POLICIES VIOLATE THE FIRST AMENDMENT BY CENSORING PROTECTED SPEECH ......................................................... 2

II.    THE POLICIES EXEMPLIFY THE BLATANT VIEWPOINT DISCRIMINATION THAT CHARACTERIZES TYRANNICAL GOVERNMENT ............................................................................. 3

     A.    Viewpoint discrimination destroys liberty of thought ......................... 4

     B.    Offense is not sufficient justification for the School's censorship ...... 6

     C.    Viewpoint-based censorship attacks the dignity of those who disagree with the prevailing state orthodoxy ....................................... 7

     D.    The prohibition of viewpoint discrimination is firmly entrenched in Supreme Court precedent as a necessary component of the Free Speech Clause............................................................................... 9

III.    THE POLICIES TRANSGRESS LIBERTIES OF RELIGION AND CONSCIENCE ........................................................................... 13

IV.    THERE IS NO LEGITIMATE PEDAGOGICAL PURPOSE FOR THE SCHOOL'S POLICIES ............................................................... 15

     A.    Transgender ideology is a matter of intense public concern.................... 16

B. The School has no "legitimate pedagogical purpose" in suppressing a student's viewpoint about "gender identity" ...........................................17

C. Schools can affirm the dignity of every student without sacrificing the constitutional liberties of any other student .............................................21

CONCLUSION ................................................................................... 23

CERTIFICATE OF COMPLIANCE ..................................................... 24

CERTIFICATE OF SERVICE ............................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Abrams v. United States*,
    250 U.S. 616 (1919)..................................................................................... 9, 10

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002)........................................................................................ 4

*Axson-Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) ................................................................ 17, 18

*Barr v. Lafon*,
    538 F.3d 554 (6th Cir. 2008) ........................................................................ 20

*Benton v. Maryland*,
    395 U.S. 784 (1969)........................................................................................ 5

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986)............................................................................... 2, 15, 17

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
    725 F.3d 293 (3d Cir. 2013) .......................................................................... 17

*Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*,
    457 U.S. 853 (1982)....................................................................................... 15

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000)................................................................................... 7, 19

*Brown v. Li*,
    308 F.3d 939 (9th Cir. 2002) ........................................................................ 17

*Capitol Square Review & Advisory Bd. v. Pinette*,
    515 U.S. 753 (1995)....................................................................................... 14

*Carey v. Brown*,
    447 U.S. 455 (1980)....................................................................................... 12

*Castorina v. Madison County Sch. Bd.*,
   246 F.3d 536 (6th Cir. 2001) ............................................................ 20

*Cohen v. California*,
   403 U.S. 15 (1971)............................................................................ 10

*Coles ex rel. Coles v. Cleveland Bd. of Educ.*,
   171 F.3d 369 (6th Cir. 1999) ............................................................ 22

*Curry v. Sch. Dist. of Saginaw*,
   452 F.Supp.2d 723 (E.D. Mich. 2006) .............................................. 18

*Doe v. Hopkinton Pub. Schs.*,
   19 F.4th 493 (1st Cir. 2021)............................................................... 20

*Doe v. University of Michigan*,
   721 F.Supp.852 (E.D. Mich. 1989) ................................................... 19

*Fleming v. Jefferson County Sch. Dist. R-1*,
   298 F.3d 918 (10th Cir. 2002) .......................................................... 18

*Girouard v. United States*,
   328 U.S. 61 (1946)............................................................................ 14

*Good News Club v. Milford Central School*,
   533 U.S. 98 (2001)............................................................................ 12

*Hansen v. Ann Arbor Pub. Schs*,
   293 F. Supp. 2d 780 (E.D. Mich. 2003) ............................................. 1

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988)................................................................. 2, 15, 18

*Holloman v. Harland*,
   370 F.3d 1252 (11th Cir. 2004) ........................................................ 16

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
   515 U.S. 557 (1995)........................................................ 6, 8, 9, 12, 13

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) ................................................................. 4, 13

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*,
   138 S. Ct. 2448 (2018) ..................................................................... 16

