Nos. 23-1535, 23-1645

# In the United States Court of Appeals for the First Circuit

L.M., a minor by and through his father and stepmother, Christopher and Susan Morrison,

*Plaintiff-Appellant,*

v.

TOWN OF MIDDLEBOROUGH; MIDDLEBOROUGH SCHOOL COMMITTEE; CAROLYN J. LYONS, Superintendent of the Middleborough Public Schools, in her official capacity; and HEATHER TUCKER, acting Principal of Nichols Middle School, in her official capacity,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Massachusetts, Eastern Division
Case No. 1:23-cv-11111-IT

**AMICUS BRIEF OF PARENTS DEFENDING EDUCATION
IN SUPPORT OF APPELLANT AND REVERSAL**

J. Michael Connolly
Thomas S. Vaseliou
Rachel L. Daley
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
tvaseliou@consovoymccarthy.com
rdaley@consovoymccarthy.com

*Counsel for Parents Defending Education*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Parents Defending Education hereby certifies that it has no parent company and no publicly held corporation owns 10% more of its stock.

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................iii

Interest of *Amicus Curiae* ............................................................................................1

Summary of Argument ..................................................................................................2

Argument ........................................................................................................................3

   I.  The Town of Middleborough has joined the growing trend of schools using speech codes to punish student speech on gender identity. ...................................3

  II. Middleborough unconstitutionally suppressed L.M.'s speech. .................................6

     A. Middleborough engaged in impermissible viewpoint discrimination. ................8

     B. Middleborough also failed to meet its burden under *Tinker*. ............................ 13

Conclusion .................................................................................................................... 23

Certificate of Compliance ........................................................................................... 24

Certificate of Service .................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ......................................................................5, 6, 7, 16

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.,*
  57 F.4th 791 (11th Cir. 2022) (en banc) ...........................................................4

*Barr v. Lafon,*
  538 F.3d 554 (6th Cir. 2008) ........................................................2, 8, 9, 10

*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986) ........................................................................................7

*Boy Scouts of America v. Dale,*
  530 U.S. 640 (2000) ........................................................................................6

*Brown v. Ent. Merchants Ass'n,*
  564 U.S. 786 (2011) ........................................................................................7

*Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.,*
  246 F.3d 536 (6th Cir. 2001) ....................................................................... 10

*Chandler v. McMinnville Sch. Dist.,*
  978 F.2d 524 (9th Cir. 1992) ...................................................................20, 22

*Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist.,*
  386 F.3d 514 (3d Cir. 2004) ........................................................................ 12

*Counterman v. Colorado,*
  143 S. Ct. 2106 (2023) ................................................................................ 18

*Dambrot v. Cent. Mich. Univ.,*
  55 F.3d 1177 (6th Cir. 1995) ...................................................................... 12

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999) ..................................................................................... 20

*Defoe ex rel. Defoe v. Spiva,*
  625 F.3d 324 (6th Cir. 2010) ...................................................................... 11

*DeJohn v. Temple Univ.,*
  537 F.3d 301 (3d Cir. 2008) ........................................................................ 16

*Doe v. Hopkinton Pub. Schs.,*
  19 F.4th 493 (1st Cir. 2021) ........................................................ 3, 19, 20, 22

*FCC v. Pacifica Found.,*
  438 U.S. 726 (1978) ..................................................................................... 17

*Frontiero v. Richardson,*
  411 U.S. 677 (1973) ...................................................................................4

*Fulton v. City of Philadelphia,*
  141 S. Ct. 1868 (2021) .............................................................................. 21

*Green v. Miss USA, LLC,*
  52 F.4th 773 (9th Cir. 2022) ......................................................................4

*Hazelwood Sch. Dist. v. Kuhlmeier,*
  484 U.S. 260 (1988) ...................................................................................7

*Holloman ex rel. Holloman v. Harland,*
  370 F.3d 1252 (11th Cir. 2004) .........................................................9, 10, 12

*Iancu v. Brunetti,*
  139 S. Ct. 2294 (2019) .........................................................................1, 9, 12

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
  138 S. Ct. 2448 (2018) .......................................................................... 4, 5

*Kennedy v. Bremerton Sch. Dist.,*
  142 S. Ct. 2407 (2022) .......................................................................... 5, 13

*Kuhlmeier v. Hazelwood Sch. Dist.,*
  795 F.2d 1368 (8th Cir.), *rev'd on other grounds,* 484 U.S. 260 (1988)........................... 14

*Kutchinski v. Freeland Cmty. Sch. Dist.,*
  69 F.4th 350 (6th Cir. 2023) .....................................................................8

