Nos. 23-1535, 23-1645

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

L.M., a minor by and through his father and stepmother and natural guardians, Christopher and Susan Morrison,
*Plaintiff-Appellant*,

v.

TOWN OF MIDDLEBOROUGH, MASSACHUSETTS; MIDDLEBOROUGH SCHOOL COMMITTEE; CAROLYN J. LYONS, Superintendent, Middleborough Public Schools, in her official capacity; HEATHER TUCKER, Acting Principal, Nichols Middle School, in her official capacity,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts, Eastern Division
Case No. 1:23-cv-11111-IT

BRIEF OF *AMICI CURIAE* STATES OF SOUTH CAROLINA, ALABAMA, ARKANSAS, GEORGIA, IDAHO, IOWA, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, NORTH DAKOTA, TEXAS, UTAH, AND VIRGINIA SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL

STATE OF SOUTH CAROLINA
OFFICE OF THE ATTORNEY
GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

ALAN WILSON
*Attorney General*
Robert Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
Thomas T. Hydrick
*Asst. Dep. Solicitor General*
Joseph D. Spate
*Asst. Dep. Solicitor General*
Counsel of Record

October 2, 2023

*Attorneys for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION AND INTERESTS OF *AMICI CURIAE* ....................................1

BACKGROUND ...........................................................................2

SUMMARY OF ARGUMENT ..................................................................3

ARGUMENT .............................................................................4

    I.  The District Court failed to properly apply the *Tinker* standard ...............6

        *A.* Tinker *Imposes a Demanding Standard to Restrict Student Speech*.....6

        *B.* Tinker *is Particularly Protective of Student Speech on Matters of Conscience*..........................................................................10

        *C. The District Court Misapplied* Tinker *and Its Progeny* ......................11

    II. The District Court failed to meaningfully consider L.M.'s claim of viewpoint discrimination. ARGUMENT .................................................14

        *A. The Dress Code Prefers One Viewpoint Over Other Perspectives on the Same Topic*..........................................................................16

        *B. The Dress Code Does Not Apply Equally to All Students* ....................18

CONCLUSION ...........................................................................19

ADDITIONAL COUNSEL ..................................................................21

CERTIFICATE OF COMPLIANCE ...........................................................22

CERTIFICATE OF SERVICE ..............................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                    Page(s)

*303 Creative LLC v. Elenis*,
   143 S. Ct. 2298 (2023) ................................................................................. 1, 15
*Barr v. Lafon*,
   538 F.3d 554 (6th Cir. 2008) ................................................. 8, 14, 18
*Bethel Sch. Dist. No. 403 v. Fraser*,
   478 U.S. 675 (1986) ........................................................................ 4
*Boy Scouts of America v. Dale*,
   530 U. S. 640 (2000) ....................................................................... 1
*Doe v. Hopkinton Pub.*,
   *Schs.*, 19 F.4th 493 (1st Cir. 2021) ................................. 3, 9, 12
*Good News Club v. Milford Central School*,
   533 U.S. 98 (2001) .......................................................................... 1
*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ........................................................................ 5
*Holloman ex rel. Holloman v. Harland*,
   370 F.3d 1252 (11th Cir. 2004) ................................................. 6, 7
*L.M. v. Town of Middleborough*,
   No. 1:23-cv-11111-IT, 2023 WL 4053023 (D. Mass. June 16, 2023) .......... passim
*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
   141 S. Ct. 2038 (2021) ............................................................ passim
*Matal v. Tam*,
   582 U.S. 218 (2017) ...................................................................... 17
*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ................................................. 14, 15
*Morse v. Frederick*,
   551 U.S. 393 (2007) ................................................ 5, 9, 10, 11
*Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*,
   969 F.3d 12 (1st Cir. 2020) ...................................... 6, 9, 10
*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*,
   523 F.3d 668 (7th Cir. 2008) .................................................. passim
*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ...................................................................... 12
*Ridley v. Massachusetts Bay Transp. Auth.*,
   390 F.3d 65 (1st Cir. 2004) ....................................... 1, 15, 16
*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995) .............................................................. 15, 16

