Nos. 23-1535, 23-1645

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

L.M., a minor by and through his father and stepmother and natural guardians, Christopher and Susan Morrison,

Plaintiff-Appellant*,*

v.

TOWN OF MIDDLEBOROUGH, MASSACHUSETTS; MIDDLEBOROUGH SCHOOL COMMITTEE; CAROLYN J. LYONS, Superintendent, Middleborough Public Schools, in her official capacity; HEATHER TUCKER, Acting Principal, Nichols Middle School, in her official capacity,

Defendants-Appellees.

On Appeal from the United States District Court for the District of Massachusetts, Eastern Division Case No. 1:23-cv-11111-IT

### *AMICUS CURIAE* BRIEF OF MOUNTAIN STATES LEGAL FOUNDATION AND MANHATTAN INSTITUTE IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

James L. Kerwin
    *Counsel of Record*
William E. Trachman
MOUNTAIN STATES LEGAL
    FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
jkerwin@mslegal.org
wtrachman@mslegal.org

Ilya Shapiro
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

In accordance with Fed. R. App. P. 26.1, *amici curiae*, Manhattan Institute and Mountain States Legal Foundation state that they are nonprofit corporations.    Neither amicus has any parent companies, subsidiaries, or affiliates.    Neither amicus issues shares to the public, and no publicly traded corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT........ i

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES....................................................... iii

INTEREST OF AMICUS CURIAE............................................ 1

SUMMARY OF ARGUMENT .................................................. 2

ARGUMENT ........................................................................... 4

I.   Government Suppression of LM's Message Was Not Justified on the Ground that it "Invaded the Rights of Others."... 4

    A.   Student Speech that Contributes to the Marketplace of Ideas Can Never Be Suppressed Based Solely on the Alleged Psychological Strain Felt by Listeners...... 4

    B.   Even Assuming Student Speech Can Be Regulated in Light of its Psychological Impact on Listeners, Assessment of that Impact Must Be Made Based on a Reasonable Observer's Reaction, not the Most Hyper-Sensitive Observer's Tendency to be Offended. 16

II.   LM's Speech May Not Be Restricted by the Government Because It Reflects Foundational Legal Principles That Have Been Repeatedly Reaffirmed by the Supreme Court................ 25

CONCLUSION ........................................................................ 30

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*303 Creative LLC v. Elenis,*
   143 S. Ct. 2298 (2023)...................................................................... 1, 13

*Adams v. Sch. Bd. of St. Johns Cty.,*
   57 F.4th 791 (11th Cir. 2022) ........................................................ 22

*Adarand Constr., Inc. v. Pena,*
   515 U.S. 200 (1995)........................................................................ 1

*Ballard v. United States,*
   329 U.S. 187 (1946)........................................................................ 25

*Bethel Sch. Dist. No. 403 v. Fraser,*
   478 U.S. 675 (1985)........................................................................ 9

*Blackwell v. Issaquena Co. Bd. of Ed.,*
   363 F.2d 749 (5th Cir. 1966).......................................................... 6, 7

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020)................................................................... 4, 26

*B.P.J. v. W.V. St. Bd. of Ed.,*
   No. 2:21-cv-00316, 2023 WL 111875 (S.D.W. Va. 2023) ........ 22, 26

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022)................................................................... 25

*Doe v. Hopkinton Pub. Schs.,*
   19 F.4th 493 (1st Cir. 2021)........................................................... 10

*Frontiero v. Richardson,*
   411 U.S. 677 (1973)....................................................................... 25

*Good News Club v. Milford Cent. Sch.,*
   533 U.S. 98 (2001)......................................................................... 24

*Harper v. Poway Unified Sch. Dist.,*
    445 F.3d 1166 (9th Cir. 2006)................................................. 15

*Holloman ex rel. Holloman v. Harland,*
    370 F.3d 1252 (11th Cir. 2004)................................................. 19

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022)................................................. 1

*L.M. v. Town of Middleborough,*
    No. 1:23-CV-11111-IT, 2023 WL 4053023 (D. Mass. 2023) ... 19

*L.W. v. Skrmetti,*
    No. 23-560, 2023 WL 6321688 (6th Cir. 2023) ...................... 22

*Mahanoy Area Sch. Dist. v. B.L.,*
    141 S. Ct. 2038 (2021)................................. 8, 9, 12, 14, 15

*Matal v. Tam,*
    582 U.S. 218 (2017)................................................. 8

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021)................................................. 16

*Neese v. Becerra,*
    No. 2:21-cv-163-Z, 2022 WL 1265925 (N.D. Tex. 2022) ......... 27

*Newport News Shipbuilding and Dry Dock Co. v. EEOC,*
    462 U.S. 669 (1983)................................................. 25

*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204,*
    523 F.3d 668 (7th Cir. 2008)................................................. 19

*Parents Defending Ed. v. Linn Mar Comm. Sch. Dist.,*
    No. 22-2927, 2023 WL 6330394 (8th Cir. 2023) .................... 16, 24

