# United States Court of Appeals
## For the First Circuit

---

Nos. 23-1535, 23-1645

L.M., a minor by and through his father and stepmother and
natural guardians, Christopher and Susan Morrison,

Plaintiff, Appellant,

v.

TOWN OF MIDDLEBOROUGH, MASSACHUSETTS; MIDDLEBOROUGH SCHOOL
COMMITTEE; CAROLYN J. LYONS, Superintendent, Middleborough
Public Schools, in her official capacity; HEATHER TUCKER, Acting
Principal, Nichols Middle School, in her official capacity,

Defendants, Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

---

Before

Barron, Chief Judge,
Thompson and Montecalvo, Circuit Judges.

---

David A. Cortman, with whom Rory T. Gray, Tyson C. Langhofer,
P. Logan Spena, John J. Bursch, Andrew D. Beckwith, Samuel J.
Whiting, Alliance Defending Freedom, and Massachusetts Family
Institute were on brief, for appellant.
J. Michael Connolly, Thomas S. Vaseliou, Rachel L. Daley, and
Consovoy McCarthy PLLC on brief for Parents Defending Education,
amicus curiae.
Joseph D. Spate, Assistant Deputy Solicitor General of South
Carolina, Alan Wilson, Attorney General, Robert Cook, Solicitor
General, J. Emory Smith, Jr., Deputy Solicitor General, Thomas T.
Hydrick, Assistant Deputy Solicitor General, Steve Marshall,
Attorney General of Alabama, Tim Griffin, Attorney General of
Arkansas, Christopher M. Carr, Attorney General of Georgia, Raúl

Labrador, Attorney General of Idaho, Brenna Bird, Attorney General of Iowa, Daniel Cameron, Attorney General of Kentucky, Jeff Landry, Attorney General of Louisiana, Lynn Fitch, Attorney General of Mississippi, Andrew Bailey, Attorney General of Missouri, Austin Knudsen, Attorney General of Montana, Michael T. Hilgers, Attorney General of Nebraska, Drew Wrigley, Attorney General of North Dakota, Ken Paxton, Attorney General of Texas, Sean Reyes, Attorney General of Utah, and Jason Miyares, Attorney General of Virginia, on brief for South Carolina, Alabama, Arkansas, Georgia, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Texas, Utah, and Virginia, amici curiae.

Robert Corn-Revere and Abigail E. Smith on brief for Foundation for Individual Rights and Expression, amicus curiae.

Gary M. Lawkowski and Dhillon Law Group, Inc. on brief for Center for American Liberty, amicus curiae.

James L. Kerwin, William E. Trachman, and Ilya Shapiro on brief for Mountain States Legal Foundation and Manhattan Institute, amici curiae.

Catherine W. Short and Sheila A. Green on brief for Life Legal Defense Foundation and Young America's Foundation, amici curiae.

Gene C. Shaerr, Jennifer C. Braceras, and Schaerr Jaffe LLP on brief for Independent Women's Law Center, amicus curiae.

Deborah J. Dewart on brief for the Institute for Faith and Family, amicus curiae.

Deborah I. Ecker, with whom Gregg J. Corbo and KP Law, P.C. were on brief, for appellees.

Ruth A. Bourquin, Kirsten V. Mayer, and Rachel E. Davidson on brief for the American Civil Liberties Union of Massachusetts, Inc., amicus curiae.

Chris Erchull, Mary L. Bonauto, Gary D. Buseck, Michael J. Long, Kelly T. Gonzalez, and Long, Dipietro, and Gonzalez, LLP on brief for GLBTQ Legal Advocates & Defenders and Massachusetts Association of School Superintendents, amici curiae.

Charles McLaurin, Jin Hee Lee, Avatara Smith-Carrington, Janai S. Nelson, Samuel Spital, Alexsis Johnson, and Colin Burke on brief for NAACP Legal Defense & Educational Fund, Inc., amicus curiae.

———————————

June 9, 2024

———————————

BARRON, **Chief Judge**.  <u>Tinker</u> v. <u>Des Moines Independent</u>
<u>Community School District</u>, 393 U.S. 503 (1969), famously upheld
the First Amendment right of public-school students to wear black
armbands at school in protest of the country's involvement in the
Vietnam War.  The Supreme Court was sensitive, however, to the
"special characteristics of the school environment" and so took
care to explain that there was "no evidence whatever of . . .
interference, actual or nascent, with the schools' work or of
collision with the rights of other students to be secure and to be
let alone."  <u>Id.</u> at 506, 508.  It also affirmed more generally
that "of course" school authorities may restrict student speech
that "materially disrupts classwork or involves substantial
disorder or invasion of the rights of others" or, otherwise put,
"'materially and substantially interfere[s] with the requirements
of appropriate discipline in the operation of the school' [or]
. . . collid[es] with the rights of others."  <u>Id.</u> at 513 (citation
omitted).

In the more-than-half century since <u>Tinker</u>, the Court
has addressed variations of the First Amendment question presented
in that landmark case.  But it has not addressed the vexing
question of when (if ever) public-school students' First Amendment
rights must give way to school administrators' authority to
regulate speech that (though expressed passively, silently, and
without mentioning any specific students) assertedly demeans

characteristics of personal identity, such as race, sex, religion, or sexual orientation.

In these consolidated appeals, we confront a dispute that raises that question for the first time in our Circuit, although other federal courts have confronted it before. The underlying suit, filed in the District of Massachusetts, concerns the "hate speech" provision of a public middle school dress code, which the defendants applied to prohibit a twelve-year-old student first from wearing a t-shirt that read "There Are Only Two Genders" and then from wearing that same t-shirt with the words "Only Two" covered by a piece of tape on which was written "CENSORED."

Relying solely on Tinker's "invasion of the rights of others" limitation, and thus not Tinker's "material disruption" limitation, the District Court denied the student's motion for a preliminary injunction. On that same basis, the District Court granted the defendants final judgment on all the student's claims, which challenged both the dress code's specific applications and two portions of the dress code on their face. We affirm the District Court's rulings, albeit on somewhat different grounds.

**I.**

**A.**

**1.**

John T. Nichols Middle School ("NMS") is a public middle school in Middleborough, Massachusetts. NMS's students are in the

sixth through eighth grades and are between ten and fourteen years old.

NMS and the Middleborough Public School System ("MPSS") administrators knew that several NMS students identified as part of the "LGBTQ+ community."  In addition, Heather Tucker, the then-interim principal of NMS, who had just started at the school, was aware that several NMS students identified as "transgender or gender nonconforming."

Prior to coming to NMS, Tucker had educated young students for two decades.  During that time, she met with students who had been bullied based on their gender identities and worked closely with students who had self-harmed, contemplated suicide, or attempted to commit suicide "because of their gender identity." Tucker also worked on teams that had recommended out-of-district placements for students "because of [those students'] gender identity and suicidal ideation."

Carolyn Lyons, the superintendent of the MPSS, also knew that several NMS students had "attempted to commit suicide or have had suicidal ideations in the past few years, including members of the LGBTQ+ community."  Lyons further stated in an affidavit that "[t]hese situations have frequently cited LQBTQ+ status and treatment as a major factor."  Lyons attested that "[s]tudent survey data collected in June 2022, through NMS's platform Panorama, show over 20 individual student[s'] comments about

perceived bullying at school, feeling unwelcome at school, and expressing specific concerns about how the LGBTQ+ population is treated at school."

NMS had a student-run organization called the Gay Straight Alliance Club ("GSA"), which was "intended as a space for students who fit under the LGBTQ+ umbrella or are their allies" (cleaned up). The GSA was open to all NMS students, and at any given time "approximately ten to twenty students . . . attend[ed] the GSA['s] [monthly] meetings."

### 2.

NMS's code of conduct included a dress code ("Dress Code") that was set forth in the "Student & Family Handbook," which was provided to NMS's students and their families. The Dress Code's preface states that the Dress Code is "governed by health, safety[,] and appropriateness" and that, because "an environment conducive to learning is necessary," clothing that "causes distractions and inhibits learning is not allowed." The preface further states that students are "encourage[d] . . . to dress in a neat and presentable manner that reflects pride in themselves and their school."

The Dress Code provides:

- Clothing must be neat and clean.
- Clothing that is excessively revealing . . . will not be allowed.
- Tank tops or basketball shirts must have a t-shirt underneath.

- Chains, chain belts, spikes, studs, and gang related attire is not allowed.
- Clothing with alcohol, tobacco, vulgar writing, sexual references or controlled substance reference[s] will not be allowed.
- Outer coats, hats, caps, bandanas, sweatshirt hoods, and sunglasses will not be worn in the building without permission of an administrator.
- Wheeled shoes and platform shoes are dangerous on our floors and not allowed. Blankets or other clothing that drapes down or is considered a tripping hazard will not be allowed.
- Clothing must not state, imply, or depict hate speech or imagery that target[s] groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation, or any other classification.
- Any other apparel that the administration determines to be unacceptable to our community standards will not be allowed.

(Emphases added). The Dress Code concludes by stating that should a student "wear something inappropriate to school, [the student] will be asked to call their parent/guardian to request that more appropriate attire be brought to school" and that "[r]epeated violations of the dress code will result in disciplinary action."

**3.**

In the Spring of 2023, L.M. was a seventh grader at NMS. He held the belief that there are only two biological sexes (male and female), that the word "gender" is synonymous with "sex[,]" and that because there are only two biological sexes there are only two genders.

On March 21, 2023, L.M. wore a black t-shirt to school that displayed, in black capitalized letters with thick white outlines, the words "There Are Only Two Genders" (the "Shirt"). L.M. wore the Shirt both to express his own views, which he understood to be contrary to those NMS espouses on the subject, and to convey his belief that his views are not "inherently hateful."

After L.M. arrived at his first-period class, a teacher contacted Jason Carroll, the assistant principal of NMS, about the Shirt. The teacher expressed concerns about the "physical safety" of L.M. "as well as other students' safety, citing to multiple members of the LGBTQ+ population at NMS as current students in the building who would be impacted by the t-shirt['s] message and potentially disrupt classes." Carroll then contacted Tucker, who went to L.M.'s class and asked him to meet with her.

Tucker explained that L.M. could not wear the Shirt at school and could either remove it while at school or discuss the matter further. L.M. requested to discuss the matter further, so Tucker asked him to come with her to another room to continue the discussion.

In the separate room, with the school counselor also present, Tucker explained that some students had "complained" and that L.M. could not return to class if he did not remove the Shirt.