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967) .................................................................... 16, 22

*Lamb's Chapel v. Center Moriches Union Free School District*,
   508 U.S. 384 (1993) ........................................................................ 12

*Lee v. Weisman*,
   505 U.S. 577 (1992) .................................................................... 14, 22

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) .......................................................... 7, 10, 13

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ........................................................... 22

*Morse v. Frederick*
   551 U.S. 393 (2007) .......................................................................... 2

*National Institute of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018) ......................................................... 3, 5, 8, 15

*Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of Cal.,*
   475 U.S. 1 (1986) ......................................................................... 6, 11

*Palko v. Connecticut*,
   302 U.S. 319 (1937) .......................................................................... 5

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983) ........................................................................... 11

*Police Department of Chicago v. Mosley*,
   408 U.S. 92 (1972) ........................................................................... 11

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ................................................................ 11, 12

*Reed v. Town of Gilbert*,
    135 S. Ct. 2215 (2015) ................................................................ 13

*Regents of University of California v. Bakke,*
    438 U.S. 265 (1978) ................................................................ 17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................ 3, 7, 12, 20

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ...................................................... 3, 21

*Schneiderman v. United States*,
    320 U.S. 118 (1943) ................................................................ 5

*Settle v. Dickson County Sch. Bd.*,
    53 F.3d 152 (6th Cir. 1995) ...................................................... 17

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ............................................................ 15, 16

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ................................................................ 20

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................ 11, 17

*Thomas v. Collins,*
    323 U.S. 516 (1945) ................................................................ 8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) .................................................... 2, 7, 15, 19, 20

*Turner Broadcasting Systems, Inc. v. FCC,*
    512 U. S. 622 (1994) ................................................................ 4

*United States v. Schwimmer*,
  279 U.S. 644 (1929)............................................................................ 7

*Ward v. Polite*,
  667 F.3d 727 (6th Cir. 2012) ............................................................ 19

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943)........................................ 2, 3, 5, 6, 10, 12, 21, 22

*Wooley v. Maynard*,
  430 U.S. 705 (1977)................................................................... 3, 5, 15

## State Constitutions

ALM Constitution Appx. Pt. 1, Art. II.................................................. 14

## Other Authorities

Lackland H. Bloom, Jr., *The Rise of the Viewpoint-Discrimination Principle*,
  72 SMU L. Rev. F. 20 (2019) ......................................... 10, 11, 12, 13

Richard F. Duncan, *Article: Defense Against the Dark Arts:*
  *Justice Jackson, Justice Kennedy, and the No-Compelled Speech Doctrine*,
  32 Regent U. L. Rev. 265 (2019-2020) ................................. 2, 3, 4, 13

Richard F. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*
  *Through the Lens of Telescope Media*,
  99 Neb. L. Rev. 58 (2020) ..................................................... 5, 6, 9, 15

Erica Goldberg, *"Good Orthodoxy" and the Legacy of Barnette*,
  13 FIU L. Rev. 639 (2019) ...................................................... 5, 8, 22

Paul Horwitz, *A Close Reading of Barnette, in Honor of Vincent Blasi*,
  13 FIU L. Rev. 689 (2019) .................................................................. 5

George Orwell, "1984" 206 (Penguin Group 1977) (1949) ..................... 3

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

As *amicus curiae*, the Institute for Faith and Family urges this Court to reverse the District Court's ruling.

The Institute for Faith and Family is a North Carolina nonprofit organization that exists to preserve and promote faith, family, and freedom through public policies that protect constitutional liberties, including speech and religion. See https://iffnc.com.

## INTRODUCTION AND SUMMARY

Transgender ideology is invading American public schools at an alarming rate. But "no matter how well-intentioned the stated objective, once schools get into the business of actively promoting one political or religious viewpoint over another, there is no end to the mischief that can be done in the name of good intentions." *Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 2d 780, 803 (E.D. Mich. 2003). Such "mischief" pervades the Nichols Middle School policies set forth in the Student & Family Handbook, including the Dress Code (the "Policies"). Blatant viewpoint discrimination is a prominent feature of these Policies.