*L.M. v. Town of Middleborough,*
  2023 WL 4053023 (D. Mass. June 16, 2023) .....................................................4

*Mahanoy Area Sch. Dist. v. B.L. by & through Levy,*
  141 S. Ct. 2038 (2021) ...................................................................passim

*Matal v. Tam,*
  582 U.S. 218 (2017) .......................................................................... 9, 12

*McGuire v. Reilly,*
  386 F.3d 45 (1st Cir. 2004) ......................................................................9

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) .............................................................2, 4, 21

*Minn. Voters Alliance v. Mansky,*
  138 S. Ct. 1876 (2018) ............................................................................9

*Morse v. Frederick,*
  551 U.S. 393 (2007) ...................................................................................7

*N.J. ex rel. Jacob v. Sonnabend,*
   37 F.4th 412 (7th Cir. 2022) ................................................................. 13, 14

*Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.,*
   969 F.3d 12 (1st Cir. 2020) ...................................................................passim

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.,*
   --- F.4th ----, 2023 WL 6330394 (8th Cir. Sept. 29, 2023) ................... 14, 16

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) ............................................................................ 10, 12

*Ridley v. Mass. Bay Transp. Auth.,*
   390 F.3d 65 (1st Cir. 2004) ........................................................................9

*Rosenberger v. Rector and Visitors of UVA,*
   515 U.S. 819 (1995) ...................................................................................9

*Saxe v. State Coll. Area Sch. Dist.,*
   240 F.3d 200 (3d Cir. 2001).................................................................passim

*Scott v. School Bd. of Alachua Cnty.,*
   324 F.3d 1246 (11th Cir. 2003) .......................................................... 20, 21

*Shurtleff v. City of Bos.,*
   142 S. Ct. 1583 (2022) ...............................................................................9

*Speech First, Inc. v. Cartwright,*
   32 F.4th 1110 (11th Cir. 2022) ............................................................. 9, 10

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) .....................................................................5

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
   143 S. Ct. 2141 (2023) ............................................................................ 18

*Texas v. Johnson,*
   491 U.S. 397 (1989) ............................................................................. 8, 12

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) ...............................................................................passim

*United States v. Varner,*
   948 F.3d 250 (5th Cir. 2020) .....................................................................4

*Ward v. Polite,*
   667 F.3d 727 (6th Cir. 2012) .....................................................................9

*West v. Derby Unified Sch. Dist. No. 260,*
   206 F.3d 1358 (10th Cir. 2000) .......................................................... 20, 21

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
636 F.3d 874 (7th Cir. 2011) ...................................................................... 12, 14, 17, 21

**OTHER AUTHORITIES**

*Spotlight on Speech Codes 2021*, Foundation for Individual Rights in Education (FIRE),
perma.cc/S22E-76Q3 ....................................................................................... 5, 6

## INTEREST OF *AMICUS CURIAE*[1]

Parents Defending Education ("PDE") is a nationwide, grassroots membership organization whose members include parents, students, and other concerned citizens. PDE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of K-12 education, including government attempts to coopt parental rights and to silence students who express opposing views.

This case directly implicates PDE's mission, and its outcome will have real-world consequences for PDE's members. Students have First Amendment rights, and they do not "shed [them] at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The district court's legal errors affect the free-speech rights of students and thus the children of PDE's members. If the district court's decision is upheld, then K-12 students throughout the First Circuit can suffer discrimination based on their viewpoints on important philosophical, religious, and political topics of our day. *Cf. Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) ("[A] core postulate of free speech law: The government may not discriminate against speech based on the ideas or opinions it conveys."). PDE's mission is to prevent such outcomes.

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amicus curiae* PDE contributed money intended to fund the brief's preparation or submission.

1

## SUMMARY OF ARGUMENT

Gender identity is a "hot issue" that "has produced a passionate political and social debate" across the country. *Meriwether v. Hartop*, 992 F.3d 492, 508-09 (6th Cir. 2021). One side believes that gender is subjective; the other side believes that sex is immutable. *Id.* at 498. Like the general public, students have varying views on this important subject, and the Supreme Court has long recognized that students don't "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Yet Middleborough's Nichols Middle School punished student speech expressed by one side of the debate—namely, that "there are only two genders" (male and female). The district court upheld the school's censorship as consistent with the First Amendment.

The district court was wrong. To pass constitutional muster, Middleborough's regulation of L.M.'s speech must, at a minimum, overcome two obstacles: (1) it must be viewpoint neutral; and (2) it must be consistent with the demanding *Tinker* standard. *See, e.g.*, *Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008). But contra the district court, Middleborough falls short of both.