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ...............................................................13
*Slotterback v. Interboro Sch. Dist.*,
    766 F.Supp. 280 ...................................................................................13
*Street v. New York,*
    394 U.S. 576 (1969)..............................................................................17
*Texas v. Johnson*,
    491 U.S. 397 (1989)................................................................................9
*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969)...................................................................... passim
*Turner Broadcasting System, Inc.* v. *FCC*,
    512 U. S. 622 (1994).............................................................................15
*Virginia v. Black*,
    538 U.S. 343 (2003)..............................................................................11
*W. Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)................................................................................1
*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
    636 F.3d 874 (7th Cir. 2011).................................................................14

## Statutes

42 U.S.C. 1983 .........................................................................................3

## Rules

Fed. R. App. P. 29(a)(2) ..........................................................................22
Federal Rule of Appellate Procedure 29(a)(5).......................................22

iii

**INTRODUCTION AND INTERESTS OF *AMICI CURIAE***

South Carolina and Amici States have a compelling interest in protecting the First Amendment rights of their citizens. Those rights are fundamental to our system of government and way of life. They encompass familiar rights of speech and conscience. *See 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2310 (2023) ("The framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.'") (quoting *Boy Scouts of America v. Dale*, 530 U. S. 640, 660–61 (2000)). And they also extend to less familiar protections against viewpoint discrimination by the government. *See Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) ("The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses.")

Citizens generally do not shed these rights at the schoolhouse gate. *See Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508 (1969). Even in the school setting, the government cannot "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). And schools may certainly not discriminate on the basis of viewpoint. *See Good News Club v. Milford Central School*, 533 U.S. 98, 112 (2001).

1

## BACKGROUND

At issue in this case is a Dress Code (the "Dress Code") contained within a Code of Conduct in the Nichols Jr. Middle School ("School") Student & Family Handbook. *See L.M. v. Town of Middleborough*, No. 1:23-cv-11111-IT, 2023 WL 4053023, at *1–2 (D. Mass. June 16, 2023). This Dress Code provides, in relevant part, that the School:

> expect[s] all students to conform to the following:
> ….
> • Clothing must not state, imply, or depict hate speech or imagery that target groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation, or any other classification.
> • Any other apparel that the administration determines to be unacceptable to our community standards will not be allowed.

*Id.* at *2. The Dress Code also states that "[i]f students wear something inappropriate to school, they will be asked to call their parent/guardian to request that more appropriate attire be brought to school. Repeated violations of the [D]ress [C]ode will result in disciplinary action." *Id.*

In conjunction with this dress code, the School also openly promotes messages commonly associated with "LGBTQ Pride." *Id.* at *1 (internal citations omitted).

Relevant for purposes of this appeal, the School applied the Dress Code to prohibit a student ("L.M.") from wearing a T-shirt that stated, "THERE ARE ONLY TWO GENDERS." *Id.* at *2. The School later applied the Dress Code to prohibit

L.M. from wearing a modified version of the T-shirt that stated, "THERE ARE ONLY CENSORED GENDERS." *Id*. at \*3.

In justifying its decisions, the School invoked a variety of legal theories, at times asserting that the T-shirt's message was likely to be considered "discriminatory, harassing, or bullying" and at other times suggesting that the T-shirt could be "disruptive" and would cause students to feel "unsafe." *Id*. In doing so, the School invoked the Supreme Court's decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) to support its decision.

L.M. subsequently brought suit against the School under 42 U.S.C. 1983 for violations of the First and Fourteenth Amendments. *Id*. at \*4. In his Complaint, L.M. alleged that the School improperly engaged in impermissible viewpoint discrimination. *Id*. Shortly after filing his Complaint, L.M. filed an emergency motion for a temporary restraining order and a preliminary injunction. *Id*. The district court ultimately denied L.M.'s motion. *Id*. at \*8.