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,*
    605 F.3d 703 (9th Cir. 2010)................................................. 8, 13

*Saxe v. State Coll. Area Sch. Dist.,*
    240 F.3d 200 (3rd Cir 2001)................................................. 8, 12, 13

iv

*Street v. New York,*
    394 U.S. 576 (1969) ................................................................ 8

*Tinker v. Des Moines Indep. Comm. Sch. Dist.,*
    393 U.S. 503 (1969) ........................................................ 2, 4, 5, 6, 12

*Tuan Anh Nguyen v. I.N.S.,*
    533 U.S. 53 (2001) ................................................................ 25

*United States v. Virginia,*
    518 U.S. 515 (1996) ................................................................ 25

## **Statutes**

20 U.S.C. § 1681(a)(2) ................................................................ 27

20 U.S.C. § 1681(a)(8) ................................................................ 28

## **Regulations**

Fed. R. App. P. 26.1 ................................................................ i

Fed. R. App. P. 29(a)(4)(E) ........................................................ 1

Nondiscrimination on the Basis of Sex in Education Programs or
    Activities Receiving Federal Financial Assistance, 85 Fed. Reg.
    30,026, 30,178 (May 19, 2020) ................................................ 29

34 C.F.R. pt. 106 ................................................................ 29

34 C.F.R. § 106.33 ................................................................ 28

34 C.F.R. § 106.34(a)(3) ........................................................ 28

34 C.F.R. § 106.37(c)(1) ........................................................ 28

## **Other Authorities**

Allie Burke, *Our Feelings Are Valid Because We Feel Them,*
    Psychology Today (Sept. 9, 2015) ........................................ 21

Emma Colton,
  Fox News, *Transgender women must sign up for military draft under Biden admin, trans men get a pass* (Oct. 11, 2022) ................ 28

Helen Joyce,
  *Trans: When Ideology Meets Reality* (2022 paperback ed.) .... 17

Mel Schwartz L.C.S.W.,
  *Can Your Feelings Be Wrong?*, PSYCHOLOGY TODAY (May 18, 2010) 21

U.S. Dep't of Educ., Off. for Civil Rts.,
  ANNUAL REPORT TO THE SECRETARY, THE PRESIDENT, AND THE CONGRESS (2021) .................................................................. 26

U.S. Dep't of Educ., Off. for Civil Rts.,
  *First Amendment: Dear Colleague Letter* (2003) ................... 10

U.S. Dep't of Educ., Off. for Civil Rts.,
  *Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties* (2001) 10

## INTEREST OF AMICUS CURIAE[1]

Mountain States Legal Foundation ("MSLF") is a nonprofit, public-interest law firm organized under the laws of the state of Colorado. MSLF is dedicated to bringing before the courts issues vital to the defense and preservation of individual liberties, the right to own and use property, the free enterprise system, and limited and ethical government. Since its creation in 1977, MSLF attorneys have been active in litigation regarding the proper interpretation and application of statutory, regulatory, and constitutional provisions. *See, e.g.*, *Adarand Constr., Inc. v. Pena*, 515 U.S. 200 (1995) (MSLF serving as lead counsel); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. —, 142 S. Ct. 2407 (2022) (*amicus curiae* in support of petitioner); *303 Creative LLC v. Elenis*, (2023) 600 U.S. —, 143 S. Ct. 2298 (*amicus curiae* in support of petitioners).

The Manhattan Institute (MI) is a nonprofit policy research foundation that works to keep America and its great cities prosperous, safe, and free. MI develops and disseminates ideas that foster individual

---

[1] Plaintiff-Appellant and Defendants-Appellees have all consented to the filing of this brief. Additionally, no counsel for a party authored this brief in whole or in part, and no person other than *Amici* and their counsel has made a monetary contribution to the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

freedom and economic choice across multiple dimensions.  To that end, it produces scholarship and files briefs opposing regulations that violate constitutionally protected liberties, including in the marketplace of ideas.

This case is of interest to *amici* because of the school's blatant censorship of student speech that in no way disrupts the school's educational mission.

## SUMMARY OF ARGUMENT

LM wore a shirt to his public middle school stating the scientific and legal truism that "there are only two genders."  This message could reasonably be interpreted as a critique—albeit a mild one—of fashionable elite ideologies concerning sex and gender.  What it cannot reasonably be interpreted as, however, is an "attack" on the "very existence" of a vulnerable minority community.  This, however, is what school officials and the District Court said, framing LM's speech as an assault on other students that could be suppressed on the basis that it "colli[ded] with the rights of others," pursuant to *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 508 (1969).  This Court should reverse.

First, the Court should hold that the *Tinker* "rights of others" prong does not allow a school to suppress student speech on a matter of public

concern based solely on the alleged psychological distress that may be felt by listeners.  That is not what the Supreme Court meant by its reference to the "rights of others," and an interpretation that limits free speech rights on the basis of emotional impact alone turns important First Amendment values on their head.