When L.M. declined to do so, Tucker called L.M.'s father to explain that L.M. would need to remove the Shirt to return to class.

L.M.'s father stood by L.M.'s decision not to remove the Shirt and thereafter picked L.M. up from school and took him home. School administrators took no other action at that point.

L.M. did not personally witness any noticeable disruption on March 21 or thereafter that resulted from his wearing of the Shirt. L.M. has since worn shirts expressing his views on a range of other topics, which included messages like "Don't Tread on Me" and "First Amendment Rights," none of which he was asked to remove. L.M. has not been disciplined by NMS administrators for wearing the Shirt or any of those shirts or for any views he has expressed while off school grounds.

**4.**

On April 1, 2023, L.M.'s father sent Lyons an email in which he asked for an explanation of the problem with the Shirt, given that "nothing about [the] shirt . . . was directed to any particular person" and that "[i]t simply stated [L.M.'s] view on a subject that has become a political hot topic . . . that is being discussed . . . all across our country." Lyons responded in an email on April 4, 2023, that stated that L.M. had not been, nor would be, disciplined for having worn the Shirt. Lyons explained that Tucker had been enforcing the Dress Code because the Shirt's

contents had been understood to "target[] students of a protected class; namely in the area of gender identity."

On April 27, 2023, L.M.'s counsel sent Lyons a letter that asserted NMS had violated L.M.'s free-speech rights under Tinker by prohibiting him from wearing the Shirt and that "the 'hate speech' provision" of the Dress Code was facially unconstitutional. The letter further stated that L.M. intended to wear the Shirt on May 5 and that, if NMS "interfere[d] with [L.M.] doing so again," it "may be necessary" for L.M. to initiate legal action.

MPSS's counsel responded on May 4 with a letter that stated NMS's actions had been justified under applicable legal authorities. The letter stated that state law "provides [students] protection against discrimination, harassment and bullying on the basis of . . . gender identity" and that those protections were against "communications, whether oral, written, . . . or through the wearing of apparel, that may reasonably be considered intimidating, hostile, offensive or unwelcome based on . . . gender identity . . . and/or may otherwise be reasonably likely to lead to a disruption of [school] operations." The letter further stated that MPSS administrators would prohibit the wearing of t-shirts "likely to be considered discriminatory, harassing and/or bullying . . . by suggesting that [others'] sexual orientation, gender identity or expression does not exist or is invalid."

NMS's actions attracted local and national media coverage. L.M. participated in several interviews with news media about the March 21 incident and became the subject of local and national news coverage.

On April 13, two individuals stood near NMS's bus drop-off area, but off school property, and held signs that read, "there are only two genders" and "keep woke politics out our schools." The next day, counter-protesters standing off school property held signs that read, "trans people belong," "everyone is welcome here," and "we support trans rights." Lyons received complaints from community members about both groups of individuals.

In late April and early May, Lyons, Tucker, NMS, and Middleborough High School received a slew of messages, emails, and phone calls related to the controversy involving the Shirt. Lyons described some of the calls as being "threatening in nature," and Tucker attested that she and other NMS staff received "hateful messages" in emails from individuals both within and without Massachusetts.

On May 1, 2023, NMS received over fifty telephone messages Tucker described as "hateful and lewd." The calls continued for about two weeks, tapered off, and started up again around May 31.

Lyons found out about a post on the social-media platform "X," formerly known as "Twitter," that listed the NMS staff

directory and stated, "if you see these people in public, you know what to do."   In response to some of these messages, the Middleborough Police Department provided a police detail to NMS between April 24 and April 28.

**5.**

L.M. wore the Shirt to school again on May 5.  This time he covered the words "Only Two" with a piece of tape on which was written in marker "CENSORED" (the "Taped Shirt").  L.M. wore the Taped Shirt to "speak up about" and protest NMS barring him from wearing the Shirt even though other students, according to L.M., were permitted to express other views on gender.

Soon after arriving at school on May 5, L.M. was brought to Tucker's office.  While L.M. was alone in the office, Lyons, Tucker, and school counsel conferred and decided not to allow L.M. to wear the Taped Shirt.  L.M. ultimately took the Taped Shirt off and returned to class.  He was not disciplined for having worn the Taped Shirt.

On May 9, two other NMS students wore t-shirts to school that read "There Are Only Two Genders."  Tucker met with those students and told them they could not wear those shirts.  One of the students removed the shirt and returned to class.  The other student declined to comply, and their parents were called.  Neither student faced discipline.

**B.**

L.M., by and through his natural guardians, filed suit in the United States District Court for the District of Massachusetts pursuant to 42 U.S.C. § 1983. The complaint alleged violations of L.M.'s rights under the First and Fourteenth Amendments to the U.S. Constitution. The complaint named as defendants the Town of Middleborough, the Middleborough School Committee, superintendent Lyons, and then-interim now-acting principal Tucker (collectively "Middleborough").

L.M.'s complaint alleged that, by barring him from wearing the Shirt and Taped Shirt, Middleborough violated the First Amendment as incorporated against the states through the Due Process Clause of the Fourteenth Amendment. The complaint further alleged that the Dress Code's prohibitions on "hate speech" that "target[s]" groups and on clothing "unacceptable to . . . community standards" are facially unconstitutional because they are impermissible prior restraints, void for vagueness, and overbroad. The complaint sought an injunction prohibiting Middleborough from barring L.M.'s wearing of the Shirt, Taped Shirt, and similar t-shirts; a declaratory judgment that the challenged portions of the Dress Code are unconstitutional, both facially and as applied to L.M.'s t-shirts; and actual and nominal damages.

Soon thereafter, L.M. moved for a temporary restraining order and a preliminary injunction.  Middleborough opposed both motions.

Middleborough first noted that Massachusetts law required schools to "develop anti-bullying plans that recognize the vulnerability of certain students" and prevent bullying or harassment based on gender identity and that Middleborough's actions must be understood in the context of guidance provided by the Massachusetts Board of Elementary and Secondary Education directing schools to "create a culture in which transgender and gender nonconforming students feel safe, supported, and fully included."  Middleborough also reviewed the evidence of the school administrators' "specific knowledge of the vulnerability of students who are members of the LGBTQ+ community."  Middleborough then invoked out-of-circuit decisions applying Tinker's rights-of-others and material-disruption limitations in assertedly similar contexts.  See Harper v. Poway Unified Sch. Dist., 445 F.3d 1166, 1171-72, 1177-83 (9th Cir. 2006) (addressing a t-shirt in the high-school context that displayed "Be ashamed, our school embraced what God has condemned" on the front and "Homosexuality is shameful" on the back), vacated as moot by Harper ex rel. Harper v. Poway Unified Sch. Dist., 549 U.S. 1262 (2007); Scott v. Sch. Bd. of Alachua Cnty., 324 F.3d 1246, 1247-49 (11th Cir. 2003) (addressing high-school students' display of a confederate flag on

- 14 -

school premises); Sapp v. Sch. Bd. of Alachua Cnty., Fla., No. 09cv242, 2011 WL 5084647, at *1, *4-*5 (N.D. Fla. Sept. 30, 2011) (addressing a t-shirt that displayed "Islam is of the Devil" in the middle- and high-school contexts).

Based on the record and the rulings, Middleborough argued that "it is clear that [its] decision that [L.M.'s] message on the [Shirt] would invade the rights of others, the rights of particularly vulnerable students who are members of the [LGBTQ+] community (a protected class) to feel safe in school and to be free from harassment and bullying while in school, was reasonable." Middleborough also argued that "[i]t was, likewise, reasonable for [it] to conclude that [L.M.'s] shirt would materially disrupt classwork or involve substantial disorder in the school." Noting the young age of NMS's students and the school's "active LGBTQ+ community," Middleborough further argued that "[t]he level of self-advocacy expressed by this group of students strongly suggests that they would not sit idly by and allow someone to deny their very existence" and that "[i]t was . . . reasonable for the [NMS administrators] to take proactive measure to ensure the integrity of the learning environment in NMS."

Middleborough separately argued that L.M. was not likely to succeed on the merits of his as-applied claim concerning the Taped Shirt. Middleborough contended that, "[a]s with the message on [the Shirt], [administrators] reasonably forecasted that the

message on [the Taped Shirt], that merely replaced the [words 'only two'] with the word 'censored,' would not only make the LGBTQ+ students feel unsafe and excluded in the educational environment but would also cause a substantial disruption in the school and was inconsistent with NMS [sic] basic educational mission of inclusivity and creating a safe welcoming environment for all students to learn."

Middleburgh emphasized that its decision to bar L.M. from wearing the Taped Shirt on May 5 did not occur "in a vacuum" and followed "the history of disruption caused by [L.M.] wearing the [Shirt]" as well as L.M.'s attorney having "linked the two shirts by making [Middleborough] aware that [L.M.] was going to wear the same shirt to school on May 5." Middleborough thus argued that it "could reasonably forecast that [the Taped Shirt] would cause disruption and would interfere in the rights of other students under the circumstances."

As to L.M.'s First Amendment-based facial claims, Middleborough first contended that he did not have Article III standing to challenge the Dress Code. Middleborough also contended, in the alternative, that the prohibition on clothing depicting "hate speech that target[s] groups based [on,] among other protected categories, sexual orientation or gender identity," was not overbroad because it "comport[ed] with the laws and regulations that protect[] students from discrimination,

- 16 -

harassment and bullying."  Middleborough separately contended that
L.M. was unlikely to succeed on his Due Process-based facial claims
because L.M. was never disciplined and did not "articulate . . .
what process he claims he is or was due" given that the handbook
containing the Dress Code "provides disciplinary guidelines and
procedures."

The District Court denied the temporary-restraining-
order motion on June 1 and the preliminary-injunction motion on
June 16.  In denying the latter motion, the District Court reviewed
the evidence of what Middleborough knew about students at NMS and
those students' vulnerability before turning to the merits.

With respect to the March 21 incident involving the
Shirt, the District Court concluded that the "school
administrators were well within their discretion to conclude" that
the message displayed on the Shirt "may communicate that only two
gender identities -- male and female -- are valid, and any others
are invalid or nonexistent."  The District Court reasoned Tinker's
rights-of-others limitation applied, because "students who
identify differently . . . have a right to attend school without
being confronted by messages attacking their identities."  The
District Court thus concluded that L.M. had failed to establish a
likelihood of success on the merits because he could not "counter
[Middleborough's] showing" that it had enforced the Dress Code on

March 21 "to protect [against] the invasion of the rights of other students to a safe and secure educational environment."