L.M.'s t-shirt ("THERE ARE ONLY TWO GENDERS") is speech that touches a matter of intense public concern and debate. Not everyone accepts culturally popular

---

[1] *Amicus curiae* certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel made a monetary contribution to its preparation or submission. All parties consent to the filing of this brief.

"gender identity" concepts or believes that a person can transition from one sex to the other. The First Amendment safeguards the right to speak according to one's own beliefs on these matters, even in public schools. Students can respect the dignity of others without sacrificing their own rights to thought, conscience, and speech.

The Policies cannot be salvaged by appealing to cases that allow restrictions of student speech under limited circumstances, *e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986) (sexually explicit speech); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (school-sponsored expression); *Morse v. Frederick*, 551 U.S. 393, 409 (2007) (speech promoting illegal drug use). Public school students do not sacrifice their constitutional rights as a condition of attending public school.

**ARGUMENT**

## I.     THE POLICIES VIOLATE THE FIRST AMENDMENT BY CENSORING PROTECTED SPEECH.

As in *Barnette*, there is "probably no deeper division" than a conflict provoked by the choice of "what doctrine . . . public educational officials shall compel youth to unite in embracing." Richard F. Duncan, *Article: Defense Against the Dark Arts: Justice Jackson, Justice Kennedy, and the No-Compelled Speech Doctrine*, 32 Regent U. L. Rev. 265, 292 (2019-2020), citing *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 641 (1943). There are deep divisions over what

2

public schools should teach, particularly about sexuality and other contentious matters. These divisions dramatically impact speech.

Nichols Middle School mandates conformity to its preferred viewpoint. *Barnette, Wooley, NIFLA* and other "eloquent and powerful opinions" stand as "landmarks of liberty and strong shields against an authoritarian government's tyrannical attempts to coerce ideological orthodoxy." Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 266; *Barnette*, 319 U.S. 624; *Wooley v. Maynard*, 430 U.S. 705 (1977); *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361 (2018). Even "[h]arassing or discriminatory speech," however evil and/or offensive, "may be used to communicate ideas or emotions that nevertheless implicate First Amendment protections." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001).

## II. THE POLICIES EXEMPLIFY THE BLATANT VIEWPOINT DISCRIMINATION THAT CHARACTERIZES TYRANNICAL GOVERNMENT.

"The possibility of enforcing not only complete obedience to the will of the State, but *complete uniformity of opinion* on all subjects, now existed for the first time." George Orwell, "1984" 206 (Penguin Group 1977) (1949) (emphasis added). Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It creates a "substantial risk of excising certain ideas or viewpoints from the public dialogue."

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). This is "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring).

The School openly advocates transgender ideology and supports the LGBTQ+ community by promoting "messages commonly associated with 'LGBTQ Pride,'" and "observ[ing] events like 'Pride Month,' and 'Pride Day.'" *L.M. v. Town of Middleborough*, 2023 U.S. Dist. LEXIS 104901 (D. Mass. 2023), *3. L.M.'s speech, displayed on his t-shirt, was censored because of his "view on a subject that has become a political hot topic." *Id*. at *7. The *content* of his shirt "targeted" students based on gender identity. *Id*. L.M. encountered no censorship in wearing clothing that displayed other potentially controversial messages, e.g., "Don't Tread on Me"; "First Amendment Rights"; "Freedom Over Fear"; and "Let's Go Brandon." *Id*. at *6. The District Court makes no secret of the School's content *and* viewpoint discrimination, and the School does not even pretend to grant equal air time to both sides of the contentious transgender issue.

A.     **Viewpoint discrimination destroys liberty of thought.**

Viewpoint discrimination ushers in an Orwellian system that destroys liberty of thought. As Justice Kennedy cautioned, "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal*., 535 U.S. 234, 253 (2002); *see* Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 265. The School

imperils these liberties by enforcing Policies that trample freedom of thought, the "indispensable condition" of "nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 326-27 (1937)), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1969). The freedom of thought that undergirds the First Amendment merits "unqualified attachment." *Schneiderman v. United States*, 320 U.S. 118, 144 (1943). A system that protects the right to promote ideological causes "must also guarantee the concomitant right to decline to foster such concepts." *Wooley*, 430 U.S. at 714; Richard F. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly Through the Lens of Telescope Media*, 99 Neb. L. Rev. 58, 63 (2020).