***First***, Middleborough all but admits that it engaged in viewpoint discrimination. It permitted—indeed, encouraged—speech supporting the idea that there are more than two genders. At the same time, it prohibited L.M.'s speech expressing the opposite view. Thus, Middleborough discriminated against L.M.'s speech based on the viewpoint that the speech conveyed. That alone requires reversal.

2

**Second**, to satisfy *Tinker*, Middleborough must put forth "evidence that [the school's censoring is] necessary to avoid material and substantial interference with schoolwork" or "invasion of the rights of others." *Tinker*, 393 U.S. at 511, 513. That is a "demanding standard," which Middleborough did not come even close to meeting. *Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 141 S. Ct. 2038, 2048 (2021). Middleborough provided no evidence that any student was harmed or would be reasonably expected to be injured beyond the mere discomfort from unpopular speech. But it is well-established that *Tinker* requires far more than hurt feelings or discomfort, even when the speech is deeply offensive or disparaging. *See, e.g.*, *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 & 29 n.18 (1st Cir. 2020); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210-17 (3d Cir. 2001) (Alito, J.). Nor did Middleborough show that L.M.'s speech targeted a specific individual, even though First Circuit and Supreme Court precedent require as much. *See Norris*, 969 F.3d at 29; *Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493, 506 (1st Cir. 2021); *Mahanoy*, 141 S. Ct. at 2045.

For either reason, this Court should reverse the district court and hold that the First Amendment protects L.M.'s speech.

## ARGUMENT

### I. The Town of Middleborough has joined the growing trend of schools using speech codes to punish student speech on gender identity.

Debates about biological sex and gender identity are raging across the country. While society has long referred to males and females by sex-specific pronouns (*e.g.*, "he," "his," or "she," "her"), many individuals—including students in secondary

schools—now identify as transgender or "non-binary" and adopt other pronouns that correlate with their "gender identity" rather than their biological sex. *See, e.g.*, *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020). According to transgender and non-binary advocates—and the district court—asserting that one cannot identify contrary to the person's biological sex is a form of "bullying," "discrimination," and "harassment." Add.6, 11-12; *L.M. v. Town of Middleborough*, 2023 WL 4053023, at *3 & *6 (D. Mass. June 16, 2023).

On the other hand, many others believe that people are either male or female, biological sex is immutable, and sex does not change based on someone's internal feelings. *See Meriwether*, 992 F.3d at 508-09; *Varner*, 948 F.3d at 257; *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc) (discussing "the Supreme Court's longstanding recognition that 'sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth'" (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973))). Many individuals on this side of the debate ground their positions in scientific, "religious," or "philosophical beliefs." *Meriwether*, 992 F.3d at 509.

In sum, "gender identity" is a "sensitive politic topi[c]" that is "undoubtedly [a] matte[r] of profound value and concern to the public." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (cleaned up); *accord Green v. Miss USA, LLC*, 52 F.4th 773, 785 n.12 (9th Cir. 2022); *Meriwether*, 992 F.3d at 508 ("[S]peech about 'race, gender, and power conflicts' addresses matters of public concern."). The

First Amendment gives both sides the freedom to promote their beliefs in the marketplace of ideas, without the government tipping the scales. "[L]earning how to tolerate speech … of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2430 (2022). Indeed, "tolerance, not coercion, is our Nation's answer. The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2322 (2023). This is especially true where, as here, the "speech occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Janus*, 138 S. Ct. at 2476 (cleaned up).

Yet there is a growing trend of schools picking one side of the debate over the other. Schools are increasingly adopting speech codes regarding gender identity that forbid students from sharing their deeply held convictions. Speech codes prohibit expression that would be constitutionally protected outside school, punishing students for unpopular speech by labeling it "harassment," "bullying," "hate speech," or "incivility." *See Spotlight on Speech Codes 2021*, Foundation for Individual Rights in Education (FIRE) at 10, perma.cc/S22E-76Q3. These policies—imposing overbroad, content-based (and often viewpoint-based) restrictions on speech—are unconstitutional. *Id.* at 10, 24; *Speech First, Inc. v. Fenves*, 979 F.3d 319, 338-39 & n.17 (5th Cir. 2020) (collecting a "consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague"). Speech codes are written so

broadly or vaguely that they effectively shut down all discussion or debate on transgender issues. *See, e.g.*, *FIRE Spotlight* at 24.

In line with this trend, Middleborough adopted a policy that prohibits speech on one side of the gender-identity debate. According to Middleborough, it is fine to express views promoting the idea that gender is fluid and that students can be a gender inconsistent with their biological sex, but it violates its speech code to express the view that there are only two sexes and students cannot change their sex. In short, Middleborough has shut down one side of the debate, preventing all meaningful discussion on gender identity.