## SUMMARY OF ARGUMENT

In denying L.M.'s motion, the district court erred for at least two reasons. First, the district court misapplied *Tinke*r. The district court reasoned that "a group of potentially vulnerable students will not feel safe" when confronted by a message with which they do not agree, and that the T-shirt thus involved the "invasion of the rights of others." *Id*. at \*6 (citing *Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493, 505

3

(1st Cir. 2021)) (discussing the *Tinker* standard). This holding fundamentally misunderstands and misapplies *Tinker*'s "invasion of the rights of others" standard and ignores decades of precedent from this Court. Further, the district court failed to meaningfully grapple with the remaining portions of the *Tinker* standard. Under this standard, the School's actions were plainly impermissible, and L.M. was entitled to a preliminary injunction.

Second, the district court apparently failed entirely to grapple with L.M.'s allegations regarding viewpoint discrimination. Under longstanding precedent, the School plainly engaged in impermissible viewpoint discrimination.

## ARGUMENT

Over fifty years ago, the Supreme Court famously pronounced: "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Since then, the Court has sought to clarify the scope of student speech rights in public secondary schools. In doing so, the Court has identified approximately four circumstances in which student speech may be subject to regulation. *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2045 (2021).

First, schools may regulate indecent, lewd, or vulgar speech that is uttered on school grounds. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986).

Second, schools may regulate speech that is reasonably regarded as promoting illegal drug use. *See Morse v. Frederick*, 551 U.S. 393, 408 (2007). Third, schools may regulate student speech that "the public might reasonably perceive to bear the imprimatur of the school." *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988).

Fourth, and relevant for purposes of this appeal, schools may regulate speech under the *Tinker* standard. Under *Tinker*, schools may regulate student speech if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker*, 393 U.S. at 513. Of course, schools may generally not invoke the *Tinker* standard to engage in otherwise impermissible viewpoint discrimination. *See Morse*, 551 U.S. at 423 (Alito, J., concurring).[1]

Here, the district court misapplied and failed to apply relevant portions of the *Tinker* standard and failed to meaningfully consider L.M.'s claim of viewpoint discrimination.

---

[1] Of course, schools may ordinarily restrict certain types of speech that are inconsistent with its educational mission. "In a math class, for example, the teacher can insist that students talk about math, not some other subject. In addition, when a teacher asks a question, the teacher must have the authority to insist that the student respond to that question and not some other question, and a teacher must also have the authority to speak without interruption and to demand that students refrain from interrupting one another." *Mahanoy*, 141 S. Ct. at 2050 (Alito, J., concurring) (internal citation omitted).

I.    **The District Court failed to properly apply the *Tinker* standard.**

    A. ***Tinker* Imposes a Demanding Standard to Restrict Student Speech.**

Courts have concluded that *Tinker* imposes a "demanding standard" on schools to justify restrictions on student speech. *Mahanoy*, 141 S.Ct. at 2048. *Tinker* generally places the burden on schools to justify those restrictions. *See Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020). To meet this burden, schools must demonstrate a likelihood that any restrictions on speech were justified. *Id*. In doing so, schools should cite to specific facts from the school environment. *See Tinker*, 393 U.S. at 514. This is an objective standard, which analyzes the objective reasonableness of a school's actions. *See Norris*, 969 F.3d at 25.

Turning to the standard itself, for a restriction to be upheld on the basis of a threat of substantial disorder or disruption, "there must be a real or substantial threat of actual disorder, as opposed to the mere possibility of one." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1273 (11th Cir. 2004). Mere "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508.

The threat of disorder must be analyzed based on the specific circumstances at a particular school. *See Holloman*, 370 F.3d at 1274 (noting that "a restriction on student expression cannot be determined in the abstract, but must be assessed with

6

at least one eye toward the actual or likely (not merely potential) impact of that expression on the learning environment."). "Conduct that may be constitutionally protected in one school or under one set of circumstances may tend to incite disruption or disorder—and so be constitutionally proscribable—in others." *Id*.

Under this standard, schools generally may not take into account the possibility of a heckler's veto. *See id*. at 1276 ("While the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason.").