Second, the Court should also hold that, even in cases of bullying or juvenile displays of vulgarity (which, to be clear, do not characterize LM's speech here), where a school could arguably suppress caustic attacks on the core identities of vulnerable students that "would materially and substantially disrupt the work and discipline of the school," *id.* at 513, the determination of whether particular speech counts as a disruptive attack must be made from the point of view of a *reasonable audience member*, not based on the perspective of a highly sensitive listener.  To reach its conclusion that LM's utterance was an attack on some students, the District Court erroneously adopted the point of view of the most sensitive conceivable audience member.

Finally, not only is it *not* an "attack" on someone's identity to disagree with metaphysical claims about such things as the alleged ability of inner feelings to change biological sex, but with the particular

statement here—"there are only two genders"—there is an additional and insurmountable barrier to the government's speech suppression: as the Supreme Court has reaffirmed time and again, including, most recently, in *Bostock v. Clayton County*, 590 U.S. —, 140 S. Ct. 1731 (2020), as a matter of foundational legal principle: *there are in fact, only two genders*. No court has ever applied *Tinker* or its progeny to allow government curtailment of speech that expresses a legally accurate statement, particularly one that a student might just as likely hear in a government or biology class as on a t-shirt. LM's expression thus cannot be limited, consistent with the First Amendment.

## ARGUMENT

I. **Government Suppression of LM's Message Was Not Justified on the Ground that it "Invaded the Rights of Others."**

A. *Student Speech that Contributes to the Marketplace of Ideas Can Never Be Suppressed Based Solely on the Alleged Psychological Strain Felt by Listeners*

Public schools ought to inculcate the culture and practice of free speech among rising generations of Americans. "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker*, 393

U.S. at 739 (cleaned up).  This is why students maintain free speech rights past "the schoolhouse gate," *id.* at 506, and why, once inside, they are not to be treated as "closed-circuit recipients of only that which the State chooses to communicate," *id.* at 511.  Consistent with these principles, the Supreme Court has repeatedly reaffirmed that school officials have a duty to foster open debate, including encouraging, if not acceptance, then at least tolerance, of unpopular opinions.

In its seminal *Tinker* opinion, the Supreme Court addressed whether a high school could regulate symbolic speech protesting the Vietnam War—one of the most weighty public issues of the day.  393 U.S. at 510 n.4 (noting that our involvement in the Vietnam War had been "the subject of a major controversy for some time [and that the] debate . . . had become vehement in many localities.").  Several students planned, as part of a broader movement, to wear black armbands in class to bear "silent . . . witness" against the war, but not to otherwise engage in any speech or conduct.  *Id.* at 514.  The Court held that the school's enforcement of a hastily adopted policy prohibiting armbands violated the students' First Amendment rights.  *Id.* at 508-14.

5

"The classroom is peculiarly the marketplace of ideas." *Id.* at 512 (cleaned up).  In *Tinker*, the Court found that school officials could not conclude that silently wearing two-inch black armbands would materially disrupt school operations.  *Id.* at 509-10.  Accordingly, the school's attempt to suppress its students' speech was unconstitutional. Here, LM's expression similarly concerned important social issues at the core of First Amendment values, and could not be prohibited, absent conduct, "whether it stems from time, place, or type of behavior," that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others."  *Id.* at 513.

*Tinker* did not provide a comprehensive analysis of what it meant by the suggestion that student speech that "invades" or "collides with the rights of others" could be regulated by school authorities.  Nevertheless, *Tinker*'s holding is irreconcilable with the proposition that school authorities are at liberty to regulate speech on matters of public concern merely "to avoid . . . discomfort and unpleasantness."  *Id.* at 509.  In passing, the *Tinker* court adopted language about the "collision with the rights of others" directly from the Fifth Circuit's opinion in *Blackwell v.*

*Issaquena Co. Bd. of Ed.*, 363 F.2d 749 (1966). *See Tinker*, 393 U.S. at 513.

In *Blackwell*, however, there was no question that the speech at issue interfered with the school's ability to educate students, and the students' ability to learn. 363 F.2d at 751-54. Specifically, as part of a multi-day series of student protests, students stayed out of class and engaged in loud disturbances in school hallways, physically accosted other students who did not wish to be part of the protest, and even forced them to wear supportive buttons under threat of assault. The plaintiff students aggressively insulted their principal by calling him an "Uncle Tom," "threw [protest] buttons into the building through the windows," and generally subjected non-participating students to "harassment" that made it impossible for them to learn. *Id.* at 751-53.

Against this background, the Fifth Circuit had little trouble finding that the protests involved "an unusual degree of commotion, boisterous conduct, [and] a collision with the rights of others." *Id.* at 754. The limited categories of "rights of others" to which the Fifth Circuit referred (and which the Supreme Court later implicitly adopted in *Tinker*) then, were (1) the right not to be forced to join a protest, (2) the right of bodily

integrity (*i.e.*, a right against being forced to wear an unwanted protest button), and (3) a right to be free from a multi-day spree of chaos and disorder rendering learning all but impossible.