With respect to the May 5 incident involving the Taped Shirt, the District Court concluded that the analysis was no different.  The District Court concluded that L.M. could not show a likelihood of success, because Middleborough could "reasonably conclude that the Taped Shirt did not merely protest censorship but conveyed the 'censored' message and thus invaded the rights of other students."  In a footnote, the District Court explained that, in light of its rulings, it did not need to determine if Tinker's material-disruption limitation would also be applicable to any of L.M.'s claims.  The District Court thus did not address the possible relevance of any of the evidence concerning what had occurred at NMS between March 21 and May 5 or thereafter.

Finally, the District Court ruled L.M. had no likelihood of success with respect to his facial challenges.  It reasoned that was so because the Dress Code both "does not threaten discipline for a violation . . . that has not been specifically identified by the school as improper" and "provides that if students wear something inappropriate to school, they will be asked to call their parent/guardian to request that more appropriate attire be brought to school" (cleaned up).

L.M. filed a notice of interlocutory appeal of the District Court's ruling on June 23, 2023.  On July 17, the parties

filed a joint motion for final judgment pursuant to Federal Rules of Civil Procedure 54(a), 56, and 65(a)(2). The parties "agreed that, based on the factual record as established through the preliminary injunction proceedings, judgment as a matter of law [was] appropriate" and asked the District Court to convert its ruling into a final judgment because the "interests of the Parties . . . will be better served by an appeal from a final judgment." The parties clearly expressed that they "continue to dispute the proper legal outcome of [L.M.'s] constitutional claims."

Two days later, the District Court entered final judgment for Middleborough as to all L.M.'s claims, incorporating the reasoning from the preliminary-injunction ruling. L.M. timely appealed, and on August 15, 2023, this Court granted the parties' joint motion to consolidate the appeals.

## II.

The parties agree that the factual record needs no further development, and neither party contends that any material facts are in dispute. Our review is de novo. See García-Rubiera v. Calderón, 570 F.3d 443, 455-56 (1st Cir. 2009).

We recognize that "where First Amendment interests are implicated, our review must be more searching," Mullin v. Town of Fairhaven, 284 F.3d 31, 37 (1st Cir. 2002), as we have an obligation "to independently review the factual record to ensure that the [lower] court's judgment does not unlawfully intrude on

free expression," Boy Scouts of America v. Dale, 530 U.S. 640, 648-49 (2000).  We note, too, that the parties agree Tinker governs this dispute and "places the burden on the school to justify student speech restrictions."  Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 25 (1st Cir. 2020).  The parties do not dispute that school administrators "may rely only on the justification originally provided to" L.M. for restricting his speech.  Id. at 28.

### III.

L.M. contends that the District Court's First Amendment-related rulings on his claims -- both facial and as-applied -- for monetary, declaratory, and injunctive relief conflict with Tinker.  But, as we will explain, regardless of whether Tinker's rights-of-others limitation applies here, we conclude that Tinker's material-disruption limitation does.[1]  We thus affirm the District Court's Tinker-based rulings on that ground -- save for one of the First Amendment-related facial claims, for which we conclude that L.M. lacks Article III standing. See United States v. George, 886 F.3d 31, 39 (1st Cir. 2018) ("We

---

[1] One of the amici argues that Middleborough could not rely on Tinker's rights-of-others limitation as a matter of state law, but "we need not address" that contention "[b]ecause the parties did not raise the issue," Norris, 969 F.3d at 33 n.22, and because we affirm under Tinker's material-disruption limitation.

are at liberty to affirm a district court's judgment on any ground made manifest by the record.").

We dive into the details of L.M.'s challenges to the District Court's Tinker-based rulings in Parts IV and V.  First, however, we need to set forth the legal framework that, under Tinker, we understand to apply in this context.  We thus now explain what that framework is and our reasons for embracing it.[2]

**A.**

As we noted above, the District Court relied solely on Tinker's rights-of-others limitation in upholding Middleborough's actions.  Specifically, the District Court held that "students who identify differently . . . have a right to attend school without being confronted by messages attacking their identities" and that L.M. could not "counter [Middleborough's] showing" that Middleborough had enforced the Dress Code on both days "to protect [against] the invasion of the rights of other students to a safe and secure educational environment."

---

[2] Our analysis does not address Tinker's application in a post-secondary school setting.  Cf. Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 267 (3d Cir. 2002) ("[T]he public school setting is fundamentally different from other contexts, including the university setting."); Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 443 (4th Cir. 2013) ("Elementary and secondary schools are undoubtedly different than colleges . . . and this distinction results in different legal standards in some instances.").

There is some uncertainty, however, as to when, if ever, the rights-of-others limitation applies to passive and silent expression that does not target any specific student or students but assertedly demeans a personal characteristic like race, sex, religion, or sexual orientation that other students at the school share.  Tinker itself had no reason to address how, or whether, such speech implicates that limitation, as the armbands at issue there were not asserted to espouse any message other than opposition to the Vietnam War and did not -- unlike the t-shirts here -- refer to any such personal characteristic.  See 393 U.S. at 510-11.

Tinker also did not elaborate on the contents of "the rights of other students to be secure and to be let alone." Id. at 508.  The Court did cite approvingly, id. at 513, to a Fifth Circuit decision that upheld school officials' authority to forbid the wearing of "freedom buttons" at school based on evidence that "actions by the students in distributing [the] buttons, pinning [the buttons] on others, and throwing [the buttons] through windows constituted a complete breakdown in school discipline." Blackwell v. Issaquena Cnty. Bd. of Educ., 363 F.2d 749, 754 (5th Cir. 1966). But no physically coercive conduct by the speaker is involved here. And while the rights-of-others limitation appears to encompass tortious speech more generally, see Kuhlmeier v. Hazelwood Sch. Dist., 795 F.2d 1368, 1375-77 (8th Cir. 1986), rev'd on other

grounds by Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988),
there is no developed contention that speech of that sort is
involved here either.

The Supreme Court has recently affirmed schools'
authority to regulate "severe bullying and harassment," but the
Court did so without specifying whether schools may do so pursuant
to the rights-of-others limitation. See Mahanoy Area Sch. Dist.
v. B.L. ex rel. Levy, 594 U.S. 180, 188 (2021). The Court merely
emphasized that the "special characteristics" of the public-school
context afford schools "special leeway when [they] regulate speech
that occurs under [their] supervision." Id.

There has been discussion in post-Tinker caselaw about
whether the rights-of-others limitation applies only to
circumstances in which the speech in question would be
independently unlawful and there is no developed contention that
the speech involved here is. But the Court has made clear that it
has not decided whether the limitation is so limited. See
Kuhlmeier, 484 U.S. at 273 n.5.

For our part, we have held that the rights-of-others
limitation applies in the case of bullying, even when there is no
physical invasion of any kind -- seemingly without regard to
whether the state separately makes such bullying a source of tort
liability. See Doe v. Hopkinton Pub. Schs., 19 F.4th 493, 507-09
(2021); cf. Norris, 969 F.3d at 29. Beyond that, though, we have

not addressed the scope of that limitation. We note that the bullying speech in Doe and Norris was asserted to target a specific student. But there is no contention that L.M.'s speech similarly was, notwithstanding that it addressed in general terms a characteristic of personal identity that other students at the school shared.

At the same time, it is not obvious how passive, silently expressed student speech that targets no specific students but demeans characteristics like those described above relates to the material-disruption limitation. Given the nature of the expression involved in Tinker, the Court there had no occasion to address such a question directly. The evidence of disruption the Court concluded was missing appeared to relate to "aggressive, disruptive action," "group demonstrations," or "threats or acts of violence on school premises" that would impede a school from carrying out its educational mission and not to the possible negative psychological effects of the speech in question on a subset of students. 393 U.S. at 508.

More recently the Court addressed a school's attempt to regulate off-campus speech under the material-disruption limitation. See Mahanoy, 594 U.S. at 193. In doing so, the Court made clear that the standard for showing the limitation applied was "demanding." Id.

We also have not had occasion to address how or whether the material-disruption limitation is implicated by expression that assertedly demeans a characteristic of personal identity like race, sex, religion, or sexual orientation. So, our precedent, too, does not offer any direct guidance on that score.

There is, however, an extensive body of federal court caselaw that applies <u>Tinker</u> in circumstances -- akin to those present in this case -- involving passive and silently expressed messages by students that do not target specific students but that assertedly demean other students' personal characteristics, like race, sex, religion, or sexual orientation. As we will explain, those rulings address when school authorities may regulate such expression and whether they may do so to prevent a "material[] disrupt[ion]" of the classroom, a "collision with the rights of other students to be secure and to be let alone," or both. <u>Tinker</u>, 393 U.S. at 508, 513. We thus now review those rulings for the guidance that they may offer here.

**B.**

Two circuit-level rulings in this line have relied on the rights-of-others limitation. The first is the now-vacated-as-moot Ninth Circuit decision in <u>Harper</u> v. <u>Poway Unified School District</u>, 445 F.3d 1166 (9th Cir. 2006), <u>vacated as moot by</u> <u>Harper ex rel. Harper</u> v. <u>Poway Unified School District</u>, 549 U.S. 1262 (2007), which affirmed the denial of a preliminary injunction to

prevent public high-school officials from barring a student from
wearing a t-shirt that read "Homosexuality is Shameful."  Id. at
1178.

Harper reasoned that "[b]eing secure involves not only
freedom from physical assaults but from psychological attacks that
cause young people to question their self-worth" and that "[t]he
'right to be let alone'" is a "'recognizable privacy interest
. . .' [that is] perhaps most important 'when persons are
"powerless to avoid it."'"  Id. (quoting Hill v. Colorado, 530
U.S. 703, 714-16 (2000)).  The court explained that speech that
strikes at a "core characteristic" of a minority group's identity
has a "detrimental" effect on "[the students'] psychological
health . . . [and] educational development" and, in so explaining,
relied on social-science literature, of which it took judicial
notice, that concluded such denigration is "harmful . . . to [those
students'] educational performance."  Id. at 1178-79.

Harper concluded that the school "had a valid and lawful
basis" for barring the t-shirt under the rights-of-others
limitation, because the shirt's message "was injurious to gay and
lesbian students and interfered with their right to learn."  Id.
at 1180.  In so holding, Harper appeared to presume that t-shirts
could be restricted in a high school pursuant to the rights-of-
others limitation whenever their denigrating message was "directed

- 26 -

at students' minority status such as race, religion, and sexual orientation." Id. at 1183.