"[T]he history of authoritarian government . . . shows how relentless authoritarian regimes are in their attempts to stifle free speech." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring). There is "no such thing as good orthodoxy" under a Constitution that safeguards thought, speech, conscience, and religion, even when the government pursues seemingly benign purposes like national allegiance (*Barnette*), equality, or tolerance. Erica Goldberg, *"Good Orthodoxy" and the Legacy of Barnette*, 13 FIU L. Rev. 639, 643 (2019). "Even commendable public values can furnish the spark for the dynamic that Jackson insists leads to the 'unanimity of the graveyard.'" Paul Horwitz, *A Close Reading of Barnette, in Honor of Vincent Blasi*, 13 FIU L. Rev. 689, 723 (2019).

Every speaker must decide "what to say and what to leave unsaid." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 575 (1995), quoting *Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (plurality opinion). An individual's "intellectual autonomy" is the freedom to say what that person believes is true and refrain from saying what is false. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 85.

In some of the transgender ideology cases, the government compels speech, such as the use of a child's preferred pronouns. In other cases, like this one, the government censors protected speech. Both approaches gut the First Amendment. The School darkens the "fixed star in our constitutional constellation" that forbids any government official, "high or petty," from prescribing "what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642.

### B.    Offense is not sufficient justification for the School's censorship.

The District Court notes recent student survey data reporting "perceived bullying at school, feeling unwelcome at school," and other "specific concerns about how the LGBTQ+ population is treated at school." *L.M.*, at *2. The School's Dress Code reflects this emphasis on offense, requiring that "c]lothing must not state, imply, or depict hate speech or imagery that target groups based on . . . sexual orientation, gender identity. . . ." *Id*. at *4. The Dress Code grants virtually unfettered

6

discretion to school officials to ban "any other apparel" deemed "unacceptable to our community standards." *Id*. L.M.'s t-shirt was banned, at least in part, "because of complaints." *Id*. at *5. "[S]ome students and staff complained that the Shirt made them upset." *Id*. at *6.

The First Amendment provides no exception for offended listeners. As the District Court admits, the School must show that "its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id*. at *13, quoting *Tinker*, 393 U.S. at 509. The "proudest boast" of America's free speech jurisprudence is that we safeguard "the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (plurality opinion) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Gender identity may be "embraced and advocated by increasing numbers of people," but that is "all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000).

### C. Viewpoint-based censorship attacks the dignity of those who disagree with the prevailing state orthodoxy.

The School imposes a broad gag order that demeans students who hold conscientious objections to transgender ideology. The government may not regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. The

7

School's Policies represent "a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring).

The Policies contravene "[t]he very purpose of the First Amendment . . . to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Thomas v. Collins,* 323 U.S. 516, 545 (1945) (Jackson, J., concurring). This is dangerous to a free society where the government must respect a wide range of diverse viewpoints. The government itself may adopt a viewpoint but may never "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

Through its Policies, the School attempts to enhance the dignity of some students by silencing other students who disagree with the prevailing orthodoxy. This purpose is "insufficient to override First Amendment concerns." *Goldberg*, *"Good Orthodoxy"*, 13 FIU L. Rev. at 664. Even when it is appropriate to regulate harmful discriminatory conduct, the School may not silence dissenting voices. Dignity is an interest "so amorphous as to invite viewpoint-based discrimination, antithetical to our viewpoint-neutral free speech regime, by courts and legislatures." *Id*. at 665.