## II.     Middleborough unconstitutionally suppressed L.M.'s speech.

Middleborough violated the First Amendment by forbidding L.M. to wear clothing that said, "there are only two genders." The framers designed the Free Speech Clause of the First Amendment to "protect the 'freedom to think as you will and to speak as you think.'" *303 Creative*, 143 S. Ct. at 2310 (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 660-61 (2000)). They did so because "they saw the freedom of speech 'both as an end and as a means.'" *Id.* "An end because the freedom to think and speak is among our inalienable human rights," and "[a] means because the freedom of thought and speech is indispensable to the discovery and spread of political truth." *Id.* at 2310-11 (cleaned up). "[I]f there is any fixed star in our constitutional constellation, it is the principle that the government may not interfere with an uninhibited marketplace of ideas." *Id.* at 2311 (cleaned up). The First Amendment thus protects "an

individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided, and likely to cause anguish or incalculable grief." *Id.* at 2312 (cleaned up).

Students, too, have First Amendment rights, and they do not "shed [them] at the schoolhouse gate." *Tinker*, 393 U.S. at 506. America's public schools are "the nurseries of democracy," and "[o]ur representative democracy only works if we protect the 'marketplace of ideas.'" *Mahanoy*, 141 S. Ct. at 2046. Schools must "ensur[e] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.*

Given these bedrock principles, the Supreme Court has recognized only four "specific categories of speech that schools may regulate in certain circumstances," *id.* at 2045:

> (1) "'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds," *id.* (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986));
>
> (2) "speech, uttered during a class trip, that promotes 'illegal drug use,'" *id.* (quoting *Morse v. Frederick*, 551 U.S. 393, 408 (2007));
>
> (3) "speech that others may reasonably perceive as 'bearing the imprimatur of the school,' such as that appearing in a school-sponsored newspaper," *id.* (alteration omitted) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)); and
>
> (4) on-campus and some off-campus speech that "'materially disrupts classwork or involves substantial disorder or invasion of the rights of others,'" *id.* (quoting *Tinker*, 393 U.S. at 513).

Importantly, the fourth category requires schools to meet a "demanding standard." *Id.* at 2048; *see Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) ("Minors are entitled

to a significant measure of First Amendment protection." (cleaned up)). To justify barring speech, a school must "show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509; *accord Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356 (6th Cir. 2023). "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Norris*, 969 F.3d at 25.

Moreover, even if a school's policy passes *Tinker*, the policy may still violate the First Amendment for another reason. Regardless of whether the speech is disruptive or invades the right of another under *Tinker*, public schools cannot engage in "viewpoint discrimination." *Barr*, 538 F.3d at 571. In short, a school seeking to regulate student speech must show, at a minimum, that its regulations are (1) viewpoint neutral and (2) satisfy the demanding standard under *Tinker*. Here, Middleborough flunks both requirements.

## A.    Middleborough engaged in impermissible viewpoint discrimination.

**1.** "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). At all times, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the

restriction." *Rosenberger v. Rector and Visitors of UVA*, 515 U.S. 819, 829 (1995). Time and again, the Supreme Court has reaffirmed that speech restrictions "based on viewpoint are prohibited." *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *see also, e.g.*, *Matal v. Tam*, 582 U.S. 218, 223 (2017) ("Speech may not be banned on the ground that it expresses ideas that offend."); *Shurtleff v. City of Bos.*, 142 S. Ct. 1583, 1593 (2022) (viewpoint discrimination prohibited); *cf., e.g.*, *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) (same); *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004) (same). This is "a core postulate of free speech law." *Iancu*, 139 S. Ct. at 2299.

The First Amendment's prohibition on viewpoint discrimination applies no differently "in the public school … setting." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (citing *Rosenberger*, 515 U.S. at 828); *accord Barr*, 538 F.3d at 571 (same for K-12 schools). Thus, even if a school's regulation is "consistent with … the *Tinker* standard," it will still be unconstitutional if it fails "*Rosenberger*'s prohibition on viewpoint discrimination." *Id.*; *e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) ("[E]ven if [the university] could (per *Tinker*) restrict harassing speech that disrupts the school's functions, it couldn't do so, as it has here, based on the viewpoint of that speech."); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1280 (11th Cir. 2004) ("[T]his fundamental prohibition against viewpoint-based discrimination extends to public schoolchildren.").