Applying this standard in practice, in *Tinker* itself, the Supreme Court concluded that students protesting the Vietnam War engaged in expression protected by the Constitution. *See Tinker*, 393 U.S. at 514. Those students wore "on their sleeve a band of black cloth, not more than two inches wide," which was intended to "exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them." *Id*. In concluding that their expressive conduct did not interrupt school activities or intrude on school affairs or the lives of others, the Court noted that while their actions "caused discussion outside of the classrooms," their actions did "no interference with work and no disorder." *Id*.

7

Likewise, in yet another student apparel case, the Seventh Circuit concluded that there was no evidence that a student's T-shirt that says "Be Happy, Not Gay" would cause a substantial disruption in the school environment. *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 676 (7th Cir. 2008). This was true even though there had been previous "incidents of harassment" targeted towards gay students. *Id*. In directing the district court to enter an injunction against the school, the court observed the following:

> Nevertheless, "Be Happy, Not Gay" is only tepidly negative; "derogatory" or "demeaning" seems too strong a characterization. As one would expect in a school the size of Neuqua Valley High School, there have been incidents of harassment of homosexual students. But it is highly speculative that allowing the plaintiff to wear a T-Shirt that says "Be Happy, Not Gay" would have even a slight tendency to provoke such incidents, or for that matter to poison the educational atmosphere. Speculation that it might is, under the ruling precedents, and on the scanty record compiled thus far in the litigation, too thin a reed on which to hang a prohibition of the exercise of a student's free speech.

*Id*.

In contrast to the courts' conclusions regarding student apparel in *Tinker* and *Nuxoll*, the Sixth Circuit in *Barr v. Lafon*, 538 F.3d 554, 577 (6th Cir. 2008), upheld a school policy prohibiting students from wearing clothing that depicted the Confederate flag. Significantly, however, the Sixth Circuit only reached this conclusion after finding "compelling evidence" of racial tension at the school. *See id*. at 565–66 ("Were Plaintiffs-Appellants correct and the record showed minimal

8

evidence of prior disruption related to racial tension, then we would likely conclude that the school had little basis for anticipating disruption caused by images of the Confederate flag. But the evidence on the record belies Plaintiffs-Appellants' argument.").

For a restriction to be upheld on the basis of the invasion of the rights of others, *Tinker* requires a school to show that it had a reasonable basis to conclude that the restricted speech "targeted a specific student and that it invaded that student's rights." *Norris*, 969 F.3d at 29; *see also Hopkinton*, 19 F.4th at 506 ("A general statement of discontent is vastly and qualitatively different from bullying that targets and invades the rights of an individual student."). Furthermore, courts also require schools to establish a "causal link" between the restricted speech and the bullying incident. *Norris*, 969 F.3d at 31.

Speech that is merely offensive to a listener is not enough to justify a restriction. *Norris*, 969 F.3d at 29 n.18. After all, if "there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). And "much political and religious speech might be perceived as offensive to some." *Morse*, 551 U.S. at 409.

In *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 33 (1st Cir. 2020), this Court found that the school improperly imposed punishment on a

9

student for engaging in protected speech because the school failed to establish that the speech caused the bullying at issue. This Court observed that even if the school could reasonably conclude that the speech referred to a particular student, "there is a different question as to whether the note caused the bullying harm as the school system alleged." *Id*.

Similarly, the Seventh Circuit in *Nuxoll* dismissed any claim that the T-shirt invaded the rights of other students. *See id*. at 673 ("Of course a school can—and often it must—protect students from the invasion of their legal rights by other students. But people do not have a legal right to prevent criticism of their beliefs or for that matter their way of life.").

In short, *Tinker* imposes a demanding standard on schools that seek to restrict student speech. To meet this standard, schools should present significant evidence to support their claims that any speech restrictions are justified under *Tinker* and its progeny.