Those rights were decidedly not, as the Supreme Court and many lower courts have since re-emphasized, rights to be shielded from *mere ideas* that can potentially cause distress in sensitive listeners. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 223 (2017) (citing the "bedrock First Amendment principle [that s]peech may not be banned on the ground that it expresses ideas that offend"); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3rd Cir 2001) (Alito, J.) ("The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it."); *Street v. New York*, 394 U.S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *accord Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2048 (2021) (declining to find substantial disruption or "harm to the rights of others" where student speech caused "some members of the cheerleading team [to be] 'upset'"); *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605

F.3d 703, 708 (9th Cir. 2010) (the First Amendment protects even speech expressing the "thesis . . . that [certain members of the audience] are less than equal" because "the government may not silence speech because the ideas it promotes are thought to be offensive."). This is all the more true where the alleged emotional distress is felt not by "a particular member of the school community, but [is] based on [a generalized feeling of] negativity put out there . . . in the school." *Mahanoy*, 141 S. Ct. at 2048.

In contrast, where student speech does not involve the expression of ideas on matters of public concern, but rather consists merely of juvenile outbursts, bullying, harassment, or otherwise low- or zero-value expression, the "personal sensibilities of . . . [the] audience[]," can, in narrow circumstances, be considered by a school official in suppressing speech. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1985). In *Fraser*, for example, the Supreme Court countenanced regulation of student speech "unrelated to any political viewpoint," *id.* at 685, that was characterized by "pervasive sexual innuendo" and delivered to a school assembly of 600 children, *id.* at 677-83, "many of whom were only 14 years old and on the threshold of awareness of human sexuality," *id.* at 683. Given that the lewd content of the "confused boy['s]" speech could

create "offens[e] to both teachers and students—indeed to any mature person [and] was acutely insulting to teenage girl students," *id.*, the Supreme Court held that it could be suppressed by school officials, *id.* at 680; *but see* U.S. Dep't of Educ., Off. for Civil Rts., *First Amendment: Dear Colleague Letter* (2003) ("OCR's regulations and policies do not require or prescribe speech, conduct or harassment codes that impair the exercise of rights protected under the First Amendment.")[2]; *see also* U.S. Dep't of Educ., Off. for Civil Rts., *Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties*, at 22 (2001) ("Title IX is intended to protect students from sex discrimination, not to regulate the content of speech.").[3]

Similarly, in *Doe v. Hopkinton Pub. Schs.*, this Court found that a course of conduct by eight members of a high school hockey team targeting a teammate for extensive and repeated bullying (verbal and otherwise) was legitimately regulated under the "rights of others" prong

---

[2] https://www2.ed.gov/about/offices/list/ocr/firstamend.html

[3] https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.  Note that this guidance was issued after notice and comment in January 2001. *Id.* at ii. It was withdrawn after formal regulations addressing sexual harassment were promulgated in August 2020, but remains available for historical purposes.

of *Tinker*, 19 F.4th 493, 505-09 (1st Cir. 2021).  There, the Court found that school officials' "interest in regulating serious or severe bullying or harassment . . . that targets and invades the rights of an individual student," justified disciplinary action against the bullies.  *Id.* at 506 (cleaned up).  Notably, however, the bullying conduct did not involve any expression that could remotely be deemed a contribution to the marketplace of ideas.  Instead, it included such things as "taking nonconsensual photos and videos of [the victim], attempting to get him to say inappropriate statements on camera, and isolating him from the hockey team."  *Id.* at 507.  Further, social media messages by others encouraging and egging the bullies on "were causally connected to the direct bullying."  *Id.*; *see also, id.* at 509 ("Speech or conduct that actively and pervasively encourages bullying by others or fosters an environment in which bullying is acceptable and actually occurs . . . is not protected under the First Amendment.").  A distinguishing feature running through the cases giving weight to feelings of offense and psychological disturbance by student audience members is that the speech at issue is inherently juvenile and vulgar or characterized by repeated bullying

tactics targeting a vulnerable individual. *See, e.g.*, *Fraser*, 478 U.S. at 677-83; *Doe*, 19 F.4th at 505-09.

On the other hand, where a student is engaging in speech on important public topics, the fact that audience members may take offense or feel personally attacked carries little, if any, weight in the First Amendment analysis. Indeed, in *Tinker* itself, there was evidence that wearing black armbands in opposition to the Vietnam War would engender traumatic feelings in classmates whose friend had been killed in the war. 393 U.S. at 509 n.3. Yet against the background of high-value speech on a topic of utmost public importance, the Supreme Court did not suggest in any way that the undeniable emotional impacts on students who might naturally feel offended on behalf of their fallen classmate amounted to an invasion of their rights. *Id.* at 509 (mere desire to avoid the discomfort and unpleasantness not sufficient to regulate student speech); *Saxe*, 240 F.3d at 217 ("[While the] precise scope of *Tinker's* 'interference with the rights of others' language is unclear . . . it is certainly not enough that the speech is merely offensive to some listener. . . . [Where core] political and religious speech . . . [concerns] personal characteristics [and] offends someone . . . it is [nevertheless]