The second rights-of-others ruling is West v. Derby Unified School District No. 260, 206 F.3d 1358, 1362, 1365-68 (10th Cir. 2000), in which the Tenth Circuit rejected a First Amendment challenge to the suspension of a middle-school student for his violating the school district's racial-harassment policy by drawing a confederate flag in class. Notably, however, Derby concluded that the school district "had reason to believe that a student's display of the Confederate flag" would not only "interfere with the rights of other students to be secure and let alone" but also "cause disruption." Id. at 1366. The court did so, moreover, without suggesting that different showings were necessary to trigger each limitation. Id. at 1366.

Unlike Harper, however, Derby neither explained why the rights of other students "to be secure and to be let alone" were implicated nor relied on a presumption about the negative psychological impact on minority students of the expression. The court instead relied on the factual predicate of racial tensions in the school district, which included students spray painting racist and threatening graffiti in school bathrooms, a fight breaking out because a student wore a confederate-flag headband, and students responding to displays of the flag with t-shirts bearing the letter "'X,' denoting support for the teachings of

Malcolm X." Id. at 1362, 1366-67. Derby made clear, though, that administrators had acted reasonably even with respect to the middle schooler's drawing of the flag, notwithstanding that the more extreme incidents occurred at the high school and "the [racial] tensions were not widespread and involved relatively few students at the middle school." Id. at 1362.

Several rulings in this line have relied on similar logic in invoking the material-disruption limitation to approve of a school's authority to regulate seemingly similar expression. But, in doing so, those rulings have either expressly eschewed reliance on, or simply not mentioned, the rights-of-others limitation.

Nuxoll ex rel. Nuxoll v. Indian Prairie School District #204 is an example. There, the Seventh Circuit addressed a school rule barring "'derogatory comments,' oral or written, 'that refer to race, ethnicity, religion, gender, sexual orientation, or disability'" as applied to a t-shirt bearing the message "Be Happy, Not Gay." 523 F.3d 668, 670 (7th Cir. 2008).

The court acknowledged as "prudent" the student's concession that the message "homosexuals go to Hell" could be barred as "fighting words." Id. at 671. But the court made clear that, the "fighting words" category aside, Tinker also permitted school officials to restrict some passive, silent expression of derogatory comments that, by demeaning characteristics of "personal identity" such as those listed in the rule, "strike a

- 28 -

person at the core of his being" because of how "unalterable" or
"otherwise deeply rooted" those characteristics are.  Id. at 671.
And that was so, Nuxoll made clear, even if the speech did not
expressly target specific students.  Id. at 672, 674.

Like Harper, Nuxoll noted evidence suggesting "that
adolescent students subjected to derogatory comments about such
characteristics may find it even harder than usual to concentrate
on their studies and perform up to the school's expectations."
Id. at 671 (collecting social-science literature).  The court also
observed that it could "foresee" that other students might respond
with "negative comments on the Bible" or the religious
characteristic of the speaker and thereby "poison the school
atmosphere" and "deterior[ate] the school's ability to educate its
students."  Id. at 671.  As the court put it, "[m]utual respect
and forbearance enforced by the school may well be essential to
the maintenance of a minimally decorous atmosphere for learning."
Id.

Nuxoll rejected the school's assertion, however, that
the school rule could be upheld against a facial attack under
Tinker because "all" it does is "protect the 'rights' of the
students against whom derogatory comments are directed."  Id. at
672.  Nuxoll instead stated the school was "on stronger ground" in
contending that, because the rule "strikes a reasonable balance

between . . . free speech and ordered learning," the material-disruption limitation justified the rule.  Id. at 672-73.

Nuxoll pointed to the "psychological effects" of such expression and reasoned that a "material disruption" under Tinker need not involve violence and could involve "a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school -- symptoms therefore of substantial disruption."  Id. at 671, 674.  Nuxoll then indicated that speech demeaning the characteristics of personal identity that the school's rule covered could be prohibited under Tinker's material-disruption limitation if school authorities could reasonably forecast that the speech would have "psychological effects" on students with those characteristics that would yield such "symptoms."  Id. at 674.[3]

The court held that, on its face, "Be Happy, Not Gay" was only "tepidly negative" and so would not have "even a slight tendency . . . to poison the educational atmosphere," thereby clarifying that it might matter how "negative" the message was. Id. at 676.[4]  Indeed, Nuxoll suggested that a case involving a t-

---

[3] In context, we understand Nuxoll to have been referring to absenteeism and declining academic performance among the students with the demeaned characteristic suffering the "psychological effects" of being exposed to, and demeaned by, the expression. See id. at 674.

[4] In reasoning that "Be Happy, Not Gay" was only "tepidly negative" -- and not "derogatory" or "demeaning" -- the Seventh

shirt "on which was written 'blacks have lower IQs than whites' or 'a woman's place is in the home'" would be different because of the "psychological effects" on students with the demeaned characteristic of that expression. Id. at 674. And, in reversing with instructions to enter a preliminary injunction and remanding for further proceedings, Nuxoll observed that "[t]he district judge will be required to strike a careful balance between the limited constitutional right of a high-school student to campaign inside the school against the sexual orientation of other students and the school's interest in maintaining an atmosphere in which students are not distracted from their studies by wrenching debates over issues of personal identity." Id. at 676.

The Seventh Circuit revisited the same expression and school in Zamecnik v. Indian Prairie School District No. 204, 636 F.3d 874 (7th Cir. 2011). Zamecnik acknowledged that "[s]chool authorities are entitled to exercise discretion in determining when student speech crosses the line between hurt feelings and substantial disruption of the educational mission" but still concluded that the high school had failed to adduce sufficient evidence to ground a forecast of future material disruption. Id. at 877-78.

---

Circuit noted that "'gay' used to be an approximate synonym for 'happy'" and, thus, the message's negative import would not be clear on its face without cultural context. Id. at 675-76.

Importantly, Zamecnik held, "the fact that homosexual students and their sympathizers harassed [the plaintiff] because of their disapproval of her message [was] not a permissible ground for banning it" because otherwise protected speech "met by . . . unprivileged retaliatory conduct" cannot be suppressed because of that conduct.  Id. at 879.  But Zamecnik did not question Nuxoll's observation that schools had a legitimate interest in regulating expression that is especially demeaning out of a concern that, if students "attack[ed] each other with wounding words" about one another's personal characteristics, such a "First Amendment free-for-all[]" could "poison the school atmosphere," Nuxoll, 523 F.3d at 671-72, 675, or "cause serious disruption of the decorum and peaceable atmosphere of an institution dedicated to the education of the youth," Zamecnik, 636 F.3d at 877.  "A school has legitimate responsibilities, albeit paternalistic in character, toward the immature captive audience that consists of its students," the court explained, "including the responsibility of protecting them from being seriously distracted from their studies by offensive speech during school hours."  Id. at 879-80.  Thus, in holding that "Be Happy, Not Gay" would not "have even a slight tendency to . . . poison the educational atmosphere," the court did not suggest that

the outcome would be the same for a more overtly demeaning message and, if anything, indicated the opposite.  See id. at 876–78.[5]

        The Third Circuit in Sypniewski v. Warren Hills Regional Board of Education, 307 F.3d 243 (3d Cir. 2002), similarly relied on the material-disruption limitation to assess the facial validity of a school district's racial-harassment policy and its application to bar a student from wearing a t-shirt displaying the term "redneck."[6]  Sypniewski observed that "'[t]he mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected'" and that the

---

        [5] This reasoning in Nuxoll and Zamecnik mirrored the Seventh Circuit's earlier analysis in Muller ex rel. Muller v. Jefferson Lighthouse School, 98 F.3d 1530 (7th Cir. 1996), overruled on other grounds by N.J. by Jacob v. Sonnabend, 37 F.4th 412, 424-25 (7th Cir. 2022), with respect to younger students.  "[An adult] Christian can tell the Jew he is going to hell, or the [adult] Jew can tell the Christian he is not one of God's chosen," Muller opined without reference to either Tinker limitation, but "it makes no sense to say that the overly zealous Christian or Jewish child in an elementary school can say the same thing to his classmate." Id. at 1540.  Muller also explained that elementary-school officials could restrict "[r]acist and . . . hateful views" that "could crush a child's sense of self-worth." Id. (emphasis added).

        [6] Sypniewski followed the Third Circuit's decision in Saxe v. State College Area School District, which held that a school district's anti-harassment policy could not pass constitutional muster under the material-disruption limitation insofar as the policy barred speech "intended to [cause disruption]" and speech that creates a "hostile environment" without "any threshold showing of severity or pervasiveness[,]" 240 F.3d 200, 216-17 (3d Cir. 2001) (emphasis added).  In so holding, Saxe noted that the "precise scope of Tinker's [rights-of-others limitation] is unclear" but that "it is certainly not enough that the speech is merely offensive to some listener." Id. at 217.

prohibition on written materials that create "ill will" was overbroad under Tinker because it could not be reasonably interpreted to refer to "something more than mere offense." Id. at 264-65 (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 414 (1992) (White, J., concurring)).

At the same time, Sypniewski upheld the portion of the policy prohibiting materials that "create[] . . . hatred," because the term "hatred" "implie[d] such strong feelings that a serious possibility of disruption might be inferred." Id. (emphases added). Moreover, Sypniewski upheld the prohibition on "name calling" in part because "[a]lthough mere offense is not a justification for suppression of speech, schools are generally permitted to step in and protect students from abuse." Id. at 264. And, with respect to the as-applied claim, the court seemingly approved the school's authority to bar the confederate flag, given its connection to a student gang known as "the Hicks" and past incidents of racial tension involving its members, but not the "redneck" t-shirt, because of the lack of evidence indicating that students would react to that word in light of the district's past racial disturbances. See id. at 254-57.

Thereafter, the Eleventh Circuit also relied on Tinker's material-disruption limitation in holding that high-school students could be disciplined for displaying confederate flags on school grounds. See Scott, 324 F.3d at 1247-48. "Public school

students' First Amendment rights . . . should not interfere with a school administrator's professional observation that certain expressions have led to, and therefore could lead to, an unhealthy and potentially unsafe learning environment for the children they serve." Id. at 1247. And, in accord with Nuxoll, Scott indicated a school would not need evidence of past violence at the school to deem the expression materially disruptive: "[O]ne only needs to consult the evening news to understand the concern school administrators had regarding the disruption . . . emotional trauma and outright violence which the display of the symbols involved in this case could provoke." Id. (emphasis added). Indeed, the court noted that "[w]ords like 'symbol', 'heritage', 'racism', 'power', 'slavery', and 'white supremacy' are highly emotionally charged" and that it is "constitutionally allowable for school officials to closely contour the range of expression children are permitted regarding such volatile issues." Id. at 1249. Scott reasoned both that "[p]art of a public school's essential mission" is "teach[ing] students of differing races, creeds and colors to engage each other in civil terms rather than in 'terms of debate highly offensive or highly threatening to others'" and that the school had not "attempted to suppress civil debate on racial matters" but only those symbols "[so] associated with racial prejudice [and] so likely to provoke feelings of hatred and ill will in others that they are inappropriate in the school context."