The District Court held that school officials were within their discretion to conclude that L.M.'s t-shirt "may communicate that only two gender identities—male and female—are valid, and any others are invalid or nonexistent," and that students who "identify differently . . . have a right to attend school without being confronted by messages attacking their identities." *L.M.* at *16. But as *Hurley* teaches, the state must guard against such "conflation" of a *message* with a *person*. The trial judge in *Hurley* erroneously reasoned that the parade organizer's rejection of a group's *message* was tantamount to "discrimination on the basis of the innate *personhood* of the group's members." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 64 (emphasis added). The First Amendment guards a speaker's autonomy to "discriminate" by favoring viewpoints he wishes to express and rejecting other viewpoints. *Id*. Rejecting a *message* is not tantamount to rejecting a *person* who prefers that message. Similarly, rejecting transgender ideology is not tantamount to rejecting a gender-confused *person*.

**D.    The prohibition of viewpoint discrimination is firmly entrenched in Supreme Court precedent as a necessary component of the Free Speech Clause.**

A century ago, the Supreme Court affirmed a conviction under the Espionage Act, which criminalized publication of "disloyal, scurrilous and abusive language" about the United States when the country was at war. *Abrams v. United States*, 250 U.S. 616, 624 (1919). If that case came before the Court today, no doubt "the statute

itself would be invalidated as patent viewpoint discrimination." Lackland H. Bloom, Jr., *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. 20, 21 (2019). A few years after *Abrams*, the Court shifted gears in *Barnette*, "a forerunner of the more recent viewpoint-discrimination principle." *Id*. *Barnette*'s often-quoted "fixed star" passage was informed by "the fear of government manipulation of the marketplace of ideas." *Id*. Justice Kennedy echoed the thought: "The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate. . . . To permit viewpoint discrimination . . . is to permit Government censorship." *Matal*, 137 S. Ct. at 1767-1768 (Kennedy, J., concurring). Justice Kennedy's comments "explain why viewpoint discrimination is particularly inconsistent with free speech values." Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 36.

Since *Barnette*, courts have further refined the concept of viewpoint discrimination. In *Cohen v. California*, Justice Harlan warned that "governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." 403 U.S. 15, 26 (1971); *see* Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 22. A year later the Court affirmed that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content" and "must afford

10

all points of view an equal opportunity to be heard." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972).

Further development occurred in the 1980's. Both the majority and dissent in *Perry Education Ass'n v. Perry Local Educators' Ass'n* agreed that viewpoint discrimination is impermissible, with the dissent explaining that such discrimination "is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'" 460 U.S. 37, 62 (1983) (Brennan, J., dissenting). In *Pacific Gas & Electric*, the Court struck down a viewpoint-based regulation based on coerced association with the views of other speakers. 475 U.S. at 20-21 (plurality opinion). Later the Court affirmed the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Justice Scalia authored a key decision in the early 1990's striking down a Minnesota ordinance that criminalized placing a symbol on private property that "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992) (burning cross). The Supreme Court considered "the anti-viewpoint-discrimination principle . . . so important to free speech jurisprudence that it applied even to speech that was otherwise excluded from First Amendment protection." Bloom, *The Rise of the*

11

*Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 25, citing *R.A.V.*, 505 U.S. at 384-385. The ruling defined viewpoint discrimination as "hostility—or favoritism—towards the underlying message expressed" (*R.A.V.*, 505 U.S. at 385 (citing *Carey v. Brown*, 447 U.S. 455 (1980)), effectively placing the principle "at the very heart of serious free speech protection." Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 25. As Justice Scalia observed, the government may not "license one side of a debate to fight free style, while requiring the other to follow Marquis of Queensberry rules." *R.A.V.*, 505 U.S. at 392.

During this same time frame, the Supreme Court also held that the government may not discriminate against speech solely because of its religious perspective—a key component of the current debates about sexuality. *See, e.g., Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 394 (1993) (policy for use of school premises could not exclude film series based on its religious perspective); *Rosenberger*, 515 U.S. at 829 (invalidating university regulation that prohibited reimbursement of expenses to student newspaper that "primarily promotes or manifests a particular belief in or about a deity or an ultimate reality"); *Good News Club v. Milford Central School*, 533 U.S. 98, 112 (2001) (striking down regulation that discriminated against religious speech).