This makes sense. After all, viewpoint discrimination is an "'egregious form of content discrimination.'" *Iancu*, 139 S. Ct. at 2299. For this reason, "[t]he Supreme Court

has consistently held that the government may not regulate on the basis of viewpoint *even within a category of otherwise proscribable speech.*" *Cartwright*, 32 F.4th at 1127 n.6 (emphasis added) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383-90 (1992)). So "regardless of whether [a student's] expression [i]s constitutionally protected in itself," the student still "has the First Amendment right to be free of viewpoint-based discrimination and punishment." *Hollman*, 370 F.3d at 1265. *Tinker* thus "doesn't apply to viewpoint-based restrictions." *Cartwright*, 32 F.4th at 1127 n.6; *see also Barr*, 538 F.3d at 571; *Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001).

**2.** Middleborough effectively concedes that it banned L.M.'s shirt because of the viewpoint it expressed. *See, e.g.*, App.55-56, 63-64. The district court did as well. *See* Add.11 ("School administrators were well within their discretion to conclude that the statement 'THERE ARE ONLY TWO GENDERS' may communicate that only two gender identities—male and female—are valid, and any others are invalid or nonexistent, and to conclude that students who identify differently, whether they do so openly or not, have a right to attend school without being confronted by messages attacking their identities." (footnote omitted)). This alone dooms Middleborough's conduct and requires reversal. Regardless, the record leaves no room for doubt that Middleborough censored L.M.'s speech because of the message he conveyed.

To start, Middleborough has permitted and even encouraged in-school discussion of sexual orientation and gender identity. The school observes "Pride Month" and other events "in support of the 'LGBTQ+ community.'" Add.2. It has a

Gay Straight Alliance Club to support "'students who are part of the LGBTQ+ community.'" *Id.* And it "promotes messages commonly associated with 'LGBTQ Pride.'" *Id.*

Seeking to participate in his school's ongoing discussion of gender identity, L.M. wore a shirt asserting that there are only two genders. Add.4. Middleborough admits it censored L.M.'s speech because his shirt's message could suggest to "gender nonconforming" students that "'their sexual orientation, gender identity or expression does not exist or is invalid,'" and the school was concerned that the shirt "'would cause students in the LGBTQ+ community to feel unsafe.'" Add.6. Indeed, Middleborough has said that it censored L.M. because "staff and students … found his shirt upsetting," App.56; because the message is "likely to be considered discriminatory, harassing and/or bullying to others, including those who are gender nonconforming by suggesting that their … gender identity or expression does not exist or is invalid," App.64; and because of "concerns that other students would also attempt to wear clothing with the same or similar messages," App.67.

That is textbook viewpoint discrimination. After encouraging in-school conversations on a controversial topic, Middleborough promoted one side of the debate and silenced the other. Rather than allow both sides to speak and letting the best idea win, Middleborough chose to impose a viewpoint-specific ban on some clothing with "divisive [messages] and not others." *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 336 (6th Cir. 2010) (cleaned up). But the government cannot license one side to speak freely

11

while muzzling the other. *See R.A.V.*, 505 U.S. at 392; *see also Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011) ("[A] school that permits advocacy of the rights of homosexual students cannot be allowed to stifle criticism of homosexuality."). Thus, by prohibiting opinions about biological sex that Middleborough disfavors, Middleborough imposed a "'viewpoint-discriminatory restrictio[n].'" *Saxe*, 240 F.3d at 206; *see also Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995).

It's irrelevant that Middleborough claims to have acted to prevent L.M. from offending other students. That's because "[g]iving offense is a viewpoint," and silencing speech because it could offend "is viewpoint discrimination." *Matal*, 582 U.S. at 243; *see also, e.g.*, *Iancu*, 139 S. Ct. at 2299 ("the government cannot discriminate against 'ideas that offend'"); *Texas*, 491 U.S. at 414 ("the government may not prohibit the expression of an idea simply because society finds the idea itself offensive"); *Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004) (Alito, J.) ("To exclude a group simply because it is controversial or divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint."). Even if the district court found the school's motivation admirable, that motivation does not excuse the school from adhering to the First Amendment's requirement of viewpoint neutrality. *See, e.g.*, *Holloman*, 370 F.3d at 1281 ("Although Allred has the authority under the *Tinker-Burnside* standard to proscribe student expression that materially and substantially disrupts the class, she may not punish such

expression based on the fact that she disagrees with it. Even when engaging in speech that is not directly constitutionally protected, Holloman still has the First Amendment right to be free from viewpoint discrimination.").

In short, Middleborough cannot impose its preferred viewpoint (*e.g.*, gender can be fluid) over another (*e.g.*, sex is binary and immutable). "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech and eviscerate th[e] [Supreme] Court's repeated promise that [students] do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy*, 142 S. Ct. at 2425 (quoting *Tinker*, 393 U.S. at 506). This alone requires reversing the district court.