### B. *Tinker* is Particularly Protective of Student Speech on Matters of Conscience.

Although *Tinker* may apply to all types of student speech, it is particularly concerned with political speech or speech related to matters of individual conscience. *See Morse*, 551 U.S. at 403. This is likely true for at least two reasons. First, political speech is at the core of what the First Amendment is designed to

protect. *Morse*, 551 U.S. at 403 (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003)).

Second, *Tinker* and its progeny recognize that public schools have a unique role to play in our democratic system of government. As the Supreme Court has explained, "public schools are the nurseries of democracy." *Mahanoy*, 141 S.Ct. at 2046. And in educating democratic citizens, schools have an obligation to prepare their students for democracy's "marketplace of ideas." *Id*. This preparation necessarily involves exposing students to speech related to politics and matters of conscience.

### C. The District Court Misapplied *Tinker* and Its Progeny.

In denying Appellant's request for a preliminary injunction, the district court failed to apply much of this longstanding precedent. Instead, the district court made the conclusory determination that Appellant had not shown a substantial likelihood of success on the merits because the School sought to promote a "broader view" of student safety, concluding that school officials rightly determined that students have a "right to attend school without being confronted by messages attacking their identities" and a "right to be let alone." 2023 WL 4053023, at *6.

The district court's holding represents an alarming departure from precedent and finds no basis in opinions from this Court or the Supreme Court. In support of

its approach, the district court cited a single decision from this Court—*Doe v. Hopkinton Public Schools*, 19 F.4th 493 (1st Cir. 2021).

But *Hopkinton* actually undermines the district court's approach. This Court in *Hopkinton* reaffirmed familiar rules derived from *Tinker*—namely that schools have an interest in regulating harassment or bullying that invades the rights of individual students and that there must be a causal connection between the speech and the bullying. *See Hopkinton*, 19 F.4th at 506 (noting that speech must invade the "rights of an individual student."). The district court ignored—or refused to apply—this precedent.

The district court also ignored relevant case law from other courts. For example, the Seventh Circuit in *Nuxoll* directly addressed an analogous situation, holding that a student wearing a T-shirt with a message that took a position on LGBTQ+ issues did not invade the rights of other students. Squarely addressing the issue before the district court, the Seventh Circuit held, "we cannot accept the defendants' argument that the rule is valid because all it does is protect the 'rights' of the students against whom derogatory comments are directed. Of course a school can—often it must—protect students from the invasion of their legal rights by other students. But *people do not have a legal right to prevent criticism of their beliefs or for that matter their way of life*." *Nuxoll*, 523 F.3d at 672 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992)) (emphasis added).

And "at least one court has opined that [the 'interference with the rights of others' language from *Tinker*] covers only independently tortious speech like libel, slander or intentional infliction of emotional distress." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (citing *Slotterback v. Interboro Sch. Dist.*, 766 F.Supp. 280, 289 n. 8 (E.D. Pa. 1991)). The court in *Saxe* ruled that a school's "hostile environment" policy that barred Christians from expressing their belief that homosexuality is a sin did not interfere with the rights of others because, absent a realistic threat of substantial disruption, the policy could "conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." 240 F.3d at 217. The School's Dress Code in this case should likewise be rejected because L.M.'s T-shirt in question, which simply expressed a belief about the nature of gender, failed to invade the rights of others.

Although the district court declined to address whether L.M.'s conduct caused a material disruption of classwork or substantial disorder, it is clear that the School failed to produce sufficient facts to make such a showing. *See Tinker*, 393 U.S. at 514; *see also Nuxoll*, 523 F.3d at 676 (noting that speculation regarding a material disruption or substantial disorder is "too thin a reed on which to hang a prohibition of the exercise of a student's free speech.").

Aside from this evidentiary shortcoming, the message on the T-shirt in question bears no resemblance to the kinds of speech that courts have recognized as

being likely to cause material disruption of the classroom, such as answering a question different than the one asked by a teacher, *Mahanoy*, 141 S. Ct. at 2050, or even displaying a Confederate flag in a school with a history of intense racial tensions, *Barr*, 538 F.3d at 577.