within a student's First Amendment rights."); *see also Mahanoy*, 141 S. Ct. at 2055 (Alito, J. concurring) ("At the other end of the spectrum, there is a category of speech that is almost always beyond the regulatory authority of a public school. This is student speech that . . . addresses matters of public concern, including sensitive subjects like politics, religion, and social relations. Speech on such matters lies at the heart of the First Amendment's protection.") (citations omitted); *accord 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) ("[T]he First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided' and likely to cause 'anguish' or 'incalculable grief.'") (internal citations omitted); *Rodriguez*, 605 F.3d at 708 ("Without the right to stand against society's most strongly-held convictions, the marketplace of ideas would decline into a boutique of the banal, as the urge to censor is greatest where debate is most disquieting and orthodoxy most entrenched.").

All of this makes particularly good sense in the public-school setting. Ideally, public schools have the primary mission of educating students. *See, e.g.*, *Saxe*, 240 F.3d at 217. This includes instruction in

such things as literature, history, and science, but also, crucially, includes the very important role of inculcating a culture of free speech and tolerance for the views of others—even views that can cause hurt and dismay in listeners. *See, e.g.*, *Mahanoy*, 141 S. Ct. at 2046 (because "America's public schools are the nurseries of democracy. . . . schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'"); *id* at 2049 (Alito, J. concurring) ("[P]ublic schools have the duty to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government.").

Student conduct that causes genuinely substantial disruption interferes with the functions of a public school. If, for instance, protestors are marching in and out of classrooms, accosting students who do not wish to join in, chanting, and drowning out instructors' voices, hardly any learning at all can take place. This is the *Tinker* "substantial disruption" prong.

Absent substantial disruption, however, if a student experiences psychological distress when exposed to speech on a matter of public

concern, the mission of the educational institution includes not only a duty to foster a necessary respect for the right of others to speak, *Mahanoy*, 141 S. Ct. at 2046, but also to *help that student* develop resilience and a sense of self-worth that comes with responding to and attempting to refute the disagreeable speech. After all, suppressing objectionable ideas only forces them to be "whispered behind backs or scribbled on bathroom walls," while "confronting . . . such views in a public forum may well empower [allegedly distressed] students, contributing to their sense of self-esteem." *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1200 (9th Cir. 2006) (Kozinski, J. dissenting), *vacated as moot by* 549 U.S. 1262 (2007). Helping create the next generation of citizens who have a proper respect for free speech may sometimes require that school administrators address the overreactions of students who feel "threatened," "harmed," or "offended" by others' opinions; and those students in turn can benefit from standing up to oppose—through reasoned debate—the speech with which they disagree.

Regardless of whether one agrees or disagrees with LM's expression, it is beyond argument that it represents the sharing of a social and political point of view and, therefore, a contribution to the

marketplace of ideas. Because the speech at issue goes to core First Amendment concerns, this Court should hold that it is categorically exempt from regulation based solely on the alleged psychological impact on listeners. *See Parents Defending Ed. v. Linn Mar Comm. Sch. Dist.*, No. 22-2927, 2023 WL 6330394, at \*4 (8th Cir., Sept. 29, 2023) (student speech stating the belief that "biological sex is immutable," is not "bullying" or "harassment" amenable to proscription under the *Tinker* "rights of others" standard, but rather represents an "open exchange of ideas" protected by the First Amendment despite its potential to offend); *cf. Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021) (enforcement of university gender identity speech policies would amount to an unconstitutional attempt "to discipline professors, students, and staff any time their speech might cause offense.").

> **B.  *Even Assuming Student Speech Can Be Regulated in Light of its Psychological Impact on Listeners, Assessment of that Impact Must Be Made Based on a Reasonable Observer's Reaction, not the Most Hyper-Sensitive Observer's Tendency to be Offended.***

LM's statement made a simple declaration: that there are only two "genders"—by which he means "sexes"—male and female. On the reasonable assumption that LM is referring to the sexes of human beings,

this is undoubtedly true.[4]   The statement says nothing about "trans identities," the place in society of students who feel more comfortable expressing themselves as stereotypically female when they are male (and vice versa) or who believe that they are neither male nor female, or any other topic going to the psychological self-understanding—let alone the worth or dignity as a human being—of anyone.   Put simply, the statement cannot reasonably be interpreted as bullying or derogatory in any way.