Id. (quoting Denno v. Sch. Bd. of Volusia Cnty., Fla., 218 F.3d 1267, 1273 (11th Cir. 2000)).

The Sixth Circuit reached a similar conclusion in Barr v. Lafon, 538 F.3d 554 (6th Cir. 2008), which also upheld a school district's ban on displays of the confederate flag. The court first rejected the students' argument that the school board's forecast of future disruption was unreasonable because there was no evidence that the confederate flag itself had caused past disruption on the ground that "Tinker . . . does not require that the banned form of expression itself actually have been the source of past disruptions." Id. at 565. Barr then concluded that the record "belie[d]" the students' arguments that racial tensions at the school were not as high as the board claimed, there was "minimal evidence of prior disruption," and thus there was little basis for anticipating future disruption. Id. at 556-66. To those points, the court observed that "[t]here is no requirement that disruption under Tinker be violent" and that "an increase in absenteeism" is "the epitome of disruption in the educational process." Id. at 566.

More recently, in Sapp v. School Board of Alachua County, Florida, No. 09-cv-242, 2011 WL 5084647 (N.D. Fla. Sept. 30, 2011), a district court in the Eleventh Circuit drew on Scott to uphold a school district's ban on wearing t-shirts at school that read "Islam is of the Devil." The court first pointed to past incidents

of disturbance, such as a high-school football game where attendees wearing the t-shirts had been asked to leave after a student became deeply upset and the principal of the elementary school "received disturbing and threatening emails." Id. at *4-5. Sapp then upheld the administrators' actions under Tinker's material-disruption limitation because administrators had forecasted that, based on their years of experience as educators, the t-shirts' demeaning message would "lead to an unnecessary distraction and a hostile environment." Id. at *5. The court credited determinations by administrators that "the message was offensive and demeaning to [the school's twenty-five] Muslim students . . . and could cause an unsafe environment due to the polarizing effect of the anti-Islamic message," id. at *5 & n.3; that t-shirts that "single[] out a group of people and call[] them evil" would lead to unnecessary distraction, id. at *5; and that such a message being displayed on a t-shirt would "foster a hostile and intimidating atmosphere for students" and "compromise[] the school's ability to provide [an] . . . effective educational setting," id.

### C.

The reasoning of these rulings suggests that distinctions between the two Tinker limitations in the context of student speech that assertedly demeans personal characteristics -- like race, sex, religion, or sexual orientation -- may be more semantic than real. Doctrinal labels

aside, these courts appear to have converged on the shared understanding -- most fully articulated in Nuxoll -- that school officials may bar passive and silently expressed messages by students at school that target no specific student if: (1) the expression is reasonably interpreted to demean one of those characteristics of personal identity, given the common understanding that such characteristics are "unalterable or otherwise deeply rooted" and that demeaning them "strike[s] a person at the core of his being," Nuxoll, 523 F.3d at 671; cf. Saxe, 240 F.3d at 206 (noting the especially incendiary nature of "disparaging comment[s] directed at an individual's sex, race, or some other personal characteristic" (emphasis added)); and (2) the demeaning message is reasonably forecasted to "poison the educational atmosphere" due to its serious negative psychological impact on students with the demeaned characteristic and thereby lead to "symptoms of a sick school -- symptoms therefore of substantial disruption," Nuxoll, 523 F.3d at 674, 676.[7]

---

[7] Harper is no exception despite holding that the rights-of-others limitation permitted the restriction of such demeaning speech only if it was "directed at students' minority status." 445 F.3d at 1183. Harper left little doubt that Tinker permits the restriction of expression in such circumstances as described above, as it explained that expression demeaning a characteristic of a majority rather than minority group "is more likely to fall under the 'substantial disruption' prong of Tinker" and that its ruling left open "the possibility that some verbal assaults on core characteristics of majority high school students would merit application of [the rights-of-others limitation]." Id. at 1183 n.28.

Our review of these rulings persuades us that Tinker permits public-school authorities to regulate such expression when they can make the two showings described above.  We agree that those showings suffice to ensure that speech is being barred only for reasons Tinker permits and not merely because it is "offensive" in the way that a controversial opinion always may be.  See 393 U.S. at 509.

Importantly, although the standard for showing a material disruption is "demanding," Mahanoy, 594 U.S. at 193, a school need not be certain of its forecast.  "[T]aking the case law as a whole we don't think a school is required to prove that unless the speech at issue is forbidden serious consequences will in fact ensue.  That could rarely be proved. . . . It is enough for the school to present 'facts which might reasonably lead school officials to forecast substantial disruption.'"  Nuxoll, 523 F.3d at 673 (quoting Boucher v. Sch. Bd. of Sch. Dist. of Greenfield, 134 F.3d 821, 827-28 (7th Cir. 1998)) (collecting cases).  As the Sixth Circuit explained, "Tinker does not require school officials to wait until the horse has left the barn before closing the door."  Lowery v. Euvard, 497 F.3d 584, 591-92 (6th Cir. 2007).

There is also the question whether public schools may regulate student expression based on these two showings pursuant to only one of Tinker's two limitations and, if so, which one.  As we earlier explained, there is no clear answer in controlling

precedent to that question.  Our review of the rulings discussed above also reveals no obvious rationale for concluding that one limitation applies to the exclusion of the other.

Nonetheless, most federal courts in this line of authority have identified the material-disruption limitation as the better fit.  And while it may be that -- as Derby appears to have concluded -- the rights-of-others limitation applies, we see no reason to break with that consensus view.  The material-disruption limitation has served as a workable doctrinal means of accounting for the concerns that arise in this context and that Tinker requires us to assess.  It usefully permits the depth of the expression's disruptive impact on the learning environment to be evaluated in relation to myriad school contexts and the myriad forms that assertedly demeaning speech may take.

**D.**

All that said, L.M. does argue that Tinker bars schools from regulating student speech based on the its "subjective psychological intrusion[]" on listeners.  For that reason, he contends, we may not uphold Middleborough's actions here under Tinker based on a forecast of disruption that is rooted in the psychological effects on other students of expression that is passive, silent, and targets no specific students.  But his reasons do not convince us to reject the framework drawn from the long line of authority described above.

L.M. is right that we must be sensitive to Tinker's overarching concern about "punish[ing]" students for "silent, passive expressions of opinion, unaccompanied by any disorder or disturbance on the part of" the speakers themselves.  393 U.S. at 508.  Tinker stressed that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression" because the reality is that "[a]ny departure from absolute regimentation may cause trouble."  Id. Tinker observed that "[a]ny variation from the majority's opinion may inspire fear.  Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance."  Id.  But, because "our Constitution says that we must take this risk," the Court explained that, for a school "to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Id. at 508-09 (emphases added).

In short, L.M. is right that Tinker establishes that public schools cannot "confine[]" students "to the expression of those sentiments that are officially approved," as "school officials cannot suppress 'expressions of feelings with which they do not wish to contend.'"  Id. at 511 (quoting Burnside v. Byars, 363 F.2d 744, 749 (5th Cir. 1966)).  Thus, it does not permit a

"hurt feelings" exception that any opinion that could cause "offense" may trigger. Zamecnik, 636 F.3d at 877. Otherwise, school authorities could do what Tinker clearly forbids: protect other students "from the discomfort and unpleasantness that always accompany an unpopular viewpoint." 393 U.S. at 509 (emphasis added).

None of the decisions in the line of authority just reviewed, Harper included, however, purported to permit reliance on an "undifferentiated fear or apprehension of disturbance" or a desire to avoid the "trouble" that accompanies "[a]ny departure from absolute regimentation." Id. at 508 (emphases added). Each found that there was "something more" than the "mere desire to avoid . . . discomfort and unpleasantness" involved. Id. at 509 (emphasis added).

We recognize that L.M. contrasts regulable speech that causes a negative psychological impact on others, such as bullying or harassing speech, see Doe, 19 F.4th at 508-09; Chen ex rel. Chen v. Albany Unified Sch. Dist., 56 F.4th 708, 718 (9th Cir. 2022); C.R. v. Eugene Sch. Dist. 4J, 835 F.3d 1142, 1146-47, 1152 (9th Cir. 2016), with passive, silent expression that is not similarly targeted at specific students. L.M. does so on the ground that the former species of speech is "coercive" because it pervasively and repeatedly targets specific students, while the latter species results in what he contends is merely a "subjective

psychological intrusion[,]" such that, in his view, the speech may not be regulated under Tinker.

But L.M. himself acknowledged at oral argument that schools could bar silent, passive expression that described persons who identify as transgender in obviously highly demeaning terms but targeted no specific individual.[8]  And while L.M. concedes only that such expression would constitute "fighting words," see R.A.V., 505 U.S. at 383-84, 386, much as the plaintiff argued in Nuxoll about a similarly highly demeaning message ("homosexuals go to hell"), 523 F.3d at 670-71, we do not see how the fighting-words rubric is more illuminating than, and thus preferable to, the material-disruption rubric.