After *Hurley*, "the constitutional ideal of intellectual autonomy for speakers, artists, and parade organizers, which originated in *Barnette*, now had the support of

a unanimous Supreme Court." Duncan, *Defense Against the Dark Arts*, 32 Regent

U. L. Rev. at 282; *Hurley*, 515 U.S. 557. Even when the government's motives are

innocent, there is a residual danger of censorship in facially content-based statutes

because "future government officials may one day wield such statutes to suppress

disfavored speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 167 (2015).

In recent years, *Matal* "is the Court's most important decision in the anti-

viewpoint-discrimination line of cases." Bloom, *The Rise of the Viewpoint-

Discrimination Principle*, 72 SMU L. Rev. F. at 29. As this case illustrates, "[g]iving

offense [to a transgender student] is a viewpoint." *Matal*, 137 S. Ct. at 1763. The

School District may not escape the charge of viewpoint discrimination "by

tying censorship to the reaction of [the student's] audience." *Id*. at 1766. Shortly

after *Matal*, the Court struck down a provision forbidding "immoral or scandalous"

trademarks because the ban "disfavors certain ideas." *Iancu v. Brunetti*, 139 S. Ct.

at 2297. The Court's approach "indicated that governmental viewpoint

discrimination is a per se violation of the First Amendment." Bloom, *The Rise of the

Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 33.

## III.  THE POLICIES TRANSGRESS LIBERTIES OF RELIGION AND CONSCIENCE.

In addition to speech, the Policies threaten to encroach on religious liberty and

conscience.  Religious speech is not only "as fully protected . . . as secular private

expression," but historically, "government suppression of speech has so commonly

13

been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (internal citations omitted). Convictions about sexuality are inextricably intertwined with religion and conscience, as many faith traditions have strong teachings about sexual morality, marriage, and the distinction between male and female.

Like most other states, Massachusetts expressly defines religious liberty in terms of conscience:

> It is the right as well as the duty of all men in society, publicly, and at stated seasons to worship the Supreme Being, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship.

ALM Constitution Appx. Pt. 1, Art. II. The victory for freedom of thought recorded in the Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. *Girouard v. United States,* 328 U.S. 61, 68 (1946). Courts have an affirmative "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). The Policies assault liberty of thought and conscience, compelling students "to contradict [their] most deeply held beliefs, beliefs grounded in basic philosophical, ethical, or religious precepts"—by affirming the lie that a biological

female is a male (or that a male is a female). *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring); *see* Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 65-66.

Even a legitimate and substantial government or pedagogical purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Wooley*, 430 U.S. at 716-717, citing *Shelton v. Tucker,* 364 U.S. 479, 488 (1960). The Policies "broadly stifle" basic constitutional freedoms by coercing conformity with a distorted view of reality that aligns with whatever "gender identity" any child demands. Many cannot in good conscience comply.

## IV.    THERE IS NO LEGITIMATE PEDAGOGICAL PURPOSE FOR THE SCHOOL'S POLICIES.

Public schools are not "enclaves of totalitarianism" and "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 877 (1982) (Blackmun, J., concurring), quoting *Tinker*, 393 U.S. at 511. L.M. did not "shed [his] constitutional rights . . . at the schoolhouse gate" (*Tinker*, 393 U.S. at 506) and "cannot be punished merely for expressing [his] personal views on the school premises" (*Hazelwood*, 484 U.S. at 266). The School's Policies do not fall within the narrowly crafted exceptions in *Fraser*, *Hazelwood,* or any other exception, and "regardless of whether [L.M.]'s expression was constitutionally

15

protected in itself, he has the First Amendment right to be free of viewpoint-based discrimination and punishment." *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton*, 364 U.S. at 487. Even if there were a legitimate purpose for the Policies, it "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* at 488. The First Amendment facilitates the free flow of information and ideas. "The Nation's future depends upon leaders trained through wide exposure" to a "robust exchange of ideas" that "discovers truth out of a multitude of tongues" rather than "authoritative selection." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

### A.    Transgender ideology is a matter of intense public concern.

Speech on matters of public concern merits heightened protection. There is hardly a more contentious "matter of public concern" than gender identity, "a controversial [and] sensitive political topic[] . . . of profound value and concern to the public." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (cleaned up). It is not the business of *any* government official in *any* position to coerce *any* person's chosen perspective on this—including, or perhaps especially—young schoolchildren. Even "ambiguously lewd speech"

16

(*Fraser* exception) may not "be categorically restricted if it can plausibly be interpreted as political or social speech." *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 315 (3d Cir. 2013).