### B.    Middleborough also failed to meet its burden under *Tinker*.

Middleborough's regulation of L.M.'s speech violates *Tinker*, which itself requires reversing the district court. To pass *Tinker*, Middleborough must put forth "*evidence* that [the school's policy] is *necessary* to avoid material and substantial interference with schoolwork" or "invasion of the rights of others." *Tinker*, 393 U.S. at 511, 513 (emphases added). *Tinker* is a "demanding standard." *Mahanoy*, 141 S. Ct. at 2048. And "*Tinker* places the burden on the school to justify student speech restrictions." *Norris*, 969 F.3d at 25; *see also N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022) (same). This is an "objectiv[e]" inquiry. *Norris*, 969 F.3d at 25.

The district court upheld Middleborough's policy solely on the invasion-of-the-rights-of-others prong. In its view, Middleborough met this prong because (1) the court

had to defer to Middleborough's assertion that the speech would undermine "a safe and secure educational environment" and (2) Middleborough has the "discretion" to prevent "bullying." Add.11. The district court's reasoning is deeply flawed and would permit schools to censor a great deal of First Amendment-protected speech on a school's mere say-so. The First Amendment requires far more.

    **1.** The invasion-of-the-rights-of-others prong does not cover the abstract principle of "a safe and secure educational environment," which is akin to a prohibition on speech that merely offends the listener. Although "the precise scope of *Tinker*'s 'interference with the rights of others' language is unclear," it is "certainly not enough that the speech is merely offensive to some listener." *Saxe*, 240 F.3d at 217; *see also Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, --- F.4th ----, 2023 WL 6330394, at *4 (8th Cir. Sept. 29, 2023) (same); *Kuhlmeier v. Hazelwood Sch. Dist.*, 795 F.2d 1368, 1376 (8th Cir. 1986), *rev'd on other grounds*, 484 U.S. 260 (1988) ("school officials are justified in limiting student speech, under [the invasion-of-the-rights-of-others] standard, only when publication of that speech could result in tort liability for the school"). This Court has held as much: "It is clear, however, that speech that is merely offensive to the listener is not enough" to meet the invasion-of-rights prong. *Norris*, 969 F.3d at 29 n.18. Simply put, there is no "generalized 'hurt feelings' defense to a high school's violation of the First Amendment rights of its students." *Zamecnik*, 636 F.3d at 877; *see also N.J.*, 37 F.4th at 426 ("mere speculation won't do, and there's no generalized hurt feelings defense to a high school's violation of the First Amendment rights of its students"

(cleaned up)). Nor can schools restrict speech based on "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509; *see also, e.g.*, *Norris*, 969 F.3d at 25 ("'undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression'" (quoting *Tinker*, 393 U.S. at 508)). *Tinker* "requires a specific and significant fear of disruption [or invasion of rights of others], not just some remote apprehension." *Saxe*, 240 F.3d at 211. So a contention that some students might be "confronted by [a] messag[e] attacking their identities"—*i.e.*, speech that merely offends the listener—is insufficient. Add.11.

Holding otherwise would mean students *do* "shed their constitutional rights … at the schoolhouse gate." *Tinker*, 393 U.S. at 506. "[D]iscomfort and unpleasantness" will "always accompany an unpopular viewpoint." *Id.* at 509. "Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance." *Id.* at 508. "But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Id.* at 508-09 (citation omitted). So courts cannot simply relabel that discomfort as an "invasion of the rights of other students to a safe and secure educational environment." Add.11. Allowing courts to do so—as the district court did here—would eviscerate students' essential First Amendment rights.

15

And it would allow public schools to ignore their duty to expose students to unpopular expression. *See Mahanoy*, 141 S. Ct. at 2046 (schools must "protect the 'marketplace of ideas,'" and "[t]hat protection *must include* the protection of unpopular ideas" (emphasis added)); *id.* at 2049 (Alito, J., concurring) ("public schools have the duty to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government").

**2.** The district court's reliance on Middleborough's interest in preventing "bullying," "discrimination," or "harassment" fares no better. Add.6, 11-12. "A school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment.'" *Linn Mar*, 2023 WL 6330394, at *4. "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204; *see also id.* at 210 (same); *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) (same). "When a state [anti-discrimination or harassment] law and the Constitution collide, there can be no question which must prevail": the Constitution. *303 Creative*, 143 S. Ct. at 2315; *accord DeJohn*, 537 F.3d at 316 (When harassment regulations "attempt to regulate oral or written expression," they "stee[r] into the territory of the First Amendment." (cleaned up)); *Saxe*, 240 F.3d at 206 (same). Thus, neither a court nor a school may point to discrimination, bullying, or harassment generally to justify censoring speech. Far more is needed to justify restricting speech under *Tinker*. Middleborough failed to satisfy that high bar here.