Instead, L.M.'s message far more closely approximates past examples of student speech on matters of politics or conscience. Like the students' black cloth in *Tinker* or the student's T-shirt in *Nuxoll*, L.M.'s speech expressed a point of view on a matter of public importance without any threat of disruption or disorder. *See Tinker*, 393 U.S. at 508 (describing the students' "silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners.").

After all, questions of gender identity are a "hotly contested matter of public concern," which are likely to be debated for years to come. *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021). It seems only fitting then that these questions can—and should be—responsibly debated in our "nurseries of democracy." *See Mahanoy*, 141 S.Ct. at 2046.

## II.   The District Court failed to meaningfully consider L.M.'s claim of viewpoint discrimination.

The district court also failed to meaningfully consider L.M.'s claim that the School engaged in improper viewpoint discrimination in this case. *See Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011) ("Thus a school

that permits advocacy of the rights of homosexual students cannot be allowed to stifle criticism of homosexuality.").

Restrained by the First Amendment, the School may not regulate speech so as to "'excis[e] certain ideas or viewpoints from the public dialogue.'" *303 Creative*, 143 S. Ct. at 2303 (quoting *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 642 (1994)); *see also Meriwether*, 992 F.3d at 507 ("Without sufficient justification, the state cannot wield its authority to categorically silence dissenting viewpoints."). Indeed, "[t]he essence of viewpoint discrimination is not that the government incidentally prevents certain viewpoints from being heard in the course of suppressing certain general topics of speech, rather, it is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004).

For example, in *Rosenberger v. Rector & Visitors of University of Virginia*, the Supreme Court considered a public university's grant of funds for printing costs to student organization publications but denial of such funds to a student organization that published a newspaper with a Christian editorial viewpoint. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995). Ultimately, the Court found that the university's denial of funds to the student organization in question violated the First Amendment by discriminating against the

viewpoint of that organization. *Id.* The Court reasoned that because "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," and "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another," then public schools likewise "may not silence the expression of selected viewpoints." 515 U.S. at 828, 835 (internal citations omitted).

### A. The Dress Code Prefers One Viewpoint Over Other Perspectives on the Same Topic.

Here, the School has not suppressed all student speech on the general *topic* of gender. In fact, the School has actively "promot[ed] messages commonly associated with 'LGBTQ Pride,'" such as by "observ[ing] events like 'Pride Month' and Pride Day' in support of the LGBTQ+ community" and hosting a Gay Straight Alliance Club "to further the goal of providing support to students who are part of the LGBTQ+ community." 2023 WL 4053023, at *1.

In doing so, the School, through its dress code, has "intervene[d] in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." 390 F.3d at 82. Whereas the School accepts and even celebrates student speech expressing the novel beliefs that gender is not tied to sex and that there are

more than two genders, the School censors student speech that expresses time-tested beliefs to the contrary that are held by a growing majority of American adults.[2]

For the School to actively promote student speech supporting the belief that there are more than two genders while prohibiting a student from wearing a T-shirt that simply states "THERE ARE ONLY TWO GENDERS" or "THERE ARE ONLY CENSORED GENDERS" is textbook viewpoint discrimination under this Court's longstanding precedent.

It matters not that some students may take offense at a message they do not want to hear. The Dress Code's effect of banning any message "that is offensive to a substantial percentage of the members of any group" amounts to viewpoint discrimination because "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017); *see also id.* at 244 ("We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'") (quoting *Street v. New York,* 394 U.S. 576, 592 (1969)); *see also* 2023 WL 4053023, at *2 (the Dress Code states that "Clothing must not state, imply, or depict hate speech or imagery that target groups based on .

---

[2] Sean Salai, "Number of genders? Two, say most adults," *The Washington Times*, Jun. 8, 2023, https://www.washingtontimes.com/news/2023/jun/8/number-genders-two-say-most-adults/ (accessed September 6, 2023) (revealing that 65% of polled adults indicated they believe in only two genders, male and female, up from 62% in 2022 and 59% in 2021).

. . gender, . . . gender identity, . . . or any other classification."). The Dress Code improperly prefers one viewpoint over another.