To put a finer point on it, LM's statement is fully compatible with entirely respectful views of his classmates, including any or all of the following: (1) that individuals have the freedom to choose or experience

---

[4]   The fact that there are rare disorders of sexual development that sometimes make it difficult as a practical matter to determine whether an infant is male or female or sometimes result in external genitalia that appear to be ambiguous does not mean that there are more than two sexes, any more than the fact that in some rare cases persons are born with more than ten fingers means that humans are not mammals with ten fingers.   Helen Joyce, Trans: When Ideology Meets Reality 64-65 (2022 paperback ed.) ("Sexes are classes of organisms defined by the developmental pathways that evolved to produce gametes: eggs and sperm. As with any part of the body, reproductive organs may develop in anomalous ways, just as some people are born with extra fingers or toes, or missing eyes or legs, but humans are still ten-fingered and ten-toed, binocular and bipedal.   For there to be even three sexes there would have to be a third gamete, and there is not." (internal quotation marks omitted)).

their own gender identity, gender expression, and sexual orientation; (2) that if a person says that they have internal gender identity feelings of being male or female (or both or neither), even if others do not entirely understand what they mean, the person is entitled to their feelings and those feelings are neither "valid" nor "invalid," as feelings can be neither true nor false; (3) that all students are entitled to access educational opportunities, regardless of their internal feelings.

That LM's shirt did not include these points is, in addition to being impractical, entirely beside the point. What LM *actually said* was entirely consistent with a caring, accepting, supportive and unbigoted attitude toward all Nichols Middle School ("NMS") students.

Instead of pausing to think about any of this, school officials immediately jumped to the sweeping conclusion that "the message on [LM's] t-shirt . . . attempted to extinguish the gender identity of transgender and gender non-conforming students." Mem. of Law ISO Defs' Opp. To Pl's Emergency Mot. for TRO (Dkt. 35) at 11; *see also* Mem. of ISO Defs' Opp. to Pl's Mot. for Prelim. Injunction (Dkt. 44) at 18 (describing LM as seeking to "harass[] and bull[y LGBTQ+ students]," and ascribing to him a "wish to deny their very existence."). The District

Court agreed, finding that the school's actions were "within [its] discretion," because LM's message "may communicate that only two gender identities—male and female—are valid, and any others are invalid or nonexistent, [thus] attacking the[] identities" of transgender or gender non-conforming students. *L.M. v. Town of Middleborough*, No. 23-cv-11111-IT, 2023 WL 4053023, at *6 (Jun. 16, 2023).

NMS and the District Court erred by, in effect, adopting the stance that "any statement that *could be construed by the very sensitive* as critical [of a] protected group identit[y]," is an attack worthy of suppression. *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 674 (7th Cir. 2008) (emphasis added). But that is not the right standard. Instead, even in the bullying context, a determination that a particular student expression is deeply offensive or amounts to a personal attack must be made from the point of view of a reasonable observer. *Id.* (rejecting the "very sensitive" person test); *cf. Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1275 (11th Cir. 2004) (plaintiff's expression "could not be construed by a reasonable person (including a high school student) as a personal offense or insult"). Applying the correct standard, it is clear LM's speech neither constituted bullying, nor an attack of any

kind, and in fact could only have been taken as offensive by an overly-sensitive listener.  A reasonable listener could easily interpret LM's t-shirt message to express disagreement with a philosophical claim that internal feelings can change the objective reality of sex, but that very modest statement is not a threat to anyone.

Worse, the school's and the District Court's interpretation of LM's message raises more questions than it answers.  What exactly would it mean to say, as the District Court put it, that LM may have been communicating that a particular "gender identit[y is] nonexistent"?  Surely the District Court was not accusing LM of communicating that students at NMS who identify as transgender, gender-nonconforming, or pan-gender (to name a few possibilities) do not themselves exist.  Nor could the District Court have plausibly meant that LM was communicating that students who *say* they have internal feelings of "maleness," "femaleness," or (possibly) "neither-male-nor-femaleness," in fact have no such internal feelings, because such feelings actually are "nonexistent."  If there are other possible ways to understand the District Court's statement that LM may have communicated that certain gender identities are "nonexistent," they are not readily apparent.

So too, the District Court's assertion that LM may have communicated to others that certain gender identities are "invalid," is also highly puzzling. Feelings are always "valid," *as feelings*, and cannot, by their very nature, be "invalid."[5] Feelings are what they are, and LM cannot plausibly be interpreted to have claimed that NMS students who say that they are experiencing inner feelings that do not match with the sex of their bodies are not in fact having such feelings.

It is possible that the District Court meant something different: that simply by disagreeing with the view expressed by some that a person's inner feeling of being male or female (or neither) has a determinative effect on that person's actual sex (despite any contrary genetics and anatomy at birth), LM was saying that cross-sex gender identities are "invalid" in the sense of "not corresponding with objective reality."

---

[5]    *See, e.g.*, Mel Schwartz L.C.S.W., *Can Your Feelings Be Wrong?*, PSYCHOLOGY TODAY (May 18, 2010) (feelings are neither right nor wrong), at https://www.psychologytoday.com/us/blog/shift-mind/201005/can-your-feelings-be-wrong; *see also* Allie Burke, *Our Feelings Are Valid Because We Feel Them*, PSYCHOLOGY TODAY (Sept. 9, 2015) ("[O]ur feelings are valid because we feel them."), at https://www.psychologytoday.com/us/blog/paper-souls/201509/our-feelings-are-valid-because-we-feel-them.