To that point, by invoking the "fighting words" doctrine, L.M. is embracing, necessarily, the notion that words that otherwise would not constitute "fighting words" may be so deemed in the public-school setting because of the heightened psychological sensitivities of school children.  After all, even such highly demeaning expression as L.M. thinks regulable would

---

[8] Specifically, L.M. conceded that a school could bar a shirt displaying the message "All Trans Kids Are Retarded."  We do not use that language lightly, but the example clarifies that all parties agree that there are messages so overtly and highly demeaning of a personal characteristic that, if displayed on a shirt, can be restricted by a school based solely on its words, even if no specific students are targeted.  From this example it would appear the parties also would agree that known religious, racial, and sex- and sexual-orientation-related slurs also fall within this category of overtly and highly demeaning speech.

not constitute "fighting words" outside a school.  See Chaplinsky
v. New Hampshire, 315 U.S. 568, 572 (1942) ("[Fighting words are]
words . . . which by their very utterance . . . tend to incite an
immediate breach of the peace."); United States v. Bartow, 997
F.3d 203, 207-09 (4th Cir. 2021) (recognizing that speaking "even
the most egregious racial slur," without more, "is not a fighting
word per se" and that "fighting words" are limited to "direct
personal insults" that are "directed to the person of the hearer"
(internal citations omitted)).  Yet, we find it strange that school
authorities could respond to demeaning speech when its
"psychological effects," Nuxoll, 523 F.3d at 674, are strong enough
to provoke "violent resentment" by other students, cf. Gooding v.
Wilson, 405 U.S. 518, 528 (1972) (describing fighting words as
language that "when used to or of another person, and in his
presence, naturally tend to provoke violent resentment"), but not
when those effects are strong enough to "crush a child's sense of
self-worth," Muller, 98 F.3d at 1540, and so impede that child's
ability to learn, see Trachtman v. Anker, 563 F.2d 512, 520 (2d
Cir. 1977) (Gurfein, J., concurring) (observing in applying Tinker
in a high-school setting that "a blow to the psyche may do more
permanent damage than a blow to the chin"), or otherwise "poison
the educational atmosphere," Nuxoll, 523 F.3d at 676, and so lead
to "symptoms of a sick school," id. at 674.

Relatedly, L.M. does not suggest that Derby (on which the District Court here relied) was wrong to uphold the restriction on the passive, silent display of the confederate flag. He argues only that the confederate flag is distinguishable from his speech because, on his account, his "messages about gender . . . aren't remotely comparable to the Confederate flag, which flew over a breakaway polity dedicated to the slavery of African Americans." Thus, in this way, too, L.M.'s real challenge appears to turn on a question of degree and not kind about the nature of the message -- a question to which we will turn our attention shortly. Cf. Morse v. Frederick, 551 U.S. 393, 409-10 (2007) ("Stripped of rhetorical flourishes, then, the debate [with the dissent] . . . is less about constitutional first principles than about whether [the student's] banner constitutes promotion of illegal drug use. . . . [A] contrary view on that relatively narrow question hardly justifies sounding the First Amendment bugle.").

We should add that, consistent with the line of authority that we find persuasive, the Supreme Court post-Tinker has itself credited school authorities' concerns about the serious negative psychological impact of student expression on other students. It did so in holding that a student could be disciplined for a lewd speech at a school assembly in part because the speech "was acutely insulting to teenage girl students" and "could well be seriously

damaging to its less mature audience." Bethel Sch. Dist. No. 403
v. Fraser, 478 U.S. 675, 683-85 (1986) (emphasis added).

To be sure, L.M. does point to three circuit rulings
that he contends support his position: Saxe, 240 F.3d 200 (3d Cir.
2001); Sypniewski, 307 F.3d 243 (3d Cir. 2002); and Zamecnik, 636
F.3d 874 (7th Cir. 2011). But none undermines the Tinker framework
that we distill from the large body of federal court rulings in
this area, and indeed, all three are in that line.

L.M. is right that Saxe held that a school district's
anti-harassment policy was overbroad under Tinker. But Saxe did
not set forth a categorical rule protecting such derogatory
expression when passively and silently expressed. It instead drew
a distinction between "speech about some enumerated personal
characteristic[]" that is "merely offensive to some listener" and
speech of that kind where there is some "threshold showing of
severity" in the educational environment caused by the speech.
Id. at 216-17 (emphasis added). Thus, Saxe concluded that, while
the school district had a "compelling interest in promoting an
educational environment that is safe and conducive to learning,"
the school district could not prohibit "derogatory" speech about
"such contentious issues as 'racial customs,' 'religious
tradition' . . . [or] 'sexual orientation'" without a
"particularized reason as to why it anticipates substantial
disruption." Id. at 217.

Sypniewski, which followed Saxe, is no different.  As we have seen, it, too, deemed a school policy restricting speech -- there, one barring racial harassment -- overbroad in barring "written material . . . [that] creates ill will."  307 F.3d at 264-65.  But it also upheld the portion of the policy prohibiting materials that "create[] . . . hatred" because that term "implie[d] such strong feelings that a serious possibility of disruption might be inferred."  Id. at 265 (emphasis added); but see Derby, 206 F.3d at 1367-68 (upholding policy that, as construed by the school district, prohibited written material "that is racially divisive or creates ill will or hatred").  And Sypniewski held that the school administrators there were without authority to bar the t-shirt bearing the word "redneck" because the evidence did not support the conclusion that students at the school would react to that word similar to how they reacted to terms like "hick" or displays of the confederate flag.  See 307 F.3d at 255-57.

Finally, Zamecnik did affirm the injunction against the high school barring the "Be Happy, Not Gay" message because the evidence for forecasting a material disruption was speculative, unpersuasive given the heckler's veto doctrine, and unreliable in explaining why the phrase in question was "particularly insidious."  636 F.3d at 877-81.  But Zamecnik reasoned that "Be Happy, Not Gay" was "only tepidly negative" and would not "have even a slight tendency to . . . poison the educational atmosphere."

Id. at 877-78.  Thus, the court did not suggest that the outcome
would be the same for a more overtly demeaning message and, if
anything, indicated the opposite.  See id. at 876-78.

**E.**

In following the lead of other courts that have grappled
with similar cases, we emphasize that in many realms of public
life one must bear the risk of being subjected to messages that
are demeaning of race, sex, religion, or sexual orientation, even
when those messages are highly disparaging of those
characteristics.  But, like these other courts, we do not
understand Tinker, in holding that schools must allow for robust
discussion and debate over even the most contentious and
controversial topics, to have held that our public schools must be
a similarly unregulated place.

The Supreme Court has recognized, post-Tinker, that
"[it] does not follow . . . that simply because the use of an
offensive form of expression may not be prohibited to adults making
what the speaker considers a political point, the same latitude
must be permitted to children in a public school."  Fraser, 478
U.S. at 682; see Thomas v. Bd. of Educ., Granville Cent. Sch.
Dist., 607 F.2d 1043, 1057 (2d Cir. 1979) (Newman, J., concurring
in the judgment) ("[T]he First Amendment gives a high school
student the classroom right to wear Tinker's armband, but not
Cohen's jacket.").  Indeed, the Court has observed that "[even in]

our Nation's legislative halls, where some of the most vigorous political debates in our society are carried on, there are rules prohibiting the use of expressions offensive to other participants in the debate" and that "the role and purpose of the American public school system is to inculcate the habits and manners of civility as values in themselves indispensable to the practice of self-government." Fraser, 478 U.S. at 681 (cleaned up).

Across the decades, the federal courts in the line of authority we find persuasive have recognized that the "special characteristics of the school environment," Tinker, 393 U.S. at 506, warrant affording school officials the ability to respond to the way speech demeaning other students' "unalterable or otherwise deeply rooted personal characteristics" can "poison the school atmosphere," Nuxoll, 523 F.3d at 671-72. That flexibility to "teach . . . [and] demonstrate the appropriate form of civil discourse and political expression," Fraser, 478 U.S. at 683, however, has not been understood by these same courts to entitle school authorities to regulate debate on any topic just because it may be highly upsetting to some students. As Judge Brown has explained, "[p]art of a public school's mission must be to teach students of differing races, creeds and colors to engage each other in civil terms rather than in 'terms of debate highly offensive or highly threatening to others.'" West v. Derby Unified Sch. Dist. No. 260, 23 F. Supp. 2d 1223, 1233-34 (D. Kan. 1998) (emphasis

added) (quoting <u>Fraser</u>, 478 U.S. at 683), <u>aff'd by</u> <u>Derby</u>, 206 F.3d 1358; <u>see also</u> <u>Harper</u>, 445 F.3d at 1182 (distinguishing demeaning comments about political topics, like the war in Iraq, with such comments "relating to a core characteristic of particularly vulnerable students" based on the degree of "damag[e] to the individual or the educational process").  And so, with our framework for applying <u>Tinker</u> to this sensitive context in place, we now turn to L.M.'s specific challenges to the rulings below.

**IV.**

We begin with L.M.'s challenges to the rulings rejecting his as-applied claims, which turn on what this record shows about the reasonableness of both Middleborough's (1) interpretation of the messages at issue in each claim as being demeaning of the kind of characteristic of personal identity described above and (2) forecast that each of those messages, due to its negative psychological impact on students with the demeaned characteristic, would "poison the educational atmosphere" and thereby materially disrupt the learning environment, <u>Nuxoll</u>, 523 F.3d at 676.  Because we conclude that the record reveals that Middleborough has made each showing, we conclude its actions must be upheld under <u>Tinker</u>'s

material-disruption limitation even if not also, based on those same showings, under <u>Tinker</u>'s rights-of-others limitation.

**A.**

As to the as-applied claim that concerns Middleborough's actions on March 21, L.M. asserts that the Shirt was "on all fours" with <u>Tinker</u>'s armbands or, at least, was like the "Be Happy, Not Gay" t-shirt <u>Nuxoll</u> found "tepidly negative" on its face and having not "even a slight tendency to . . . poison the educational atmosphere." 523 F.3d at 676. L.M. separately contends that, in any event, the record evidence is too sparse to support Middleborough's forecast of the expression's disruptive impact on student learning due to the "vague" nature of the supporting affidavits from school administrators. We are not convinced on either score.

**1.**

Insofar as the Shirt does demean the gender identities of students who are transgender or gender nonconforming, we agree with Middleborough it is no less likely to "strike a person at the core of his being" than it would if it demeaned the religion, race, sex, or sexual orientation of other students. <u>Nuxoll</u>, 523 F.3d at 671; <u>see</u> <u>Bostock</u> v. <u>Clayton Cnty., Ga.</u>, 590 U.S. 644 (2020); Mass. G.L. ch. 71, § 37O; Mass. G.L. ch. 76, § 5. Notably, on this specific point, L.M. contends only that the message -- though concerning gender identity -- is not demeaning of anyone's gender

identity.  So, the threshold question is whether the message is demeaning of gender identity at all.

We see little sense in federal courts taking charge of defining the precise words that do or do not convey a message demeaning of such personal characteristics, so long as the words in question reasonably may be understood to do so by school administrators.  See Morse, 551 U.S. at 401 ("The message on [the student's] banner is cryptic. . . . But [the principal] thought the banner would be interpreted by those viewing it as promoting illegal drug use, and that interpretation is plainly a reasonable one."); Norris, 969 F.3d at 29 (explaining that the Supreme Court "has repeatedly emphasized the necessary discretion school officials must exercise and the attendant deference owed to many of their decisions"); see also Scott, 324 F.3d at 1249; Nuxoll, 523 F.3d at 671.  Indeed, there are good reasons for federal courts to be wary of making such an assessment for those whose job it is to deliver public education.  Cf. Nuxoll, 523 F.3d at 675 ("[W]e are concerned that if the rule is invalidated the school will be placed on a razor's edge, where if it bans offensive comments it is sued for violating free speech and if it fails to protect students . . . it is sued for violating laws against harassment.").