### B.   The School has no "legitimate pedagogical purpose" in suppressing a student's viewpoint about "gender identity".

It is neither "legitimate" or "pedagogical" to censor a student's speech about sexuality. That speech merits constitutional protection no matter how profoundly school officials (or even society generally) might find the speaker's position "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. at 414.

**Curriculum.** Students do not have free reign to alter a school assignment and receive credit. *Settle v. Dickson County Sch. Bd.*, 53 F.3d 152 (6th Cir. 1995) (Batchelder, J., concurring) (research paper). But the Policies have nothing to do with the choice of curriculum and do not regulate "academic assignments" that educators may require. *Brown v. Li*, 308 F.3d 939, 949 (9th Cir. 2002).

Even where "educational discretion" is appropriate, courts must discern whether it has been used as a pretext to punish a student based on some impermissible factor. *Regents of University of California v. Bakke,* 438 U.S. 265 (1978) (improper use of racial factors in medical school admissions); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1293 (10th Cir. 2004) (Mormon acting student may be required to follow the script, but school officials' statements suggested hostility to her faith). On the other hand, elementary school officials violated a student's free

speech rights by rejecting his candy cane project merely because the product incorporated a religious message. *Curry v. Sch. Dist. of Saginaw*, 452 F.Supp.2d 723, 736 (E.D. Mich. 2006).

**School-sponsored expression**. Faculty can "exercis[e] editorial control over the style and content of student speech in school sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. *Hazelwood* seems to sandwich a "school-sponsored speech" category in between government and private speech. *Fleming v. Jefferson County Sch. Dist. R1*, 298 F.3d 918, 923 (10th Cir. 2002) (community project decorating tiles that would become a permanent part of a school reopening after the Columbine shooting). "School-sponsored speech" encompasses expressive activity that "the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. "School-sponsored speech" may also occur "in a classroom setting as part of a school's curriculum." *Axson-Flynn v. Johnson*, 356 F.3d at 1289. It is "designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood*, 484 U.S. at 271. A teacher might encourage critical thinking by requiring students to write papers from a particular viewpoint. These *educational* purposes are poles apart from the blatant viewpoint-based censorship in this case. *Hazelwood* does not grant schools unbridled discretion to

18

engage in such censorship, and L.M.'s t-shirt, a personal article of clothing, could not possibly be perceived as representing "school-sponsored" speech.

The School adopts one side of the contentious transgender debate and shuts down further inquiry, censoring student speech that does not align with its preferred side. But the Constitution protects unpopular minority viewpoints. *Dale,* 530 U.S. at 660; *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012) ("[t]olerance is a two-way street") (overruling university's expulsion of counseling student for her religious refusal to endorse same-same relationships); *Doe v. University of Michigan*, 721 F.Supp.852, 863 (E.D. Mich. 1989) (University could not establish an anti-discrimination policy that effectively prohibited certain speech because it disagreed with the message, nor could it "proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people"). This is particularly true in a changing social environment—"the fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Dale,* 530 U.S. at 660. Even elementary schools may not prohibit speech based on "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. "Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a

19

symptom of grave illness in our society." *Sweezy v. New Hampshire*, 354 U.S. 234, 251 (1957).