***First,*** Middleborough put forth no evidence that any student was meaningfully

harmed by the speech, let alone "serious[ly] or severe[ly]." *Mahanoy*, 141 S. Ct. at 2045. At most, Middleborough can point to statements by its officials that a few students may have "complained" that L.M.'s shirt offended them. *See, e.g.*, App.28, 55-56, 96. That is not good enough.

Vague statements about some minor complaints is wholly insufficient to meet Middleborough's demanding burden. The Supreme Court "has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe*, 240 F.3d at 215 (listing cases); *e.g.*, *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection."). While "non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause," there is "no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or [gender identity]." *Saxe*, 240 F.3d at 206. Even "disparaging" speech cannot justify suppressing the speech. *See Zamecnik*, 636 F.3d at 878 ("There is no doubt that the slogan ['Be Happy, Not Gay'] is disparaging. But it is not the kind of speech that would materially and substantially interfere with school activities." (cleaned up)).

This is not to downplay or dismiss the difficult situations that transgender students face at school. But the district court conflated these struggles with the speech

that L.M. expressed or wants to express. There is no indication that L.M. wishes to bully or harass anyone at school, let alone an entire group. As L.M. explained, he wants to share the viewpoint that there are only two sexes at school because he (1) "wants to respond to the district's take on gender identity and begin a real conversation, which hasn't occurred because all existing speech is one-sided"; (2) "thinks the district's philosophy is false and harmful and wants to make students aware of that"; and (3) "wants to show that caring and compassionate people can believe that sex is binary without being hateful or bigoted towards those with different views." Opening-Br.7 (citing App.25-28); *see also* Add.11 n.3 ("L.M. attests that he does not believe his views about sex and gender to be inherently hateful and does not intend to deny any individual's existence.").

In reaching the contrary conclusion, the district court determined that L.M.'s "intent is not relevant to the question of whether the school permissibly concluded that the Shirt invades the rights of others" and that it had to defer to the school's judgment. Add.11 & n.3. But "[p]rohibitions on speech have the potential to chill, or deter, speech outside their boundaries," so the government must "condition liability on the [government]'s showing of a culpable mental state." *Counterman v. Colorado*, 143 S. Ct. 2106, 2114-15 (2023). Moreover, the Supreme Court has "been unmistakably clear that any deference must exist within constitutionally prescribed limits, and that deference does not imply abandonment or abdication of judicial review." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2168 (2023) (cleaned

up). "'[T]rust us'" is not good enough. *Id.* Middleborough must be held to the same review as everyone else. And Middleborough does not come close to overcoming its demanding burden here.

**Second,** the district court recognized that L.M.'s speech was not targeted at any particular individual, yet it upheld Middleborough's censorship anyway. As the district court explained, "the School's rational[e] for prohibiting the Shirt is not that LM is bullying a specific student, but that a group of potentially vulnerable students will not feel safe." Add.12. But this "broader view" of bullying is squarely foreclosed by First Circuit precedent. This Court requires "the student speech [to be] targeted [at] a specific student." *Norris*, 969 F.3d at 29. And for good reason. As this Court explained, "bullying that targets and invades the rights of an individual student" is "vastly and qualitatively different" than a student's "general statement" of opinion. *Doe*, 19 F.4th at 506 (citing *Mahanoy*, 141 S. Ct. at 2045). Here, as Middleborough and the district court seemingly concede, L.M.'s speech is plainly a "general statement of opinion" and thus "vastly and qualitatively different" than "bullying." *Id.*

**Third,** the district court contended that *Norris* "did not attempt to set a rule for all speech that is an invasion of the rights of others or even the precise boundaries of what speech constitutes bullying such that it falls within the invasion of the rights of others framework of *Tinker*." Add.11 (cleaned up). But *Norris* plainly concluded that the speech must be "targeted [at] a specific student." *Norris*, 969 F.3d at 29. This Court then reaffirmed *Norris*'s targeting requirement in *Doe v. Hopkinton Public Schools* when it

19

explained that "[a] general statement of discontent is vastly and qualitatively different from bullying that targets and invades the rights of an individual student." 19 F.4th at 506. And the Supreme Court in *Mahanoy* stressed that the school's interest is in preventing "serious or severe bullying or harassment *targeting particular individuals*." 141 S. Ct. at 2045 (emphasis added).