### B. The Dress Code Does Not Apply Equally to All Students.

Another consideration that courts have made in evaluating whether a school's restriction on student speech constitutes viewpoint discrimination is whether such a policy is "applied equally" to individuals on either side of a given debate. *Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008). In *Barr v Lafon*, for example, a school's prohibition on students wearing clothing depicting the Confderate flag was upheld as constitutional because, *inter alia*, it "applied equally to a student displaying a Confederate flag in solidarity with hate groups, and another who displayed a Confederate flag in a circle with a line drawn through it," and therefore it did not discriminate based upon viewpoint. *Id.*

Here, even though the Dress Code purports to govern all students, the provisions in question do not apply equally to all students. Reminiscent of Henry Ford's quip that "'[a]ny customer can have a car painted any colour [sic] that he wants so long as it is black,"[3] the Dress Code posits that students can express any belief they want about gender identity, so long as it aligns with the school's support for gender ideology. Students are allowed, even encouraged, to wear clothing that

---

[3] Henry Ford, "My Life and Work," 1922 (Doubleday, Page & Company), p. 72 (https://www.loc.gov/resource/gdcmassbookdig.mylifework01ford/?sp=2&st=pdf&pdfPage=84).

sports an LGBTQ+ pride flag, but they are not allowed to wear clothing that takes a contrary position.

Concluding that the Dress Code applies equally to students on both sides of the gender debate would be akin to maintaining that a ban on student prayer in public schools would apply equally to theists and atheists since atheists would be barred from prayer just as much as theists. In that scenario, atheist students' practices would not actually be impacted by the policies because they don't pray in the first place. In reality, a ban on student prayer would discriminate against theists since it is their conduct that is targeted by a prayer ban. Likewise, students who agree with the school's beliefs about gender identity are not burdened by a Dress Code that only permits speech in line with that belief. The Dress Code does not require adherents to gender ideology to alter their usual practice, because the Dress Code specifically conforms to their practice and requires others to do the same. It is those who hold a different view on gender who are specifically targeted and burdened by the Dress Code.

## CONCLUSION

In denying L.M.'s request for a preliminary injunction, the district court misapplied familiar principles of law under *Tinker*. It also failed to meaningfully analyze L.M.'s claim of viewpoint discrimination. This Court should reverse.

[Signature on following page]

Respectfully submitted,

<u>s/Joseph D. Spate</u>
Alan Wilson
*Attorney General*
Robert Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
Thomas T. Hydrick
*Asst. Dep. Solicitor General*
Joseph D. Spate
*Asst. Dep. Solicitor General*
STATE OF SOUTH CAROLINA
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General of Alabama

TIM GRIFFIN
Attorney General of Arkansas

CHRISTOPHER M. CARR
Attorney General of Georgia

RAÚL LABRADOR
Attorney General of Idaho

BRENNA BIRD
Attorney General of Iowa

DANIEL CAMERON
Attorney General of Kentucky

JEFF LANDRY
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

ANDREW BAILEY
Attorney General of Missouri

AUSTIN KNUDSEN
Attorney General of Montana

MICHAEL T. HILGERS
Attorney General of Nebraska

DREW WRIGLEY
Attorney General of North Dakota

KEN PAXTON
Attorney General of Texas

SEAN REYES
Attorney General of Utah

JASON MIYARES
ATTORNEY GENERAL OF VIRGINIA

**CERTIFICATE OF COMPLIANCE**

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4519 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman font) using Microsoft Word (the same program used to calculate the word count).

The Amici States are authorized to file this brief without the consent of the parties or the leave of the Court. Fed. R. App. P. 29(a)(2).

s/Joseph D. Spate
Joseph D. Spate

October 2, 2023

## CERTIFICATE OF SERVICE

I certify that on October 2, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that the foregoing document is being served on this day to all counsel of record registered to receive a Notice of Electronic Filing generated by CM/ECF.

s/Joseph D. Spate
Joseph D. Spate

October 2, 2023