This would appear to be an accurate interpretation of LM's message, but not one that legitimately amounts to an "attack" on other students. A male person's internal feelings of "femaleness" or "neither-male-nor-femaleness" can presumably constitute genuine feelings, but they cannot, as if by magic, change the objective fact of that person's sex. *See, e.g., B.P.J. v. W.V. St. Bd. of Ed.*, — F. Supp. 3d —, No. 2:21-cv-00316, 2023 WL 111875, at * 8 (S.D.W. Va., Jan. 5, 2023) ("The fact is, however, that a transgender girl is biologically male."). Here's how one sister circuit recently treated this precise point:

> Regardless of Adams's genuinely held belief about gender identity—which is not at issue—Adams's challenge to the bathroom policy revolves around whether Adams, who was determined solely by the accident of birth to be a biological female—is allowed access to bathrooms reserved for those who were determined solely by the accident of birth to be biologically male. Thus, we are unpersuaded by the dissent's argument that the district court could make any factual finding (that would not constitute clear error) to change an individual's immutable characteristic of biological sex, just as the district court could not make a factual finding to change someone's immutable characteristic of race, national origin, or even age for that matter.

*Adams v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791, 807-08 (11th Cir. 2022) (cleaned up).; *see also L.W. v. Skrmetti*, No. 23-5600, 2023 WL 6321688, at *15 (6th Cir., Sept. 28, 2023) (rejecting challenges to state laws

regarding certain medical procedures for children with gender dysphoria because they "treat boys and girls" the same for constitutional purposes).

If pointing this out could be deemed an attack on the identity of a transgender or gender non-conforming student, absurd results would follow. Under the District Court's approach, it would be an "attack" on a Christian's identity, for instance, to state one's disbelief in a deity, or to respectfully disagree with the proposition that the universe was literally created in six days; and it would be an attack on an animist's identity to respectfully state one's view that bodies of water, rocks, and other objects do not have souls. One can surely appreciate and deem "valid" others' faith-based beliefs in deep mysteries like these, while simultaneously disagreeing with their literal truth, all without mounting an "attack" against them or jeopardizing one's fundamental right to free expression.

Indeed, scientific ideas that conflict with faith-based beliefs are routinely taught in school. Any school living up to the promise of public education will teach that the disciplines of cosmology and astrophysics hold that the universe started with a big bang, and evolved over billions of years, notwithstanding that this conflicts with a literal interpretation of certain biblical passages. So too, a school must teach its students that

23

humans and other mammals are characterized by sexual differentiation between males and females, notwithstanding that this may conflict with faith-like beliefs such as the alleged ability of gender identities to manifest in real-world changes to biological reality. None of these teachings can reasonably be deemed an attack on anyone.

The law is clear that, to the extent that speech can be regulated based on its character as a deep offense or attack on a vulnerable community, the logically primary determination of whether the speech *is indeed an attack* must be made from the perspective of a reasonable audience member, not based on the tendency of the most hyper-sensitive to be offended. *Cf. Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001) (declining, where "[v]ital First Amendment speech principles are at stake," to apply a "modified heckler's veto" based on "what the youngest members of the audience might misperceive."); *Parents Defending Ed.* No. 22-2927, 2023 WL 6330394, at *4 ("A school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment.'"). In this case, the District Court applied the wrong standard, and this Court may thus reverse and remand on this separate basis.

II.   **LM's Speech May Not Be Restricted by the Government Because It Reflects Foundational Legal Principles That Have Been Repeatedly Reaffirmed by the Supreme Court.**

Binding legal precedent holds that there are two sexes, and that the differences between the two sexes are based on biology.  *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring: '[T]he *two sexes* are not fungible[.]'") (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)) (emphasis added); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth[.]") (emphasis added); *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 68 (2001) ("[T]he mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father."); *Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983) ("[O]nly women can become pregnant[.]"); *accord Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2346 (2022) (dissenting opinion of JJ. Breyer, Sotomayor, and Kagan) ("[A] majority of today's Court has wrenched this choice from *women* and given it to the States.") (emphasis added).  LM's utterance that there are "two genders," by which he means that there are "two

sexes," based on biology, is therefore a matter of fact as a legal statement, and thus should generally not be subject to governmental regulation.

Most recently, in *Bostock*, the Supreme Court relied on the time-tested truth that sex is binary and biologically determined. *Bostock*'s key passage is the following:

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

140 S. Ct. at 1741–42; *see also* U.S. Dep't of Educ., Off. for Civil Rts., ANNUAL REPORT TO THE SECRETARY, THE PRESIDENT, AND THE CONGRESS, at 27 (2021) ("The Court's holding stated that it was assuming that sex referred to an employee's biological sex, but in fact the Court's holding in *Bostock* relies on that assumption, by noting that the employee who identifies as female is biologically male[.]"); *B.P.J.*, 2023 WL 111875, at *7 ("It is beyond dispute that, barring rare genetic mutations not at issue here, a person either has male sex chromosomes or female sex chromosomes."); *id.* at *9 ("[T]ransgender girls are biologically male.