In some cases, the assessment may be easy -- the words involved may not address such a characteristic at all, do so in terms not plausibly thought negative, or, alternatively, be the

kind of denigrating speech that even L.M. acknowledges schools may
restrict.  But there is a spectrum of negativity, see Nuxoll, 523
F.3d at 676 (holding that "'demeaning' [was] too strong a
characterization" of the message, which on its face was "only
tepidly negative"); but see id. at 678-79 (Rovner, J., concurring
in the judgment), and because we must decide questions of degree
and not just kind, deference here cannot amount to rote acceptance,
see Norris, 969 F.3d at 30.

L.M. does assert that the Shirt's message is "purely
ideological" and "summarized [his] beliefs at a high level of
generality without criticizing opposing views."  Thus, L.M.
contends, the Shirt's message is not "hateful or bigoted" and
neither targets anyone nor "criticiz[es] opposing views," as it
"doesn't deny any person's existence of inherent value."  L.M.
does not dispute, however, that the message expresses the view
that students with different "beliefs about the nature of [their]
existence" are wrong.

Consistent with that acknowledgement, the District Court
determined the message is reasonably understood to be an assertion,
however sincerely believed, that individuals who do not identify
as either male or female have no gender with which they may
identify, as male and female are their only options.  As the
District Court put it, the message "may communicate that only two

gender identities -- male and female -- are valid, and any others are invalid or nonexistent."

We agree with the District Court and so cannot say the message, on its face, shows Middleborough acted unreasonably in concluding that the Shirt would be understood -- in this middle-school setting in which the children range from ten-to-fourteen years old -- to demean the identity of transgender and gender-nonconforming NMS students.  Cf. Nuxoll, 523 F.3d at 671 ("[F]or most people these are major components of their personal identity -- none more so than a sexual orientation that deviates from the norm.  Such comments can strike a person at the core of his being."); Trachtman, 563 F.2d at 518 ("The defendants have consistently treated the topic of sexuality as an important part of students' lives, which requires special treatment because of its sensitive nature.").  We also note that Middleborough interpreted the message in applying a dress code and thus in the context of assessing a particular means of expression that is neither fleeting nor admits of nuance.  As a result, Middleborough's assessment of the message's demeaning character does not necessarily reflect a categorical judgment that, whenever uttered, the message has such a character.  So understood, we see no basis for substituting our judgment for Middleborough's as to whether the Shirt demeaned the gender identities of other students at NMS.

**2.**

We turn, then, to the reasonableness of Middleborough's forecast that, by demeaning those identities, the Shirt would be materially disruptive to the learning environment because of its negative psychological impact on transgender and gender nonconforming students at NMS.  In that regard, Middleborough argues that, based off its specific knowledge of the students at NMS, it "reasonably forecast[ed]" that the Shirt's message "alone" would "materially disrupt transgender and gender non-conforming students' ability to focus on learning while in a classroom where the message is being displayed."  Middleborough further contends that, given its knowledge of "past incidents in which [students in the LGBTQ+ community] expressed concern about not being sufficiently protected," it reasonably concluded that "if [L.M. was] permitted to wear the same shirt, others would follow suit . . . . [and] that disruption would . . . have ensued with a standoff between a group of students wearing the message [of the Shirt] . . . and those students who are members of the LGBTQ+ community and their allies."

L.M. responds that Middleborough's concerns on this score are supported only by "vague affidavits referencing [those] concerns without addressing their cause."  He thus contends that the evidence does not demonstrate a "link between students' troubles and passive t-shirt messages," as nothing in the record

- 55 -

shows that a message like this one had been used in any prior bullying or caused any of the struggles by transgender and gender nonconforming NMS students of which school officials were keenly aware.

School officials, however, must have some margin to make high-stakes assessments in conditions of inevitable uncertainty. See Mahanoy, 594 U.S. at 201 (Alito, J., concurring) ("[T]he school has a duty to protect students while in school because their parents are unable to do that during those hours."); id. at 189 (Maj. Op.); Zamecnik, 636 F.3d at 880 ("A school . . . [has] the responsibility of protecting . . . its students from being seriously distracted from their studies by offensive speech during school hours."). In consequence of what the record here shows about what Middleborough reasonably understood the message to convey and what it knew about the NMS student population, we do not understand Tinker, our own precedents, or any other circuits' decisions to support our second-guessing Middleborough's assessment that there was the requisite basis for the forecast of material disruption here.

First, there is the demeaning nature of the message. To be sure, there is a spectrum of messages that are demeaning of characteristics such as race, sex, religion, sexual orientation, and so gender identity as well. It is hard to see how it would be unreasonable to forecast the disruptive impact of messages at the

most demeaning end of that spectrum, given their tendency to poison the educational atmosphere.  See Nuxoll, 523 F.3d at 674 ("Imagine the psychological effects if the plaintiff wore a T-shirt on which was written 'blacks have lower IQs than whites' or 'a woman's place is in the home.'"); Saxe, 240 F.3d at 206, 217 (reasoning that "disparaging comment[s]" about other students' personal characteristics may "create an 'hostile environment'" and thus be restricted if there is a "threshold showing of severity or pervasiveness").

But, while oral argument indicated the Shirt's message is not at the farthest end of demeaning, see n.8 supra, neither is it, on its face, only "tepidly negative."  L.M. himself agrees that the message directly denies the self-conceptions of certain middle-school students, and those denied self-conceptions are no less deeply rooted than those based on religion, race, sex, or sexual orientation.  This is also a middle-school setting, with some kids as young as ten.  See, e.g., Walker-Serrano ex rel. Walker v. Leonard, 325 F.3d 412, 416–17 (3d Cir. 2003) (recognizing that the age of students is a relevant consideration in administrators' decisions to regulate student speech); Sonnabend, 37 F.4th at 426 (same); K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 108 (3d Cir. 2013) (same).  In addition, Middleborough was enforcing a dress code, so it was making a forecast regarding the disruptive impact of a particular means of

expression and not of, say, a stray remark on a playground, a point made during discussion or debate, or a classroom inquiry. The forecast concerned the predicted impact of a message that would confront any student proximate to it throughout the school day. See Tinker, 393 U.S. at 515 (Stewart, J., concurring) (stating that "in some precisely delineated areas, a child -- like someone in a captive audience -- is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." (emphasis added) (quoting Ginsberg v. New York, 390 U.S. 629, 649-50 (1968) (Stewart, J., concurring in the judgment))); Morse, 551 U.S. at 404 ("[S]chool boards have the authority to determine 'what manner of speech in the classroom or in school assembly is inappropriate.'" (emphasis added) (first quoting Fraser, 478 U.S. at 683, then citing Fraser, 478 U.S. at 689 (Brennan, J., concurring in the judgment))).

Second, in making its assessment of how disruptive the Shirt would be on the educational atmosphere, Middleborough was not acting on abstract concerns about the potential impact of speech demeaning the gender identities of some students at NMS. Middleborough was not aware of any prior incidents or problems caused by this specific message. But it knew the serious nature of the struggles, including suicidal ideation, that some of those students had experienced related to their treatment based on their gender identities by other students, and the effect those struggles

could have on those students' ability to learn. Indeed, Tucker had previously worked on recommending out-of-district placements for such students prior to her coming to NMS. In such circumstances, we think it was reasonable for Middleborough to forecast that a message displayed throughout the school day denying the existence of the gender identities of transgender and gender non-conforming students would have a serious negative impact on those students' ability to concentrate on their classroom work. See Zamecnik, 636 F.3d at 880 ("[Schools have] the responsibility of protecting [students] from being seriously distracted from their studies by offensive speech during school hours."); Sapp, 2011 WL 5084647, at *5.

Finally, precisely because the message was reasonably understood to be so demeaning of some other students' gender identities, there was the potential for the back-and-forth of negative comments and slogans between factions of students that Nuxoll could "foresee [leading to] a deterioration in the school's ability to educate its students." 523 F.3d at 672. And that potentiality, too, was not rooted solely in abstract concerns. In addition to Tucker having been told by Carroll that L.M.'s teacher "was concerned" that "members of the LGBTQ+ population at NMS as current students . . . would be impacted by the t-shirt['s] message and potentially disrupt classes," administrators were aware from student survey data that a number of students had "specific

concerns about how the LGBTQ+ population [was] treated" at NMS. Given its specific knowledge of those facts and the "vulnerability of gender non-conforming and transgender youth . . . attending NMS," Middleborough had legitimate reason to be worried about "uninhibited . . . hallway debate over [gender identity] -- whether carried out in the form of dueling T-shirts, dueling banners, dueling pamphlets, annotated Bibles, or soapbox oratory" that would "lead to . . . symptoms of a sick school." Nuxoll, 523 F.3d at 671, 674.

Against this backdrop, we see no reason to substitute our judgment for Middleborough's with respect to its application of its Dress Code here. We conclude the record supports as reasonable an assessment that the message in this school context would so negatively affect the psychology of young students with the demeaned gender identities that it would "poison the educational atmosphere" and so result in declines in those students' academic performance and increases in their absences from school -- in other words, what Nuxoll described as "symptoms of a sick school . . . [and] therefore of substantial disruption." Id. at 674, 676.

We recognize that L.M. claims Middleborough was motivated by "a few subjective complaints" and "simply dislikes" his views. But we have explained why we do not accept that characterization of the predicate on which Middleborough acted,

and nothing indicates Middleborough permitted comparably demeaning speech, cf. Tinker, 393 U.S. at 510 (emphasizing that the school "did not purport to prohibit the wearing of all symbols of political or controversial significance," including the Iron Cross), barred L.M.'s oral expression of disagreement with pro-LGBTQ+ views in school, or prohibited the mere utterance of the particular message in question, cf. id. at 513 (reasoning that, if a rule were adopted "forbidding discussion of the Vietnam conflict, or expression by any student of opposition to it anywhere on school property except as part of a prescribed classroom exercise," that rule would be unconstitutional absent a showing of material disruption); see also Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd., 246 F.3d 536, 541-42, 544 (6th Cir. 2001) (reversing grant of summary judgment where evidence suggested viewpoint discrimination because "only certain racial viewpoints [were banned] without any showing of disruption"); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1281 (11th Cir. 2004) (reversing a grant of summary judgment after concluding that there was a dispute of material fact as to whether the student was "punished for the substance of his unpatriotic views rather than an alleged disruption of class").[9]

---

[9] We see no reason to take up L.M.'s invitation to be, as far as we can tell, the first court to import recent decisions that clearly did not contemplate the special characteristics of the

L.M. contends that he wore the Shirt to respond to Middleborough's asserted views on gender. But Tinker does not require a school to tolerate t-shirts that denigrate a race or ethnicity, for instance, just because the school celebrates Black History Month, Asian and Pacific American Heritage Month, and Hispanic Heritage Month. See Harper, 445 F.3d at 1185-86. For this reason, too, we reject L.M.'s contention that Middleborough was not entitled to act as it did in barring the Shirt pursuant to Tinker's material-disruption limitation, even if not also pursuant to the rights-of-others limitation based on the same two showings.