**Substantial disruption.** The School expresses concerns the "potentially vulnerable students will not feel safe," citing *Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493, 505 (1st Cir. 2021) ("*Tinker* holds that schools have a special interest in regulating speech that involves the 'invasion of the rights of others.'") *L.M.* at \*17. But the "[S]chool['s] regulation of student speech must be consistent with both the *Tinker* standard and *Rosenberger's* prohibition on viewpoint discrimination." *Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008). Even in the volatile context of "racial violence that necessitates a ban on racially divisive symbols," a school "does not have the authority to enforce a viewpoint-specific ban on [some] racially sensitive symbols and not others." *Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001). In this case, the Dress Code displays flagrant viewpoint discrimination, adopting a "viewpoint-specific ban" on "sensitive symbols" that oppose transgender ideology but not on those supporting that perspective.

Concerns about disruption or safety would be reasonable if harmful conduct were involved rather than pure speech. The students in *Doe* were engaged in disruptive bullying conduct, including nonconsensual photographs and videos—not pure speech. *Doe v. Hopkinton Pub. Schs.*, 19 F.4th at 507. *Doe* does not mention viewpoint discrimination, a major concern for L.M.'s situation. Schools are not a

haven where educators can ignore the First Amendment with impunity. Public schools cannot invade the protected liberties of their students. "[C]ensorship or suppression of expression of opinion is tolerated by our Constitution only when the expression presents a clear and present danger of action of a kind the State is empowered to prevent and punish." *Barnette*, 319 U.S. at 633 (allowing students to quietly forego the compulsory flag salute presented no "clear and present danger"). A child's t-shirt, unaccompanied by disruptive conduct or threats of violence, is hardly a "clear and present danger" to anyone.

### C.     Schools can affirm the dignity of every student without sacrificing the constitutional liberties of any other student.

As the Third Circuit explained in *Saxe*, "[b]y prohibiting disparaging speech directed at a person's 'values,' the Policy strikes at the heart of moral and political discourse—the lifeblood of constitutional self-government (and democratic education) and the core concern of the First Amendment." 240 F.3d at 210.  The fact "that speech about 'values' may offend is not cause for its prohibition, but rather the reason for its protection." *Id*. Deeply held convictions about sexuality, such as those displayed on L.M.'s t-shirt, implicate an individual's values and dignity. The Policies attack the values and dignity of students like L.M. who are courageous enough to resist attempts to dictate their beliefs and speech about sexuality. "No court or legislature has ever suggested that unwelcome speech directed at another's 'values' may be prohibited under the rubric of anti-discrimination." *Id*.

21

Moreover, while it is important to "affirm[] the equal dignity of every student" and to create the best environment for learning, "students need to tolerate views that upset them, or even disturb them to their core, *especially from other students*." Goldberg, *"Good Orthodoxy"*, 13 FIU L. Rev. at 666 (emphasis added). Students must learn to endure speech that is offensive or even false as "part of learning how to live in a pluralistic society, a society which insists upon open discourse towards the end of a tolerant citizenry." *Lee v. Weisman*, 505 U.S. at 590. Indeed, students attending required classes are exposed to "ideas they find distasteful or immoral or absurd or all of these." *Id*. at 591. Transgender students are not exempt but must learn to tolerate the views of those who disagree with them.

Public schools have a role in "educat[ing] youth in the values of a democratic, pluralistic society." *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 378 (6th Cir. 1999). Rigorous protection of constitutional liberties is essential to preparing young persons for citizenship, so that we do not "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette*, 319 U.S. at 637. Our Nation's deep commitment to "safeguarding academic freedom" is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Meriwether v. Hartop*, 992 F.3d 92, 504-505, 509 (6th Cir. 2021), quoting *Keyishian*, 385 U.S. at 603.

## CONCLUSION

*Amicus curiae* urges the Court to reverse the District Court ruling.

Dated: September 29, 2023        Respectfully submitted,

                                  *s/ Deborah J. Dewart*
                                    Deborah J. Dewart
                                    Attorney at Law
                                    111 Magnolia Lane
                                    Hubert, NC 28539
                                    (910) 326-4554
                                    lawyerdeborah@outlook.com

                                    *Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,263 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word in 14-point Times New Roman.

Dated: September 29, 2023

*s/ Deborah J. Dewart*
Deborah J. Dewart

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system.