In any event, "the precise boundar[y]" the *Norris* court was looking for, 969 F.3d 29 n.18, is the "harassment" standard endorsed by the Supreme Court in *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). In *Davis*, the Supreme Court adopted a narrow definition of actionable "harassment" under Title IX, holding that the harassment must be "so severe, pervasive, *and* objectively offensive that it *denies* its victims the equal access to education." *Id.* at 652 (emphases added). By imposing this stringent definition, *Davis* ensures that schools regulate harassing *conduct*, not *speech*. Middleborough did not even come close to providing evidence to meet that standard.

**Fourth,** the district court cited four other cases for the proposition that bullying need not target a particular individual, but none supports its "broader view" of "safety." *See* Add.12 (citing *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000); *Scott v. School Bd. of Alachua Cnty.*, 324 F.3d 1246 (11th Cir. 2003); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524 (9th Cir. 1992); *Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493 (1st Cir. 2021)).

Two of the cases (*West* and *Scott*) involve prohibitions on the confederate flag. In

*West*, the court permitted a school to suppress a student's display of a confederate flag because the district presented substantial evidence supporting its concerns about both material disruption and *physical* security: The school had already seen "several verbal confrontations" and "[a]t least one fight" break out because of similar displays. 206 F.3d at 1362. Likewise, in *Scott*, the court upheld the school's ban on the display of confederate flags under *Tinker*'s disorder prong, not the invasion-of-rights prong, because the school presented "evidence of racial tensions … [and] testimony regarding fights which appeared to be racially based." 324 F.3d at 1249. These cases radically differ from this one. Both *West* and *Scott* are best read to involve *Tinker*'s disorder prong, not invasion of rights. And nothing like the evidence presented in *West* or *Scott* is present here.

Regardless, the confederate-flag cases involved a symbol "widely regarded as racist and incendiary," *Zamecnik*, 636 F.3d at 877, while the speech prohibited here "strik[es] at the heart of moral and political discourse—the lifeblood of constitutional self government (and democratic education) and the core concern of the First Amendment," *Saxe*, 240 F.3d at 210; *see also Meriwether*, 992 F.3d at 508 ("[S]peech about 'race, gender, and power conflicts' addresses matters of public concern," "using racial epithets" does not.). "[L]umping those who hold traditional beliefs about [sex] together with racial bigots is insulting to those who retain such beliefs." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1925 (2021) (Alito, J., concurring in the judgment).

The district court's other two cases are similarly inapt. In *Chandler*, the court concluded that given the litigation stage, the school failed to present sufficient evidence of disruption to justify its suppression of speech that is often viewed as vulgar. 978 F.2d at 530-31. And *Doe v. Hopkinton Public Schools* involved group bullying directly targeting a specific student and whether students engaged in speech in a group chat "causal[y] connect[ed]" to certain conduct could be punished for that conduct. *See* 19 F.4th at 506. As this Court explained, the students "do not dispute that other group members directly bullied Roe, such as by taking nonconsensual photos and videos of him, attempting to get him to say inappropriate statements on camera, and isolating him from the hockey team" but "challenge[d] only whether their conduct reasonably could be viewed as a ground for treating them as active participants in such regulable conduct." *Id.* at 506-07. That is nothing like the speech here.

**Finally,** the district court's "broader view" of "safety" lacks any sort of limiting principle and would mean that *Tinker* should have come out the other way. In *Tinker*, the students engaged in "silent, passive expression of opinion." 393 U.S. at 508. They wore black armbands "to exhibit opposition to this Nation's involvement in Vietnam." *Id.* at 510-11. But their view was not shared by everyone: Students who fervently supported the Vietnam War, who planned to enlist in the military, or who had family members serving would have found themselves confronted by messages critical and hurtful of their deepest commitments. In today's language, those students were "confronted by messages attacking" or "invalid[ating]" fundamental parts of their

"identities." Add.11. Yet the student's expression in *Tinker* was protected. So too here.

## CONCLUSION

This Court should reverse the district court.

Dated:          October 2, 2023          Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Thomas S. Vaseliou
Rachel L. Daley
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
tvaseliou@consovoymccarthy.com
rdaley@consovoymccarthy.com

*Counsel for Parents Defending Education*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B) because it contains 5,879 words, excluding the parts exempted by Rule 32(f). This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

The electronic version of the brief has been scanned for viruses and is virus-free.


Dated: October 2, 2023                    */s/ J. Michael Connolly*

**CERTIFICATE OF SERVICE**

I certify that on October 2, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will automatically send email notification to all counsel of record.


*/s/ J. Michael Connolly*