26

Short of any medical intervention that will differ for each individual person, biological males are not similarly situated to biological females for purposes of athletics."). It is therefore a jurisprudential truth that there are "only two sexes."

Moreover, there are many statutes at the state and federal levels that explicitly rely on the binary nature of sex. For just one example: Title IX of the Education Amendments of 1972 prohibits recipients of federal funds—like schools—from discriminating on the basis of sex, and treats sex as limited to the binary categories of male and female, both objective and fixed. *See Adams*, 57 F.4th at 813 ("[R]eading in ambiguity to the term 'sex' ignores the overall statutory scheme and purpose of Title IX, along with the vast majority of dictionaries defining 'sex' based on biology and reproductive function."); *see also Neese v. Becerra*, No. 2:21-cv-163-z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022) ("Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'"); *see also* 20 U.S.C. § 1681(a)(2) ("[T]his section shall not apply . . . in the case of an educational institution which has begun the process of changing from being an institution which admits only students of *one sex* to being an institution which admits students of

*both sexes*[.]") (emphasis added); *see also* 20 U.S.C. § 1681(a)(8) ("[T]his section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*[.]") (emphasis added).

Not to be left out, the executive branch has also confirmed its view of sex as a binary in numerous regulations, including under Title IX. *See, e.g.*, 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of *one sex* shall be comparable to such facilities provided for students of *the other sex*.") (emphasis added); 34 C.F.R. § 106.34(a)(3) ("Classes . . . in elementary and secondary schools that deal primarily with human sexuality may be conducted in separate sessions for *boys and girls*.") (emphasis added); *cf.* 34 C.F.R. § 106.37(c)(1) ("To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of *each sex* in proportion to the number of students of *each sex* participating in interscholastic or intercollegiate athletics.") (emphasis added); Emma Colton, *Transgender women must sign up for military draft under Biden*

*admin, trans men get a pass*, Fox News, Oct. 11, 2022 ("Transgender women must still register for the military draft, according to the U.S. Selective Service. … Individuals who were born female, but identify as male do not need to register for the military draft, per the government.").[6]

Indeed, the last time that the Department of Education promulgated regulations under Title IX, it once again properly emphasized this point in the preamble to those regulations: "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020) (codified at 34 C.F.R. pt. 106) (emphasis added); *see also Adams*, 57 F.4th at 813 ("If sex were ambiguous, it is difficult to fathom why the drafters of Title IX went through the trouble of providing an express carve-out for sex-separated living facilities, as part of the overall statutory scheme.").

---

[6]     https://www.foxnews.com/us/transgender-women-must-sign-up-military-draft-biden-admin-trans-men-pass

Given that as a legal matter, *there are in fact only two sexes*, and given that this biological and jurisprudential reality has been repeatedly reaffirmed by all branches of government at all levels, students are almost certain to hear it repeated in many walks of life, including their biology, social studies classes, government classes that include units on the Supreme Court, and of course news media and casual conversations. No case has ever held that a legally true statement that a student could just as likely hear in his or her classes suddenly becomes an identity-based attack that violates the rights of others, when placed on a t-shirt. This is thus is an independent reason to reverse the District Court.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's dismissal of LM's claim, and hold that his school violated his First Amendment rights.

/s/ *James L. Kerwin*
James L. Kerwin
*Counsel of Record*
William E. Trachman
MOUNTAIN STATES LEGAL
FOUNDATION
2596 S. Lewis Way
Lakewood, CO
(303) 292-2021
jkerwin@mslegal.org

wtrachman@mslegal.org

Ilya Shapiro
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Fed. R. App. P. 29(a)(5) & 32(a)(7)(B), because it has 6,267 words, excluding parts exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) & (6), because it was prepared in proportionally spaced 14-point Century Schoolbook typeface, using Microsoft® Word for Microsoft 365 MSO (Version 2308 Build 16.0.16731.20182) 64-bit.

Dated: October 2, 2023           */s/ James L. Kerwin*
                                 James L. Kerwin

## CERTIFICATE OF SERVICE

I filed this brief via the Court's CM/ECF system on October 2, 2023, thereby electronically serving all counsel of record. I certify that the following counsel of record for the parties are registered as ECF Filers and that they will be served by the CM/ECF system:

Andrew David Beckwith, John J. Bursch, David Andrew Cortman, Rory Thomas Gray, Tyson Charles Langhofer, Paul Logan Spena, Samuel Whiting, Counsel for Plaintiff-Appellant

Gregg J. Corbo, Deborah I. Ecker, Garrett A.D. Gee, Kay H. Hodge, John Matthew Simon, Counsel for Defendants-Appellees.

Dated: October 2, 2023          */s/ James L. Kerwin*
                                 James L. Kerwin