**B.**

Turning to the as-applied claim concerning the incident involving the Taped Shirt on May 5, our analysis is largely the same. L.M. contends he wore that shirt to protest Middleborough's March 21 actions. But "[w]e conduct the Tinker inquiry objectively" and focus on "the reasonableness of the school administration's response, not on the intent of the student." Norris, 969 F.3d at 25 (quoting Cuff ex rel. B.C. v. Valley Cent. Sch. Dist., 677 F.3d 109, 113 (2d Cir. 2012)).

The Taped Shirt did cover "Only Two" with the word "CENSORED," which raises a question as to whether it conveyed a less negative message than the Shirt. But the Taped Shirt was the

---

public-school setting into that setting. See Matal v. Tam, 582 U.S. 218 (2017); Iancu v. Brunetti, 139 S. Ct. 2294 (2019).

same shirt and thus, aside from the taping, looked the same. And
while L.M. left his first-period class with Tucker and did not
return to classes on March 21, L.M. spoke at the School Committee
meeting about the precise contents of the Shirt on April 13, had
significant local and national press coverage between March 21 and
May 5, and had photos of himself wearing the Shirt go viral online
in that period. Middleborough thus reasonably concluded that,
given the attention L.M.'s wearing of the Shirt on March 21
garnered, other students would know the words written on the Taped
Shirt, even if two words were covered up. See Hardwick ex rel.
Hardwick v. Heyward, 711 F.3d 426, 430-433 (4th Cir. 2013)
(upholding bar on a student wearing certain shirts protesting her
school's prohibition on displays of the confederate flag because
administrators "reasonably predicted that the protest shirt was
likely to cause a substantial disruption" because it "explicitly
broadcast" the same racially inflammatory messages as the
Confederate flag and thus "could just as easily" cause the same
disruptions).

**V.**

We turn, then, to L.M.'s challenges to the District
Court's rulings granting judgment as a matter of law to
Middleborough on his claims facially attacking the Dress Code.
Those claims concern the Dress Code's (1) prohibition on clothing
that "state[s], impl[ies], or depict[s] hate speech or imagery

that target[s] groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation, or any other classification" and (2) rule that clothing "[school] administration determines to be unacceptable to our community standards will not be allowed [at NMS]." We see no merit to this set of challenges either.

### A.

As to L.M.'s community-standards-provision claim, our jurisdiction is limited to "Cases" and "Controversies." U.S. Const. art. III § 2 cl. 1; see Doyle v. Huntress, Inc., 419 F.3d 3, 6 (1st Cir. 2005) (explaining our "obligation to inquire sua sponte into our jurisdiction over the matter" in every case"). L.M. thus must show he has standing to bring this claim. See Wilkins v. Genzyme Corp., 93 F.4th 33, 40 (1st Cir. 2024). He cannot.

In the email exchange with L.M.'s father, Lyons explained that L.M. had been asked to remove the Shirt because "[t]he content of [his] shirt targeted students of a protected class; namely in the area of gender identity" before pasting the entirety of the Dress Code. That statement most naturally refers to the hate-speech provision, and L.M. makes no argument otherwise. L.M.'s counsel's letter to Middleborough also identified the hate-speech provision as the sole relevant and unconstitutional provision, and no other evidence indicates that the community-

standards provision was even a partial basis for Middleborough's actions on either March 21 or May 5.

Because L.M. "advances no affirmative argument that [the community-standards provision] is not severable from different parts of the [Dress Code]" he asserts are invalid and were applied to him, L.M. has no standing to challenge the community-standards provision based on past prohibitions. See Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 100 (1st Cir. 2020). There is also no non-speculative basis for concluding that future prohibitions would be fairly traceable to the community-standards provision. See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 413 (2013).

**B.**

As to the hate-speech-provision claim, L.M. advances various reasons it is facially unconstitutional. But we do not find those reasons persuasive.[10]

**1.**

L.M. contends that the provision is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause, because the provision affords Middleborough unbridled discretion to enforce it in a discriminatory and viewpoint-discriminatory manner

---

[10] Middleborough's cursory contention that L.M. does not have standing to challenge the hate-speech provision because his speech was unprotected conflates the question of whether speech is protected with whether that protected speech may nonetheless be constitutionally regulated under Tinker.

in that "hate speech" has "no standard definition and is largely in the eye of the beholder" and the "any other classification" language is "completely vacuous." School disciplinary rules, however, "need not be as detailed as a criminal code" because "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures" and schools have a legitimate "need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct." Fraser, 478 U.S. at 686; see Sypniewski, 307 F.3d at 266 (explaining that "courts have been less demanding of specificity" when confronted with vagueness challenges to student dress and disciplinary codes); J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 935-36 (3d Cir. 2011) (en banc). The Dress Code also permits a student to be disciplined only for "[r]epeated violations," thereby ensuring notice will be given in advance of such action. See A.M. ex rel. McAllum v. Cash, 585 F.3d 214, 225 (5th Cir. 2009); Hardwick, 711 F.3d at 442. Thus, this challenge claim fails as to his Due Process-based claims for monetary, declaratory, and injunctive relief.

### 2.

L.M.'s claim that the provision is overbroad under the First Amendment relies in part on its use of the term "hate speech," which he contends has "no standard definition," and in part on its bar against clothing that "state[s]," "depict[s]," or

"impl[ies]" such speech. He also argues that the bar on messages that "target groups" based on "any other classification" permits Middleborough to invent any "group" it wants and sweep in any speech that refers to anyone, especially if "target[ing]" turns on "the reaction of listeners." In pressing these points, L.M. emphasizes that the hate-speech provision does not refer to substantial disruption or interference with other students' rights and therefore "most . . . applications [of the provision] are to protected, not unprotected, speech."

The Supreme Court has emphasized post-<u>Tinker</u>, however, that public schools require flexibility in the drafting and administration of disciplinary codes. <u>See</u> <u>Fraser</u>, 478 U.S. at 686. And because there is "a much broader 'plainly legitimate' area of speech [that] can be regulated at school than outside school," <u>Sypniewski</u>, 307 F.3d at 259, "the overbreadth doctrine warrants a more hesitant application in [the public-school] setting than in other contexts," <u>Hardwick</u>, 711 F.3d at 441 (alteration in original) (quoting <u>Newsom ex rel. Newsom</u> v. <u>Albemarle Cnty. Sch. Bd.</u>, 354 F.3d 249, 258 (4th Cir. 2003)).

It is significant, therefore, that the hate-speech provision applies only to apparel and then only when worn "<u>to</u> <u>school</u>" (emphasis added). <u>Cf.</u> <u>Saxe</u>, 240 F.3d at 216 n.11 (expressing concern that anti-harassment policy could be "read to cover conduct occurring outside of school premises"). The word

"hate" in "hate speech" also indicates that the provision refers only to speech that provokes "such strong feelings that a serious possibility of disruption might be inferred." Sypniewski, 307 F.3d at 265. Thus, we do not understand the provision to bar "any unwelcome [message] which offends an individual because of some enumerated personal characteristics." Saxe, 240 F.3d at 215 (cleaned up). As a result, the provision's failure to mention "material disruption" or "invasion of the rights of others" is not fatal. Cf. id. at 217 (finding "hostile environment" portion of anti-harassment policy overbroad because it "[did] not, on its face, require any threshold showing of severity or pervasiveness"); Sypniewski, 307 F.3d at 265.

In contending that the provision could "sweep[] in speech that only a diversity, equity, and inclusion expert would find 'hateful,' and even depictions of famous art," L.M. points in part to the provision's use of the words "impl[ies]" and "depict[s]." But the prohibited messages still must constitute "hate speech," as the words L.M. highlights here merely describe means (including subtle ones) of expressing the prohibited "hate speech."[11] Nor does the residual clause support L.M.'s concern

---

[11] L.M. argues that the provision unconstitutionally discriminates in viewpoint between "negative" and "positive" messages, but we do not read Tinker or any other Supreme Court or federal court student-speech decision to require "positive messages" be prohibited if a "negative" message is regulable

that the provision could sweep in any classification one could imagine. The word "other" ensures that it encompasses only classifications akin to those listed, all of which pertain to classes of persons commonly protected in anti-discrimination measures. See, e.g., Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-15 (2001) (explaining the ejusdem generis canon); cf. Fraser, 478 U.S. at 681 (explaining that the "role and purpose" of public schools is to "inculcate the habits and manners of civility as values" (citation omitted)).

Finally, the word "target" causes no concern, as we see no reason to construe it (as L.M. contends we must) to have a meaning dependent entirely on the subjective understanding of any student rather than the objectively reasonable understanding of school administrators. Nor does L.M. argue that the word "target" renders the provision overbroad once it is construed in that narrower way.[12]

---

because it materially disrupts or invades others' rights. Cf. Sypniewski, 307 F.3d at 264 ("[S]chools are generally permitted to step in and protect students from abuse.").

[12] L.M. also contends that the provision is an impermissible prior restraint because it "forbids certain messages before they occur." But, as he offers no support for equating the provision with restrictions that have been deemed prior restraints, see Alexander v. United States, 509 U.S. 544, 553 n.2 (1993), the contention is waived for lack of development, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

**VI.**

We close by emphasizing a point that may be obvious but should not be overlooked.  The question here is not whether the t-shirts should have been barred.  The question is who should decide whether to bar them -- educators or federal judges.  Based on <u>Tinker</u>, the cases applying it, and the specific record here, we cannot say that in this instance the Constitution assigns the sensitive (and potentially consequential) judgment about what would make "an environment conducive to learning" at NMS to us rather than to the educators closest to the scene.

The judgment of the District Court is **<u>affirmed</u>**.